**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| GIUSEPPE BETTIOL and BARRY KING, derivatively on behalf of ENERGY TRANSFER LP, | |
| Plaintiffs, | Case No.: 3:19-cv-02890-X |
| vs. | |
| LE GP, LLC, KELCY L. WARREN, THOMAS E. LONG, JOHN W. MCREYNOLDS, MARSHALL S. MCCREA, III, MATTHEW S. RAMSEY, STEVEN R. ANDERSON, RICHARD D. BRANNON, RAY C. DAVIS, MICHAEL K. GRIMM, K. RICK TURNER, RAY W. WASHBURNE, and WILLIAM P. WILLIAMS, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ENERGY TRANSFER LP, | |
| Nominal Defendant. | |

## VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiffs Giuseppe Bettiol ("Plaintiff Bettiol") and Barry King ("Plaintiff King," and together with Plaintiff Bettiol, "Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Energy Transfer LP ("Energy Transfer" or the "Company"), file this Verified Consolidated Amended Unitholder Derivative Complaint against Defendants Kelcy L. Warren, Thomas E. Long, John W. McReynolds, Marshall S. McCrea, III, Matthew S. Ramsey, Steven R. Anderson, Richard D. Brannon, Ray C. Davis, Michael K. Grimm, K. Rick Turner, Ray W.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 1

Washburne, and William P. Williams (collectively, the "Individual Defendants") and Defendant LE GP, LLC ("LE GP" or the "General Partner," and together with the Individual Defendants, the "Defendants") for Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for their complaint against the Defendants, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Energy Transfer, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a unitholder (*i.e.*, shareholder) derivative action that seeks to remedy wrongdoing committed by LE GP and its officers and directors that caused damage to Energy Transfer from February 25, 2017 through the present (the "Relevant Period").[1]

2.      Energy Transfer is a natural gas and oil services company based in Dallas, Texas. The Company's business activities, which are conducted throughout the U.S., involve maintaining and operating multiple natural gas and natural gas liquids ("NGL") pipelines and

---

[1] Because Energy Transfer is a limited partnership, shares of the Company's equity, which are publicly traded, are referred to as "units."  Accordingly, holders of these units are referred to as unitholders, rather than shareholders.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 2

storage facilities, including the Dakota Access Pipeline, the Rover Pipeline, and the Mariner East pipelines.

3.      Energy Transfer is organized as a Delaware limited partnership, and the Company itself functions as an operating subsidiary of Defendant LE GP, the Company's general partner, which manages, directs, and controls all of Energy Transfer's activities. According to the Company's SEC filings, Energy Transfer does not have officers or directors—instead, it is managed by the Board of Directors (the "Board") and executive officers of the General Partner. Consequently, "the executive officers of [the General Partner] are [Energy Transfer's] executive officers." *See* Energy Transfer's annual report on Form 10-K filed with the SEC on February 22, 2019 (the "2018 10-K"). The General Partner's "directors and officers have fiduciary duties to manage [Energy Transfer's] business in a manner beneficial to [Energy Transfer] and [its] Unitholders."

4.      The Company's operations consist of inter/intrastate natural gas transportation and storage, NGL transportation, storage, and fractionation services, crude and refined oil transportation, and terminalling, acquisition, and marketing activities. Energy Transfer conducts these operations through its subsidiaries, which include Energy Transfer Operating, L.P. ("ETO"), as well as Sunoco Logistics Partners L.P. and Sunoco, Inc. (collectively, "Sunoco").

5.      In connection with its operations, the Company owns approximately 12,500 miles of intrastate and interstate natural gas transportation pipelines, which are among the largest natural gas transportation systems in the U.S. Energy Transfer also owns and operates three natural gas storage facilities located in Texas.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 3

6.      One of the Company's major pipeline systems is the Mariner East Pipeline, a nearly $3 billion NGL pipeline project extending across Pennsylvania and through parts of West Virginia and Ohio.  The first phase of the Mariner East Pipeline, Mariner East 1 ("ME1"), began operating in 2014. Soon after, construction began on Mariner East 2 ("ME2"), which eventually became operational in December 2018. To date, the construction of the Mariner East Pipeline has not gone smoothly, and has been marred by numerous temporary shutdowns, fines, and protests.

7.      However, the true, vast extent of the problems underlying the Mariner East Pipeline and the Company's associated pipeline projects was far greater than Defendants admitted to the public. As would gradually come to light over the course of the Relevant Period, Defendants had engaged in a number of fraudulent schemes—in violation of laws and regulations, and in disregard for human life—in order to hasten the completion of the Company's pipelines at all costs.

8.      The first of these schemes began after Sunoco submitted its initial permit applications for ME2 to the Pennsylvania Department of Environmental Protection ("PDEP"). Sunoco's materials contained so many facial errors and technical deficiencies that PDEP was required by law to reject the applications.  Over two years after the initial submission, John Quigley ("Quigley"), the former Secretary of PDEP, stated that Sunoco's materials were still far from acceptable.

9.      During this period of time, the Defendants, acting independently or in concert with the administration of Pennsylvania Governor Tom Wolf ("Governor Wolf"), secretly made use of coercion, bribery, and/or other illicit means of forcing PDEP to approve the permits that were vital to continuing the construction of the Mariner East Pipeline (collectively, the

"Permitting Misconduct"). Ultimately, Quigley was ousted from PDEP, and Governor Wolf's administration caused PDEP to push the ME2 permits through in early 2017, albeit with extensive special conditions to mitigate the still-problematic materials submitted by Sunoco.

10.     Subsequently, the Defendants conspired to illicitly hire Pennsylvania Constables ("Constables") to provide security for the ME2 construction, usurping the Pennsylvania Commonwealth's prerogative to keep peace, and misusing the Constables' authority to intimidate and harass citizens. Defendants caused the Company to pay these Constables through a convoluted series of shell companies and then failed to report these payments for wage tax purposes, and the Constables failed to report the same payments for their income taxes (collectively, the "Constable Misconduct").

11.     Ultimately, the Company's ME2 and Mariner East 2X ("ME2X") pipelines (together and with ME1, the "Mariner East System") and the expanded Revolution Pipeline ("Revolution," and together with the Mariner East System, the "Pipeline Projects") became, through Defendants' rush to construct them quickly at the expense of public safety and the environment, some of the most dangerous pipelines in Pennsylvania and in the United States. Defendants further caused public officials in the governor's administration, career officials at regulatory agencies, and law enforcement officials to similarly disregard public safety, the environment, and applicable laws and regulations (collectively, the "Construction Misconduct," and together with the Permitting Misconduct and the Constable Misconduct, the "Pipeline Misconduct").

12.     Throughout the Relevant Period, Defendants concealed the Pipeline Misconduct and the serious risks caused by the misconduct from the market, regulators, and the public, instead making repeated, disingenuous claims that the safety and welfare of the communities in

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 5

Pennsylvania was Energy Transfer's utmost priority and highest value. During this period, Defendants also continually projected dates and numbers for construction completion, in-service dates, and throughput that were flatly impossible to fulfill at the time Defendants made those statements. Similarly, Defendants made false representations to investors to conceal their legal and regulatory noncompliance, which in large part involved further deceptive and untrue statements made to regulators and the public.

13.     Defendants also repeatedly, disingenuously claimed that they abided by the Company's Code of Business Conduct and Ethics (the "Code" or "Code of Conduct"). In reality, the Defendants violated the spirit and the letter of the Code. For instance, although the Code specifically forbade making "Sensitive Payments"—which included "payments to government[] officials or employees" and "commercial bribes or kickbacks"—"whether lawful or unlawful, designed to secure special treatment for the Partnership Group," Defendants bribed elected Pennsylvania law enforcement officials in plain contravention of Pennsylvania law and shuffled the payments through subcontractors and shell companies to hide their crimes.

14.     Safety and environmental issues—and the false and misleading statements that Defendants made in connection—were material to unitholders because the Pipeline Projects had unusually great risks, which the Company needed to competently manage so that the Pipeline Projects could be profitable. Unlike ordinary utility pipelines that carry natural gas for cooking and heating used by local homes and businesses, the Mariner East System was planned to carry compressed NGLs, which are odorless and colorless, ordinarily undetectable, and highly explosive.  Specifically, ME2 and ME2X were intended to carry hundreds of millions of barrels of NGLs from the Marcellus shale gas fields in western Pennsylvania east to the Marcus Hook Industrial Complex at the eastern edge of Pennsylvania, just 20 miles southwest of Philadelphia.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 6

15.     In addition to the heightened risks associated with transporting NGLs, the Pipeline Projects also contended with Pennsylvania's difficult topography, which is characterized by mine voids from historic mining activities, pockets where natural limestone and dolostone formations are dissolved by subterranean water, creating the potential for surface-level collapse and unpredictable dissemination of pollutants, and steep and unstable slopes that can interact with bedrock shale formations to cause "slips." These geologic conditions make landslides, sinkholes, and other kinds of subsidence particularly likely.

16.     Many of the latent risks that the Defendants' misconduct created were ultimately realized. Repeated problems from construction of the Pipeline Projects occurred during the Relevant Period and across the several concurrent projects Energy Transfer was pushing forward in Pennsylvania. In West Whiteland Township in Chester County, for instance, improper drilling techniques destroyed a number of homes and properties. As the Mariner East System's route went westward, it destroyed several lakes, polluted dozens of water crossings, and caused hundreds of releases of pollutants. Then, before dawn on September 10, 2018, Revolution exploded in a "geyser" of fire that destroyed homes and terrified local residents.

17.     The number, severity, and repetition of violations led to harsh regulatory scrutiny, millions of dollars in fines and penalties—including one $12.6 million penalty and one $30.6 million penalty, the largest civil penalty PDEP has ever issued—added delay and costs, and public and media opprobrium. Moreover, investigations into the Pipeline Misconduct have been initiated by the Chester County District Attorney, by the Delaware County District Attorney, by the Pennsylvania Attorney General,[2] by the U.S. Attorney for the Western District

---

[2] The Pennsylvania Attorney General is conducting two investigations. The first, conducted jointly with the Delaware County District Attorney, concerns ME2. The second concerns Revolution.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 7

of Pennsylvania (which led to a federal grand jury subpoena for related documents), and by the FBI. Defendants' conduct also has given rise to civil litigation, including, *inter alia*, litigation by Lisa Drive homeowners, suits by environmental advocacy groups and a Pennsylvania legislator which have led to stop work injunctions, and suits brought by NGL producers seeking to be released from their commitment contracts because of the non-operability of the pipeline by the promised date.

18.     The truth about the Pipeline Misconduct and its consequences reached the public slowly and incompletely, and the disclosure thereof caused significant financial harm to unknowing unitholders.

19.     In early August 2018, after the Company disclosed a delay in the completion of ME2 along with expected reductions in the pipeline's throughput, the price of the Company's units fell from $18.45 per unit at market close on August 8, 2018, to $17.41 per unit on August 13, 2018, a 5.6% decline.

20.     On October 29, 2018, PDEP ordered a subcontractor to immediately stop work on Revolution because of unreported landsides and soil erosion from the pipeline route into waterways. PDEP noted that this was in violation of Chapter 102, and ordered Energy Transfer to provide a detailed plan to control erosion and landslides by November 9, 2018.

21.     This news caused Energy Transfer's unit price to fall from $15.46 per unit at market close on October 28, 2018, to $14.84 per unit on October 29, 2018, a 4% decline.

22.     On December 19, 2018, Chester County District Attorney Tom Hogan ("DA Hogan") announced that his office was commencing a criminal investigation into Energy Transfer's conduct with respect to the construction of ME2 in Chester County.

23.     News of the criminal investigation caused Energy Transfer's unit price to fall 5.4%, from $12.97 per unit at market close on December 19, 2018, to close at $12.24 per unit on December 21, 2018.

24.     On August 8, 2019, DA Hogan announced that his office was charging Pennsylvania Constables hired by Energy Transfer to guard pipeline construction sites with bribery. As press reports elaborated, two constables were arrested "after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline."

25.     News of the charges against the Constables caused Energy Transfer's unit price to fall 4.6%, from $14.03 per unit at market close on August 8, 2019, to close at $13.38 per unit on August 12, 2019.

26.     On November 12, 2019, the *Associated Press* issued a report on its website revealing that the Federal Bureau of Investigation ("FBI") had begun investigating Governor Wolf's administration for corruption, in order to determine whether the administration had forced PDEP officials to approve Energy Transfer's construction permits.[3]

27.     News of the FBI investigation caused Energy Transfer's unit price to fall 6.8%, from $11.97 per unit at market close on November 11, 2019, to close at $11.16 per unit on November 13, 2019.

28.     Finally, on December 3, 2019, DA Hogan filed criminal bribery and conspiracy charges against Energy Transfer's head of security for ME2 and ME2X, stating in a press release:

> Energy Transfer decided they needed security for the pipeline.  But rather than simply hiring a private security firm, Energy Transfer decided to ***recruit and hire***

---

[3] *See* https://apnews.com/ffd3c53d855445cebfd0d5148b3860fa (last visited July 30, 2020).

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 9

*armed Pennsylvania Constables to act as a private security force for the pipeline*. Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act. Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.

29.     News of the Chester County DA criminal charges caused Energy Transfer's unit price to fall 2%, from $11.63 per unit at market close on December 2, 2019, to close at $11.40 per unit on December 3, 2019.

30.     Defendants' schemes have cost families their homes and communities their sense of peace; caused serious ongoing risks to human health and safety; adversely impacted valuable natural resources in the Commonwealth, including game fishing resources that provide sustenance and recreation for citizens; and have actually *delayed* the Pipeline Projects, resulting in reduced throughput and revenues. These costs are not just figurative; unitholders' equity stakes have been diminished in value as a result of fines, loss of reputation, increased costs to redo or repair shoddy work, litigation, and other damages caused by the Defendants' misconduct.

31.     In sum, during the Relevant Period, the General Partner and the Individual Defendants breached their fiduciary duties to Energy Transfer causing the Company to engage in the Pipeline Misconduct, and by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and legal and regulatory compliance.  Specifically, the General Partner and the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the construction permits issued by PDEP in connection with the ME2 and ME2X were obtained by the Company through the use of coercion, bribery, or other improper methods; (ii) construction of the Company's pipelines was not conducted in conformity with the Company's

permits and violated both the permits and applicable laws and regulations; (iii) the Company had in place an "unwritten policy" to hire on-duty law enforcement officials to provide private security for its Pipeline Projects, which constituted bribery and violated numerous laws; (iv) the foregoing misconduct substantially increased the risk that the Company would be subjected to material investigations and/or litigation commenced by government authorities and others; and (v) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

32.     Furthermore, the General Partner and the Individual Defendants breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

33.     Also in breach of their fiduciary duties, the General Partner and the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

34.     In light of the General Partner and the Individual Defendants' misconduct, which has subjected the Company, the General Partner's Chief Executive Officer ("CEO"), the General Partner's Chief Financial Officer ("CFO"), the General Partner's President and Chief Commercial Officer ("CCO"), the General Partner's Chief Operating Officer ("COO"), the General Partner's former President and a current director, Energy Transfer's former President, Crude Liquids and Refined Products, and Energy Transfer's Vice President of Public Affairs to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), and has subjected the Company to criminal litigation and investigations brought by the Chester County and Delaware County District Attorneys, the Pennsylvania Attorney

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 11

General, the U.S. Attorney for the Western District of Pennsylvania, and the FBI; litigation brought by Lisa Drive homeowners, environmental advocacy groups, a Pennsylvania legislator, and NGL producers seeking to be released from their commitment contracts; the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the General Partner and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

35.     In light of the breaches of fiduciary duty engaged in by Defendant LE GP, and of the substantial likelihood of LE GP's liability in this derivative action and in the Securities Class Action, and of it not being disinterested and/or independent, LE GP cannot consider a demand to commence litigation against itself and its officers and directors on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

37.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

38.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

39.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 12

40.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

41.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

42.     Venue is proper in this District because Energy Transfer and the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff Bettiol

43.     Plaintiff Bettiol is a current unitholder of Energy Transfer. Plaintiff Bettiol has continuously held Energy Transfer common units at all relevant times.

### Plaintiff King

44.     Plaintiff King is a current unitholder of Energy Transfer. Plaintiff King has continuously held Energy Transfer common units at all relevant times.

### Nominal Defendant Energy Transfer

45.     Energy Transfer is a Delaware limited partnership with its principal executive offices located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  Energy Transfer's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "ET."

### Defendant LE GP

46.     LE GP is the general partner of Energy Transfer.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 13

47.     Energy Transfer and LE GP are governed by the Company's Partnership Agreement.  Per the Partnership Agreement, the General Partner conducts, directs and manages all activities of the Company.  All management powers over the business and affairs of the Company are exclusively vested in the General Partner.

**Defendant Warren**

48.     Defendant Kelcy L. Warren ("Warren") is a co-founder of the Company, and has served as the General Partner's Chairman and CEO since August 2007.  He is also the majority owner of the General Partner.  According to the Company's annual report on Form 10-K filed with the SEC on February 21, 2020 (the "2019 10-K"), as of February 14, 2020, Defendant Warren beneficially owned 252,037,063 of the Company's common units, which represented 9.4% of the Company's outstanding units as of that date.  Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Warren owned approximately $3.2 billion worth of Energy Transfer units.

49.     The Company's 2019 10-K stated the following about Defendant Warren:

***Kelcy L. Warren***.   Mr. Warren serves as Chairman and Chief Executive Officer of our general partner.  He was appointed Co-Chairman of the Board of Directors of our general partner, effective upon the closing of our IPO, and in August 2007, he became the sole Chairman of the Board of our general partner and the Chief Executive Officer and Chairman of the Board of the general partner of ETO. Prior to that, Mr. Warren had served as Co-Chief Executive Officer and Co-Chairman of the Board of the general partner of ETO since the combination of the midstream and intrastate transportation storage operations of ETC OLP and the retail propane operations of Heritage in January 2004.  Mr. Warren also served as the Chief Executive Officer of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017.  Prior to the combination of the operations of ETO and Heritage Propane, Mr. Warren served as President of the general partner of ET Company I, Ltd. the entity that operated ETO's midstream assets before it acquired Aquila, Inc.'s midstream assets, having served in that capacity since 1996. From 1996 to 2000, he also served as a Director of Crosstex Energy, Inc. From 1993 to 1996, he served as President, Chief Operating Officer and a Director of Cornerstone Natural Gas, Inc. Mr. Warren has more than 30 years of business experience in the energy industry.  The members of our general partner

selected Mr. Warren to serve as a director and as Chairman because he is ETO's Chief Executive Officer and has more than 30 years in the natural gas industry. Mr. Warren also has relationships with chief executives and other senior management at natural gas transportation companies throughout the United States, and brings a unique and valuable perspective to the Board of Directors.

**Defendant Long**

50.     Defendant Thomas E. Long ("Long") has served as the General Partner's CFO since February 2016, and has served as a director of the General Partner since April 2019. According to the 2019 10-K, as of February 14, 2020, Defendant Long beneficially owned 221,560 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Long owned approximately $2.81 million worth of Energy Transfer units.

51.     For the fiscal year ended December 31, 2018, Defendant Long received $6,609,967 in compensation from the General Partner.  This included $537,338 in salary, a $1,000,000 bonus, $4,251,335 in equity awards, $800,000 in non-equity incentive plan compensation, and $21,294 in all other compensation.  For the fiscal year ended December 31, 2019, Defendant Long received $4,845,208 in compensation from the General Partner.  This included $570,869 in salary, $3,352,795 in equity awards, $900,000 in non-equity incentive plan compensation, and $21,544 in all other compensation.

52.     The Company's 2019 10-K stated the following about Defendant Long:

***Thomas E. Long.*** Mr. Long has served as the Chief Financial Officer of our general partner since February 2016 and a director of our general partner since April 2019.  Mr. Long also served as the Chief Financial Officer and as a director of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Long also serves as Chief Financial Officer of ETO and was previously Executive Vice President and Chief Financial Officer of Regency GP LLC from November 2010 to April 2015.  From May 2008 to November 2010, Mr. Long served as Vice President and Chief Financial Officer of Matrix Service Company. Prior to joining Matrix, he served as Vice President and Chief Financial Officer of DCP Midstream Partners, LP, a publicly traded natural gas

and natural gas liquids midstream business company located in Denver, Colorado. In that position, he was responsible for all financial aspects of the company since its formation in December 2005. From 1998 to 2005, Mr. Long served in several executive positions with subsidiaries of Duke Energy Corp., one of the nation's largest electric power companies. Mr. Long has served as a director of Sunoco LP since May 2016, and as Chairman of the Board of USAC since April 2018. Mr. Long was selected to serve on our Board of Directors because of his understanding of energy-related corporate finance gained through his extensive experience in the energy industry.

### Defendant McReynolds

53.      Defendant John W. McReynolds ("McReynolds") served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General Partner. He has also served as a director of the General Partner since August 2005. According to the 2019 10-K, as of February 14, 2020, Defendant McReynolds beneficially owned 27,270,400 of the Company's common units, which represented 1.1% of the Company's outstanding units as of that date. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant McReynolds owned approximately $384.4 million worth of Energy Transfer units.

54.      For the fiscal year ended December 31, 2018, Defendant McReynolds received $1,422,273 in compensation from the General Partner. This included $606,306 in salary, $800,000 in non-equity incentive plan compensation, and $15,967 in all other compensation.

55.      The Company's 2019 10-K stated the following about Defendant McReynolds:

*John W. McReynolds.* Mr. McReynolds became Special Advisor to ET in October 2018. Prior to that time, Mr. McReynolds served as our President from March 2005 until October 2018. He has served as a Director since August 2005. He served as our Chief Financial Officer from August 2005 to June 2013, and previously served as a Director of ETO's general partner from August 2001 through May 2010. Mr. McReynolds has been in the energy industry for his entire career. Prior to joining Energy Transfer, Mr. McReynolds was in private law practice for over 20 years, specializing exclusively in energy-related finance, securities, corporations and partnerships, mergers and acquisitions, syndications, and a wide variety of energy-related litigation. His practice dealt with all forms of fossil fuels, and the transportation and handling thereof, together with the

financing and structuring of all forms of business entities related thereto. The members of our general partner selected Mr. McReynolds to serve in the indicated roles with the Energy Transfer partnerships because of this extensive background and experience, as well as his many contacts and relationships in the industry.

**Defendant McCrea**

56.     Defendant Marshall S. McCrea, III ("McCrea") has served as the President and CCO of the General Partner since October 2018, and he has served as a director of the General Partner since December 2009. According to the 2019 10-K, as of February 14, 2020, Defendant McCrea beneficially owned 2,087,848 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant McCrea owned approximately $26.5 million worth of Energy Transfer units.

57.     For the fiscal year ended December 31, 2018, Defendant McCrea received $10,780,120 in compensation from the General Partner. This included $1,059,976 in salary, $7,834,782 in equity awards, $1,866,000 in non-equity incentive plan compensation, and $19,362 in all other compensation. For the fiscal year ended December 31, 2019, Defendant McCrea received $11,601,341 in compensation from the General Partner. This included $1,094,260 in salary, $8,734,720 in equity awards, $1,750,817 in non-equity incentive plan compensation, and $21,544 in all other compensation.

58.     The Company's 2019 10-K stated the following about Defendant McCrea:

*Marshall S. (Mackie) McCrea, III.* Mr. McCrea is the President and Chief Commercial Officer of our general partner, having served in that role since October 2018 following the merger of Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P. Prior to that time, he had been the Group Chief Operating Officer and Chief Commercial Officer of the Energy Transfer family since November 2015. Mr. McCrea has served on the Board of Directors of our general partner since December 2009. Mr. McCrea was appointed as a director of the general partner of ETO in December 2009. Prior to that, he served as President and Chief Operating Officer of ETO's general partner from June 2008 to November 2015 and President – Midstream from March 2007 to June 2008. Previously he served as the Senior Vice President – Commercial Development since January 2004. In March 2005, Mr. McCrea was named President of La

Grange Acquisition LP, ETO's primary operating subsidiary, after serving as Senior Vice President-Business Development and Producer Services since 1997. Mr. McCrea also served as the Chairman of the Board of Directors of the general partner of Sunoco Logistics from October 2012 to April 2017. The members of our general partner selected Mr. McCrea to serve as a director because he brings extensive project development and operational experience to the Board. He has held various positions in the natural gas business over the past 25 years and is able to assist the Board of Directors in creating and executing the Partnership's strategic plan.

**Defendant Ramsey**

59.     Defendant Matthew S. Ramsey ("Ramsey") has served as the COO of the General Partner since October 2018, and he has served as a director of the General Partner since July 2012. According to the 2019 10-K, as of February 14, 2020, Defendant Ramsey beneficially owned 258,213 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Ramsey owned approximately $3.28 million worth of Energy Transfer units.

60.     For the fiscal year ended December 31, 2018, Defendant Ramsey received $4,400,195 in compensation from the General Partner. This included $662,486 in salary, $2,818,415 in equity awards, $900,000 in non-equity incentive plan compensation, and $19,294 in all other compensation. For the fiscal year ended December 31, 2019, Defendant Ramsey received $4,715,743 in compensation from the General Partner. This included $683,913 in salary, $3,123,186 in equity awards, $889,100 in non-equity incentive plan compensation, and $19,544 in all other compensation.

61.     The Company's 2019 10-K stated the following about Defendant Ramsey:

***Matthew S. Ramsey.*** Mr. Ramsey was appointed as a director of ET's general partner in July 2012 and as a director of ETO's general partner in November 2015. Mr. Ramsey has been the Chief Operating Officer or our general partner since October 2018 following the merger of Energy Transfer Equity, L.P. and Energy Transfer Partners, L.P., and currently serves as President and Chief Operating Officer of ETO's general partner since November 2015. Mr. Ramsey also served as President and Chief Operating Officer and Chairman of the board

of directors of PennTex Midstream Partners, LP's general partner from November 2016 to July 2017. Mr. Ramsey is also a director of Sunoco LP, having served as chairman of Sunoco LP's board since April 2015, and of USAC, having served on that board since April 2018. Mr. Ramsey previously served as President of RPM Exploration, Ltd., a private oil and gas exploration partnership, and previously served as a director of RSP Permian, Inc. where he served on the audit and compensation committees. Mr. Ramsey formerly served as President of DDD Energy, Inc. until its sale in 2002. From 1996 to 2000, Mr. Ramsey served as President and Chief Executive Officer of OEC Compression Corporation, Inc., a publicly traded oil field service company, providing gas compression services to a variety of energy clients. Previously, Mr. Ramsey served as Vice President of Nuevo Energy Company, an independent energy company. Additionally, he was employed by Torch Energy Advisors, Inc., a company providing management and operations services to energy companies including Nuevo Energy, last serving as Executive Vice President. Mr. Ramsey joined Torch Energy as Vice President of Land and was named Senior Vice President of Land in 1992. Mr. Ramsey holds a B.B.A. in Marketing from the University of Texas at Austin and a J.D. from South Texas College of Law. Mr. Ramsey is a graduate of Harvard Business School Advanced Management Program. Mr. Ramsey is licensed to practice law in the State of Texas. He is qualified to practice in the Western District of Texas and the United States Court of Appeals for the Fifth Circuit. Mr. Ramsey formerly served as a director of Southern Union Company. The members of our general partner recognize Mr. Ramsey's vast experience in the oil and gas space and believe that he provides valuable industry insight as a member of our Board of Directors.

**Defendant Anderson**

62.    Defendant Steven R. Anderson ("Anderson") has served as a director of the General Partner since June 2018. He also serves as a member of the General Partner's Audit Committee and Compensation Committee. According to the 2019 10-K, as of February 14, 2020, Defendant Anderson beneficially owned 1,544,598 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Anderson owned approximately $19.6 million worth of Energy Transfer units.

63.    For the fiscal year ended December 31, 2018, Defendant Anderson received $135,960 in compensation from the General Partner. This included $91,760 in fees paid in cash and $44,200 in unit awards. For the fiscal year ended December 31, 2019, Defendant Anderson

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 19

received $222,498 in compensation from the General Partner. This included $122,500 in fees paid in cash and $99,998 in unit awards.

64. The Company's 2019 10-K stated the following about Defendant Anderson:

**Steven R. Anderson.** Mr. Anderson was elected to the Board of Directors of our general partner in June 2018 and serves on the audit committee and compensation committee. Mr. Anderson began his career in the energy business in the early 1970's with Conoco in the Permian Basin area. He then spent some 25 years with ANR Pipeline and its successor, The Coastal Corporation, as a natural gas supply and midstream executive. He later was Vice President of Commercial Operations with Aquila Midstream and, upon the sale of that business to Energy Transfer in 2002, he became a part of the management team there. For the six years prior to his retirement from Energy Transfer in October 2009, he served as Vice President of Mergers and Acquisitions. Since that time, he has been involved in private investments and has served on the boards of directors of the St. John Health System and Saint Simeon's Episcopal Home in Tulsa, Oklahoma, as well as various other community and civic organizations. Mr. Anderson also served as a member of the board of directors of Sunoco Logistics Partners L.P. from October 2012 until April 2017. The members of our general partner selected Mr. Anderson to serve on our Board of Directors based on his experience in the midstream energy industry generally, and his knowledge of Energy Transfer's business specifically. Mr. Anderson also brings recent experience on audit and compensation committees of another publicly traded partnership.

**Defendant Brannon**

65. Defendant Richard D. Brannon ("Brannon") has served as a director of the General Partner since March 2016. He also serves as the Chairman of the General Partner's Audit Committee. According to the 2019 10-K, as of February 14, 2020, Defendant Brannon beneficially owned 292,102 of the Company's common units. Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Brannon owned approximately $3.71 million worth of Energy Transfer units.

66. For the fiscal year ended December 31, 2018, Defendant Brannon received $294,225 in compensation from the General Partner. This included $194,225 in fees paid in cash and $100,000 in unit awards. For the fiscal year ended December 31, 2019, Defendant

Brannon received $224,498 in compensation from the General Partner.  This included $125,000 in fees paid in cash and $99,998 in unit awards.

67.     The Company's 2019 10-K stated the following about Defendant Brannon:

**Richard D. Brannon.**  Mr. Brannon was appointed to the Board of Directors of our general partner in March 2016 and has served as the Chairman of the audit committee snice April 2016.  Mr. Brannon is the CEO of CH4 Energy II, CH4 Energy Six, and CH4 Energy-Finley Utah, LLC, all independent companies focused on horizontal oil and gas development.  Mr. Brannon previously served on the board of directors of WildHorse Resource Development from its IPO in December 2016 until June 2018.  Mr. Brannon also formerly served on the Board of Directors and as a member of the audit committee and compensation committee of Sunoco LP, Regency, OEC Compression and Cornerstone Natural Gas Corp. He has over 35 years of experience in the energy business, having started his career in 1981 with Texas Oil & Gas.  The members of our general partner selected Mr. Brannon to serve as director based on his knowledge of the energy industry and his experience as a director and audit and compensation committee member for other public companies.

**Defendant Davis**

68.     Defendant Ray C. Davis ("Davis") is a co-founder of the Company, and he has served as a director of the General Partner since July 2018.  He also served as a director of ETO from February 2013 until February 2018.  According to the 2019 10-K, as of February 14, 2020, Defendant Davis beneficially owned 87,891,686 of the Company's common units, which represented 3.3% of the Company's outstanding units as of that date.  Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Davis owned approximately $1.11 billion worth of Energy Transfer units.

69.     For the fiscal year ended December 31, 2018, Defendant Davis received $67,700 in compensation from the General Partner for his role as a Company director.  This included $25,000 in fees paid in cash and $42,700 in unit awards.  He also received $49,750 in compensation from the General Partner for his role as a director of ETO, which consisted entirely of fees paid in cash.  For the fiscal year ended December 31, 2019, Defendant Davis

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 21

received $199,998 in compensation from the General Partner.  This included $100,000 in fees

paid in cash and $99,998 in unit awards.

70.    The Company's 2019 10-K stated the following about Defendant Davis:

**Ray C. Davis.**  Mr. Davis was appointed to the Board of Directors of the general partner of Energy Transfer LP in July 2018 and served on the Board of Directors of Energy Transfer Partners, L.L.C. from February 2018 until July 2018.  From February 2013 until February 2018, Mr. Davis was an independent investor.  He has also been a principal owner, and served as co-chairman of the board of directors, of the Texas Rangers major league baseball club since August 2010.  Mr. Davis previously served on the Board of Directors of Energy Transfer LP (formerly Energy Transfer Equity, L.P.), effective upon the closing of its IPO in February 2006 until his resignation in February 2013.  Mr. Davis also served as ETO's Co-Chief Executive Officer from the combination of the midstream and transportation operations and the retail propane operations in January 2004 until his retirement from these positions in August 2007, and as the Co-Chairman of the Board of Directors of our general partner from January 2004 until June 2011.  Mr. Davis also held various executive positions with Energy Transfer prior to 2004. From 1996 to 2000, he served as a Director of Crosstex Energy, Inc. From 1993 to 1996, he served as Chairman of the Board of Directors and Chief Executive Officer of Cornerstone Natural Gas, Inc. Our general partner selected Mr. Davis to serve as director based on his over 40 years of business experience in the energy industry and his expertise in the Partnership's asset portfolio.

**Defendant Grimm**

71.    Defendant Michael K. Grimm ("Grimm") has served as a director of the General

Partner since October 2018, and serves as a member of the General Partner's Audit Committee

and Compensation Committee.  He has also served as a director of ETO since December 2005.

According to the 2019 10-K, as of February 14, 2020, Defendant Grimm beneficially owned

110,639 of the Company's common units.  Given that the price per unit of the Company's

common units at the close of trading on February 14, 2020 was $12.72, Defendant Grimm

owned approximately $1.4 million worth of Energy Transfer units.

72.    For the fiscal year ended December 31, 2018, Defendant Grimm received

$305,493 in compensation from the General Partner for his role as a director of ETO.  This

included $205,425 in fees paid in cash and $100,068 in unit awards. For the fiscal year ended

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 22

December 31, 2019, Defendant Grimm received $229,998 in compensation from the General

Partner.  This included $130,000 in fees paid in cash and $99,998 in unit awards.

73.    The Company's 2019 10-K stated the following about Defendant Grimm:

***Michael K. Grimm.***  Mr. Grimm was appointed to the Board of Directors of our general partner in October 2018, and has served on the audit committee and compensation committee since that time.  Prior to that time, Mr. Grimm served as a director of ETO's general partner beginning in December 2005, and served on the audit and compensation committee during that time.  Mr. Grimm is one of the original founders of Rising Star Energy, L.L.C., a privately held upstream exploration and production company active in onshore continental United States, and served as its President and Chief Executive Officer from 1995 until 2006 when it was sold.  Mr. Grimm is currently President of Rising Star Petroleum, LLC. Mr. Grimm was formerly Chairman of the Board of RSP Permian, Inc. (NYSE: RSPP) from January 2014 until June 2018 and since November 2018 has served on the Board of Directors of Anadarko Petroleum Corporation (NYSE: APC).  Prior to the formation of Rising Star, Mr. Grimm was Vice President of Worldwide Exploration and Land for Placid Oil Company from 1990 to 1994.  Prior to joining Placid Oil Company, Mr. Grimm was employed by Amoco Production Company for thirteen years where he held numerous positions throughout the exploration department in Houston, New Orleans and Chicago.  Mr. Grimm has been an active member of the Independent Petroleum Association of America, the American Association of Professional Landmen, Dallas Producers Club, Houston Producers Forum, Fort Worth Wildcatters and the All-American Wildcatters.  He has a B.B.A. from the University of Texas at Austin.  The members of our general partner selected Mr. Grimm to serve as a director because of his extensive experience in the energy industry and his service as a senior executive at several energy-related companies, in addition to his contacts in the industry gained through his involvement in energy-related organizations.

**Defendant Turner**

74.    Defendant K. Rick Turner ("Turner") served as a director of the General Partner

from October 2002 until he resigned on June 1, 2018.

75.    For the fiscal year ended December 31, 2018, Defendant Turner received

$199,701 in compensation from the General Partner for his role as a Company director.  This

included $99,701 in fees paid in cash and $100,000 in unit awards.  He also received $146,620

in compensation from the General Partner for his role as a director of Sunoco, which consisted

of $46,614 in fees paid in cash and $100,006 in unit awards.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 23

76.     The Company's annual report on Form 10-K filed with the SEC on February 23, 2018 (the "2017 10-K") stated the following about Defendant Turner:

*K. Rick Turner.* Mr. Turner has served as a director of our general partner since October 2002.   Mr. Turner currently serves as chair of the Compensation Committee and a member of the Audit Committee.  Mr. Turner is also a director of Sunoco LP, serving as chair of Sunoco LP's compensation and audit committees. Mr. Turner is presently a managing director of Altos Energy Partners, LLC.  Mr. Turner previously was a private equity executive with several groups after retiring from the Stephens' family entities, which he had worked for since 1983.  He first became a private equity principal in 1990 after serving as the Assistant to the Chairman, Jackson T. Stephens.  His areas of focus have been oil and gas exploration, natural gas gathering, processing industries, and power technology.   Prior to joining Stephens, he was employed by Peat, Marwick, Mitchell and Company.   Mr. Turner currently serves as a director of AmeriGas Partners, L.P. Mr. Turner earned his B.S.B.A. from the University of Arkansas and is a non-practicing Certified Public Accountant.  The members of our general partner selected Mr. Turner based on his industry knowledge, his background in corporate finance and accounting, and his experience as a director and audit committee member on the boards of several other companies.

### Defendant Washburne

77.     Defendant Ray W. Washburne ("Washburne") has served as a director of the General Partner since April 2019.   He also serves as a member of the General Partner's Compensation Committee.  According to the 2019 10-K, as of February 14, 2020, Defendant Washburne beneficially owned 2,110 of the Company's common units.  Given that the price per unit of the Company's common units at the close of trading on February 14, 2020 was $12.72, Defendant Washburne owned approximately $26,839 worth of Energy Transfer units.

78.     For the fiscal year ended December 31, 2019, Defendant Washburne received $81,881 in compensation from the General Partner.  This included $48,756 in fees paid in cash and $33,125 in unit awards.

79.     The Company's 2019 10-K stated the following about Defendant Washburne:

*Ray W. Washburne.* Mr. Washburne was appointed to the Board of Directors of our general partner in April 2019.   He is currently President and Chief Executive Officer of Charter Holdings, Inc., a Dallas-based investment company involved in

real estate, restaurants and diversified financial investments. In addition, he currently serves on the President's Intelligence Advisory Board (PIAB). From August 2017 to February 2019, Mr. Washburne served as the President and Chief Executive Officer of the Overseas Private Investment Corporation (OPIC), the United States government's development finance institution. From 2000 to 2017, Mr. Washburne served on the board of directors of Veritex Holdings, Inc. (Nasdaq: VBTX), a Texas -based bank holding company that conducts banking activities through its subsidiary, Veritex Community Bank. He has also served as an adjunct professor at the Cox School of Business at Southern Methodist University. Mr. Washburne is also a member of the Republican Governors Association Executive Roundtable, the American Enterprise Institute, the Council on Foreign Relations, and is on the Advisory Board of the United States Southern Command. The members of our general partners selected Mr. Washburne to serve on the Board of Directors because of his expertise in international finance, his relationships in government, and his experience on the board of a publicly traded company.

**Defendant Williams**

80.    Defendant William P. Williams ("Williams") served as a director of the General Partner from March 2012 until he resigned on October 19, 2018.

81.    For the fiscal year ended December 31, 2018, Defendant Williams received $228,650 in compensation from the General Partner. This included $128,650 in fees paid in cash and $100,000 in unit awards.

82.    The Company's 2017 10-K stated the following about Defendant Williams:

*William P. Williams.* Mr. Williams was appointed as a director in March 2012 and currently serves as a member of the Audit Committee. Mr. Williams began his career in the oil and gas industry in 1967 with Texas Power and Light Company as Manager of Pipeline Construction for Bi-Stone Fuel Company, a predecessor of Texas Utilities Fuel Company. In 1980, he was employed by Endevco as Vice President of Pipeline and Plant Construction, Engineering, and Operations. Prior to Endevco, he worked for Cornerstone Natural Gas. Mr. Williams later joined Energy Transfer Partners, L.P. as Vice President of Engineering and Operations, ending his career as Vice President of Measurement in May 2011. The members of our general partner selected Mr. Williams due to his experience in the pipeline industry and his familiarity with our business.

## FIDUCIARY DUTIES OF THE DEFENDANTS

83.     By reason of Defendant LE GP's role as the general partner of Energy Transfer, and by reason of the Individual Defendants' positions as officers, directors, and/or fiduciaries of the General Partner and the Company, and because of their ability to control the business and corporate affairs of Energy Transfer, Defendant LE GP and the Individual Defendants owed Energy Transfer and its unitholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Energy Transfer in a fair, just, honest, and equitable manner.

84.     The General Partner, and each director and officer of the General Partner owes to Energy Transfer and its unitholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets.

85.     The General Partner, as well as the Individual Defendants, because of their positions of control and authority as directors and/or officers of the General Partner, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

86.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

87.     Defendant LE GP, by virtue of its role as general partner of the Company, and each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its unitholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the General Partner, the absence of good faith on their part, or a

reckless disregard for their duties to the Company and its unitholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

88.     As general partner, and senior executive officers and directors of the general partner of a publicly-traded company whose common units were registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

89.     To discharge their duties, the General Partner and the officers and directors of the General Partner were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of the General Partner were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Energy Transfer's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Energy Transfer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Energy Transfer and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Energy Transfer's operations would comply with all applicable laws and Transfer's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's unitholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

90.    At all times relevant hereto, the Individual Defendants were the agents of each other, of the General Partner, and of Energy Transfer and were at all times acting within the

course and scope of such agency.

91.     Because of their advisory, executive, managerial, and directorial positions with the General Partner, each of the Individual Defendants had access to adverse, non-public information about the Company.

92.     The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Energy Transfer.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

93.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Defendants caused the Company to conceal the true facts as alleged herein. The Defendants further aided and abetted and assisted each other in breaching their respective duties.

94.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the General Partner and the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

95.     The    Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Defendants collectively and individually took the actions set forth herein.

96.     The General Partner and each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

97.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, of the General Partner, and of Energy Transfer, and was at all times acting within the course and scope of such agency.

## ENERGY TRANSFER'S CODE OF CONDUCT

98.     Regarding the Company's policy objectives, the Company's Code of Conduct states the following:

> LE GP, LLC (the "Company"), the general partner of Energy Transfer LP (the "Partnership"), has adopted a number of policies dealing with business conduct and ethics of the Company and the Partnership (collectively, the "Partnership Group"). We believe that strict adherence to these policies is not only right, but is in the best interest of the Company, its unitholders, its customers, and the industry in general. ***In all instances, the policies of the Company require that the business of the Partnership Group be conducted in a lawful and ethical manner***. ***Every Employee acting on behalf of the Partnership Group must adhere to these policies***.[4]

99.     The Code of Conduct defines the term "Employee" as including "all employees of the Partnership Group who provide services to or for the benefit of the Partnership Group, and the officers and members of the Board of Directors of the Company."

---

[4] Unless otherwise stated herein, all italics and bold are added.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 30

100.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of

Conduct provides the following:

> The ethical standards of the Partnership Group rest on obeying the law. Employees must respect and obey the laws of the cities, states and countries in which the Partnership Group operates. This Code of Business Conduct and Ethics obviously cannot mention every law that might be applicable. Although not all individuals are expected to know the details of these laws, it is important for Employees to be familiar with the laws that apply to their respective areas of responsibility, and to know enough to determine when to seek advice from supervisors, managers, the Company's President or other appropriate personnel. Because the Company is the general partner of a publicly traded partnership, Employees should be aware of the laws regarding the trading of securities of the Partnership while in possession of material, non-public information relating to the Partnership.

101.     In a section titled, "Conflicts of Interest," the Code of Conduct provides, in

relevant part, the following:

> A "conflict of interest" occurs when an individual's private interest interferes in any way, or even appears to interfere, with the interests of the Partnership Group as a whole. A conflict situation can arise when an Employee takes actions or has interests that may make it difficult to perform his/her work for the Partnership Group objectively and effectively. Conflicts of interest also arise when an Employee, or a member of his/her family, receives improper personal benefits as a result of his/her position in the Partnership Group. Loans to, or guarantees of obligations of, such persons are of special concern.
>
> *          *          *
>
> You must avoid conflicts of interest unless specific, written pre-approval has been obtained from the Company's President. In the absence of pre-approval, you must abandon or forfeit the activity or interest that creates the conflict, or seek a waiver pursuant to the provisions of this Code of Business Conduct and Ethics. Any pre-approval for an executive officer must be obtained from the Board of Directors.

102.     In a section titled, "Sensitive Payments," the Code of Conduct provides that

Company funds may not be used to secure special treatment for the Company or the General

Partner, stating the following:

> It is against the policy of the Partnership Group to authorize payment of or to use Partnership Group funds or personal funds for Sensitive Payments or other similar payment, whether lawful or unlawful, designed to secure special treatment for the

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE**
**COMPLAINT** – Page 31

Partnership Group.  It is also contrary to the policy of the Partnership Group to employ any intermediary to make such payments or to disguise such payment(s) as a commission, refund or in any other manner. Should an Employee become involved in any situation where (i) a request is made for any Sensitive Payment or any bribe, kickback or other payment the propriety of which is questionable, or where (ii) the Employee has any knowledge of payments being made to an agent which are in excess of reasonable fees for services rendered, it is the Employee's responsibility to report the situation immediately to his/her immediate supervisor.

103.    The Code of Conduct defines the term "Sensitive Payments" as including:

    a)   receipts from or payments to governmental officials or employees;

    b)   commercial bribes or kickbacks;

    c)   amounts received with an understanding that rebates or refunds will be made in contravention of the laws of any jurisdiction, either directly or through a third party;

    d)   corporate political contributions; and

    e)   payments or commitments (whether cast in the form of commissions, payments or fees for goods or services received or otherwise) made with the understanding or under circumstances that would indicate that all or part thereof is to be paid by the recipient to governmental officials or employees, or as a commercial bribe, influence payment or kickback.

104.    In a section titled, "Payments and Gifts to Government Officials (U.S. or Foreign)," the Code of Conduct emphasizes that gifts or other items of value must not be provided to government officials in connection with Company business without written approval, stating the following:

Compliance with the Partnership's Anti-Corruption Policy and the U.S. Foreign Corrupt Practices Act and other anti-corruption laws is required.  What is acceptable in the commercial business environment may be entirely unacceptable in dealings with the government (U.S. or foreign).  There are strict laws that govern providing gifts, including meals, entertainment, transportation and lodging, to certain government (U.S. or foreign) officials, employees and consultants. Because of the sensitive nature of these relationships, you should not provide gifts or anything of value to government officials, employees and consultants, or members of their families, in connection with Company business without written approval from the Company's Chief Compliance Officer or the Company's Legal Department.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 32

105.    In a section titled, "Protection and Proper Use of Assets and Proprietary Information," the Code of Conduct provides, in relevant part, the following:

> All Employees should protect the assets of the Partnership Group and ensure their efficient use.  Theft, carelessness and waste have a direct impact on the Partnership Group's profitability.  All assets of the Partnership Group should be used only for legitimate business purposes.  The use of Company equipment, property or proprietary information in violation of this Code, or for any use other than its intended business use, is prohibited unless otherwise authorized.

106.    In a section titled, "Ethical Behavior," the Code of Conduct provides, in relevant part, the following:

> Every Employee is expected to act with honesty and integrity, in good faith, responsibly, with due care, competence and diligence, without misrepresentation or omission of material facts, and without compromising their independent judgment. Each Employee is required to adhere to the highest ethical standards in fulfilling our responsibilities to, and on behalf of the Partnership Group and its investors. Each Employee is required to deal fairly and honestly with other employees, customers, vendors and third parties. Each Employee should actively encourage ethical conduct among his or her fellow officers, directors and employees.  When collecting information or other data on competitors of the Partnership Group, Employees must use only legitimate resources and not take any actions that are illegal, unethical or could cause embarrassment to the Partnership Group.

107.    In a section titled, "Financial Record Keeping," the Code of Conduct provides the following:

> It is our policy that all books and records of the Partnership Group fully and fairly reflect the assets, liabilities, receipts and expenditures of the Partnership Group. ***Attempts to create false or misleading records are forbidden. No undisclosed funds or accounts shall be established for any purpose***. Knowledge of secret cash funds or slush funds should be reported to the Company's President or to the Audit Committee of the Board.

108.    In a section titled, "Report Preparation," the Code of Conduct provides the following:

> Accounting and reporting standards and procedures established by the Partnership Group must be followed to ensure that assets are protected and properly used and

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 33

that financial records and reports are accurate and reliable. ***Financial statements published by the Partnership Group must fairly present its operating results and financial position***. Improper or fraudulent accounting, documentation or financial reporting are in violation of our policy and may also be in violation of applicable laws. ***All internal records supporting the financial statements of the Partnership Group must be prepared accurately, completely and properly***.

109.    In a section titled, "Full, Fair, Accurate and Timely Disclosure for SEC Filings,"

the Code of Conduct provides the following:

The Partnership Group has established policies and procedures that help to ensure that each SEC report and public communication (including press releases) contains information that is full, fair, accurate, timely and understandable. ***Every Employee must follow these policies and procedures to ensure that this information is timely, accurate, consistent and credible***.

110.    In a section titled, "Concealment of Information from Auditors," the Code of

Conduct provides the following:

It is our policy for Employees to provide the Company's Chief Financial Officer and his/her accounting staff and outside auditors with any and all information they request.  Since the audit function is a vital tool of management in the conduct of the affairs of the Partnership Group, the concealment of information, whether financial or operational, or allowing misleading information to be provided to the internal accounting staff or outside auditors could result in inaccurate evaluations and improper decisions concerning the activities of the Partnership Group.

111.    In a section titled, "Reporting Suspected Violations of this Code," the Code of

Conduct states that all officers and directors must report violations or suspected violations of the

Code of Conduct, including violations pertaining to the securities laws, breaches of fiduciary

duty, and the Company's internal controls. The Code of Conduct provides as follows:

Every Employee shall first report violations or potential violations of this Code to his or her supervisor(s), or the appropriate officer of the Partnership Group, of the Employee's complaint or concerns.  ***Every officer and director of the Partnership Group, regardless of whether such person is also an Employee, shall report violations or potential violations of this Code to another officer or director of the Partnership Group to whom such person is required to report, one of the Chief Financial Officer, the President, or the Audit Committee, and if appropriate, to the Board of Directors***.  Because Employees may be reluctant or unable to report such violations or potential violations dealing with a material

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 34

violation of the securities laws, breach of fiduciary duty or that relate to accounting, internal accounting controls and auditing matters, the Audit Committee has also established procedures providing for the confidential and anonymous reporting of violations to the Audit Committee or such other committee or department established by the Audit Committee for receiving and reviewing reports of violations. Retaliation against any employee who in good faith reports a suspected violation will not be tolerated. ***All reports of suspected violations will be evaluated by the Audit Committee or persons designated by it to investigate such reports***. An investigation of the reported violation will be conducted if the evaluation indicates that there is a likelihood that a problem exists. All Employees are obliged to cooperate with such investigations and to be truthful and forthcoming in the course of such investigations. ***Persons violating the standards in this Code, including failure to report fraud, will be subject to appropriate disciplinary action***, which may include written notice of a violation, censure by the Board, demotion, suspension, loss of pay, termination, referral for criminal prosecution, and restitution to the Partnership or others for any losses or damages resulting from the violation

112.    The General Partner and the Individual Defendants violated the Code of Conduct by engaging in or permitting the Pipeline Misconduct, the scheme to issue materially false and misleading statements to the public, and the scheme to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same. Moreover, in violation of the Code of Conduct, the Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## ENERGY TRANSFER'S SUPPLEMENTAL CODE OF ETHICS

113.    The Company also maintains a Code of Ethics for Senior Financial Officers (the "Code of Ethics"), which provides that it applies to the General Partner's CEO and CFO, and states that the obligations of the Code of Ethics "supplement, but do not replace, the Code of Business Conduct and Ethics applicable to all employees of the Company and its subsidiaries, as well as the Company's officers and directors."

114.    The Code of Ethics provides that the General Partner's CEO and CFO must:

>    Act with honesty and integrity, avoiding actual or apparent conflicts of interest with the Company and the Partnership in professional relationships that would likely be viewed as materially impairing the Senior Financial Officer's exercise of judgment on behalf of the Company or the Partnership.  Avoid actual or apparent conflicts of interest in all cases unless a specific, case‐by‐case exception has been made after review and approval of specific circumstances by the Board of Directors. Prohibited conflicts of interests for Senior Financial Officers include significant work for an outside employer, or transactions between the Company or the Partnership and any other enterprise in which the Senior Financial Officer has an interest (other than owning a de minimis amount of publicly traded securities), including those in which a family member of a Senior Financial Officer has an interest.

>    Take reasonable steps to cause the Partnership to provide fair, accurate, timely, and understandable disclosure in reports and documents that the Partnership files with, or submits to, the Securities and Exchange Commission (the "SEC") and in other public communications, including taking reasonable steps to cause the employees providing services to the Partnership to follow its internal accounting controls at all times.

>    Not violate applicable laws, rules and regulations of federal, state and local governments, and other appropriate private and public regulatory agencies. Although no single individual is expected to know the details of all laws, rules and regulations, it is important to take reasonable steps to ensure familiarity with all such laws, rules and regulations and to know enough to determine when to seek advice or guidance through the retention of qualified legal, financial and accounting experts, or other means.

>    *        *        *

>    Establish and maintain disclosure controls and procedures that ensure that material information is included in each periodic report during the period in which the periodic report is being prepared.

>    *        *        *

>    Bring to the attention of the Chairman of the Audit Committee of the Board of Directors matters that could compromise the integrity of the Partnership's public filings and communications, disagreements on accounting matters and violations of any part of this Code.

115.    Defendants Warren and Long violated the Code of Ethics by engaging in or permitting the Pipeline Misconduct, the scheme to issue materially false and misleading statements to the public, and the scheme to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and failing to report the same.  Moreover, in violation of the Code of Ethics, Defendants Warren and Long failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**ENERGY TRANSFER'S CORPORATE GOVERNANCE GUIDELINES**

116.    Furthermore, the Company maintains Corporate Governance Guidelines adopted by the Board, which define the Board's responsibilities to the Company, described therein as the "Partnership." Specifically, the Corporate Governance Guidelines outline the following, in relevant part:

> [t]he function of the Board is to provide guidance to and controls on the activities of the Partnership, in the exercise of the business judgment of each individual director. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the senior management of the General Partner and the Partnership and their outside advisors and auditors.

117.   In a section titled "Chief Executive Officer Evaluation: Management Succession" the Corporate Governance Guidelines state the following:

> A. *CEO Evaluation.* The Compensation Committee will conduct an annual review of the Chief Executive Officer's performance, as provided in its charter. ***The Board of Directors will review the Compensation Committee's report with a view to ensuring that the Chief Executive Officer is providing appropriate leadership for the Partnership Group in the long- and short-term***.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

118.    Energy Transfer is an energy transportation and storage company based in Dallas, Texas, and conducting business primarily in the U.S.  The Company was founded in 2002, and prior to October 2018, operated under the name Energy Transfer Equity, L.P.  The Company is organized as a Delaware limited partnership and operates as a subsidiary of the Company's general partner, Defendant LE GP.  Defendant LE GP manages and directs all of Energy Transfer's activities, and the officers and directors of Defendant LE GP function as the officers and directors of Energy Transfer.

119.    Regarding Defendant LE GP's control over the Company's activities, the 2019 10-K states the following:

> Our general partner, LE GP, LLC, manages and directs all of our activities.  The officers and directors of ET are officers and directors of LE GP, LLC.  The members of our general partner elect our general partner's Board of Directors.  The board of directors of our general partner has the authority to appoint our executive officers, subject to provisions in the limited liability company agreement of our general partner.  Pursuant to other authority, the board of directors of our general partner may appoint additional management personnel to assist in the management of our operations and, in the event of the death, resignation or removal of our chief executive officer, to appoint a replacement.

120.    Energy Transfer possesses several subsidiaries, including Sunoco and ETC Northeast Pipeline LLC ("ETC NE"), among others, through which the Company conducts its operations. The Company's operations include natural gas transportation and storage; NGL transportation, storage, and fractionation services; crude and refined oil transportation; and terminalling, acquisition, and marketing activities.

121.    In connection with its operations, the Company owns three natural gas storage facilities located in Texas, as well as around 9,400 miles of intrastate natural gas transportation

pipelines, and around 12,200 miles of interstate natural gas transportation pipelines.  Energy Transfer's natural gas transportation systems are among the largest in the U.S.

122.    One of the Company's most significant pipeline systems is the Mariner East System, an almost $3 billion NGL pipeline project extending across Pennsylvania.  The Mariner East System was designed to transport NGLs from the Marcellus and Utica Shales in West Virginia, Ohio, and parts of Western Pennsylvania to industrial complexes throughout Pennsylvania, including the Company's Marcus Hook complex on the Delaware River (the "Marcus Hook Industrial Complex").  The first phase of the Mariner East System, ME1, commenced intrastate in 2014 and interstate operations in 2016. It carries approximately 70,000 bls/d of NGLs through retrofitted 1930s pipelines.

123.    The second phase of the project, ME2, was planned as an entirely new 20-inch diameter pipeline that would be able to carry a maximum of 450,000 bls/d of NGLs from the same Marcellus and Utica Shales to industrial complexes.

124.    When Energy Transfer introduced ME2 on March 2, 2015, Energy Transfer announced that it expected ME2 to commence operations in the fourth quarter of 2016.  But, unlike ME1, which involved converting a 1930s-era gasoline pipeline for use in transporting NGLs, ME2 involved more complex and time-consuming greenfield construction.  ME2 was planned to span approximately 350 miles across 17 Pennsylvania counties, and cross 570 wetlands and more than 1,200 streams.   ME2 was also slated to cut through approximately 2,700 properties.

125.    Additionally, Energy Transfer planned to possibly construct what it called the ME2X pipeline, a 16" pipeline that would run parallel to ME2 and expand capacity along the route by an additional 250,000 bls/d.

126.   Energy Transfer also planned to expand the existing Revolution, 20 miles of 16-inch diameter pipe, by adding 110 miles of pipes with assorted 20-inch, 24-inch, and 30-inch diameters. This was called the Revolution Project. Revolution was to feed into ME2, gathering additional volumes of NGLs from the Marcellus Shale to be processed at the Marcus Hook Industrial Complex.

127.   ME1, ME2, ME2x, and Revolution comprised a $3 billion pipeline project stretching across three states and hundreds of miles, consisting of a hodgepodge of older retrofitted pipes, new pipes along old routes, and new pipes breaking through new ground.

128.   NGLs carried by the Mariner East System primarily consist of ethane, as well as propane and butane. These gases are condensed into liquid under the high pressure of the pipeline system, but, in the event of a pipeline leak, becomes a highly reactive, explosive gas. This gas is colorless and odorless, and can be ignited by as little as turning on a light, ringing a doorbell, making a phone call, or starting a car.

129.   Although Defendants described the pipelines as "critical energy infrastructure," the ethane transported by the Mariner Pipelines is not principally used to produce domestic energy. Instead, after being transported to the Marcus Hook Industrial Complex, where it is processed into ethylene, which is exported to northern Europe to be manufactured into plastics. Ethylene is also used in detergents and anti-freeze.

130.   In light of the scope of the Mariner East System and the potential for significant environmental impact and risk to human life from ME2's construction and operation, the Company was required to go through an extensive regulatory review process prior to beginning construction.  Of particular importance, the project required extensive reviews and subsequent

permitting by the PDEP focused on several key Pennsylvania environmental regulations, including, *inter alia*, Chapter 102 and the Clean Streams Law.

131.    The Defendants caused the Company to rush this essential step. However, individuals living in Delaware and Chester Counties, with the help of the Clean Air Council, commissioned a risk assessment (the "Citizens' Risk Assessment"), which was produced by Quest Consultants, Inc. ("Quest") and released on October 19, 2018. The Citizens' Risk Assessment used a quantitative risk analysis methodology which combined the magnitude of potential events with how likely those events were to occur. Findings included, *inter alia*, that fatal impacts of release events would extend as far as 2,135 feet from the pipelines; that the highest risk points were at the pipeline valve stations, where risks were in excess of international criteria for tolerable risk; and that risks were greater where more than one pipeline was co-located along the route.

132.    The Defendants were motivated to bring the pipelines into service as quickly as possible, not only because returns from the expensive infrastructure investment could only be realized once the pipelines were operational, but also because the Defendants had caused the Company to contract third-party commitments to transport NGLs using the Pipelines which were conditioned on specified service dates; in some cases, "drop-dead" dates entirely released third parties from their commitments if the Company failed to bring the Pipelines into service on time.

133.    In fact, Defendants' statements alluded to the importance of bringing ME2 into service as expeditiously as possible: on an August 9, 2017 earnings call, Defendant Ramsey noted that "it's kind of hard to bring new customers on until you get a project that's been in the works for many years in service;" but that he was "highly confident" that returns would increase

"after we bring the pipeline into service." On a November 8, 2017 investor call, Defendant McCrea likewise stated that "once we get them in service, we couldn't be more excited about the returns…. Mariner needs to come online."

### Defendants' Highly Irregular Permit Application

134.   On March 2, 2015, Sunoco announced that ME2 construction was expected to be completed, and the pipeline operating, in the fourth quarter of 2016. ME2, the second phase of the Mariner East System, would extend the pipeline to the Marcus Hook Industrial Complex.

135.   The Company had submitted permit applications in connection with ME2 as early as May 2015.  According to a number of news sources reporting on the proposed second phase project, the Company had previously experienced significant challenges to obtaining approval of these permit applications due to numerous deficiencies in the applications, as well as public concern over the environmental impact of the projects.  As such, the speed at which the ME2 permit was approved was surprising.

136.   For instance, a State Impact Pennsylvania NPR ("NPR") article published on September 15, 2016, titled "DEP gives Sunoco long to-do list on Mariner East 2 pipeline plan" noted that PDEP had identified "hundreds of issues" remaining in the Company's construction plans over a year after Sunoco, which was handling construction of the pipeline, had submitted permit applications.[5]

137.   Sunoco planned to use Horizontal Directional Drilling ("HDD"), an excavating technique which creates certain unique risks. HDD drills a small-diameter hole along the intended path of the pipeline, then enlarges the hole, and finally pulls the pipe back through the enlarged hole. Throughout, a mixture of water, clay, and chemicals called "drilling mud"

---

[5]   *See*  https://stateimpact.npr.org/pennsylvania/2016/09/15/dep-rejects-sunocos-plan-to-protect-water-ways-along-mariner-east-2-pipeline/ (last visited July 30, 2020).

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 42

facilitates the drilling, supports the enlarged bore, and reduces friction as the pipeline is threaded through the excavated pathway. However, drilling mud can seep through the ground, either rising to the surface or seeping down into and contaminating groundwater, including nearby private well-water that supplies drinking water for nearby homeowners. The PDEP required Sunoco to address this phenomenon, known as "inadvertent return" or a "frac-out incident," during the ME2 permit process.

138.    In summer 2015, Energy Transfer submitted the first Chapter 102 and Chapter 105 permit applications for ME2. Chapter 102 and 105 pertain to erosion and sedimentation control and to water encroachment. They incorporate by reference sections of the Clean Streams Law and the Dam Safety and Encroachments Act, respectively. Both lay out analogous permitting requirements, which provide the following five requirements to approve applications:

> Criteria for permit issuance and denial. (a) In addition to the other requirements of this chapter, a permit application will not be approved unless the applicant demonstrates that the following conditions are met:
>
> *(1) The application is complete and accurate.*
>
> *(2) The proposed project or action complies with the standards and criteria of this title and with other laws* administered by the Department, the Fish and Boat Commission and river basin commissions created by interstate compact.
>
> *(3) The proposed project or action will adequately protect public health, safety and the environment.*
>
> (*4) The proposed project or action is consistent with the environmental rights and values secured by Pa. Const. Art. I, § 27 and with the duties of the Commonwealth as trustee to conserve and maintain public natural resources of this Commonwealth.*
>
> *(5) The applicant has not been found to be in continuing violation of this title or other laws* administered by the Department, the Fish and Boat Commission, or a river basin commission created by interstate compact, including, but not limited to, a violation of an adjudication and order, agreement, consent order or decree, whether or not the applicant's violation resulted in an order or civil penalty assessment.

139.    As provided above, there were numerous reasons for PDEP to reject Sunoco's applications, and accordingly, PDEP prepared numerous comment letters—some as long as 70 pages—explaining how the applications were deficient and how Sunoco could fix them.

140.    With respect to the twenty separate permits required for ME2, PDEP initially rejected each application on the grounds of numerous substantive deficiencies, including the risk of pollution at water crossings which Sunoco failed to identify in its applications and risk of frac-out incidents, which PDEP enumerated in 20 technical deficiency letters. For the rest of the year, Sunoco resubmitted application materials which failed to address PDEP comments, and PDEP was unable to approve the inadequate and incomplete permits. From summer 2015 through March 2016, PDEP Secretary Quigley noted that Sunoco "wasn't even close to submitting a complete application" for each required permit. In fact, he described the materials PDEP received as "woefully inadequate," despite PDEP's "hand-holding" and what he characterized as extensive support to get the application materials to an acceptable standard. Quigley further noted that 98% of projects were ultimately approved by PDEP, due to PDEP's support of and cooperation with applicants.

141.    In March 2016, Quigley met with Sunoco executives, including Sunoco's CEO, Michael J. Hennigan ("Hennigan"), Sunoco's engineering contractor, Tetra Tech, Inc. ("Tetra Tech"), and the ME2 project manager. In that meeting, Quigley "read them the riot act." Quigley also "told Sunoco leadership that their continued inability to complete their permit application appeared to be willful and had to be immediately remedied or the application would be denied."

142.    Upon realizing the PDEP would not approve the necessary permits unless and until the application materials were sufficient, Hennigan, along with Sunoco's Senior Manager

for Public Affairs, Joseph McGinn ("McGinn"), exerted intense and improper pressure on public officials in the governor's administration and PDEP to grant the permits notwithstanding the inadequate applications.

143.    Quigley has stated that he feels sure that Hennigan then appealed to Governor Wolf, who had received substantial campaign contributions from the oil and gas industry, because Quigley "wouldn't roll over and issue a permit" for ME2 as long as the application materials were so inadequate.

144.    Quigley has also stated that special assistant to the governor Yesenia Bane ("Bane"), who, as well as being among the highest-paid individuals on Governor Wolf's staff, has raised concerns about impropriety due to her significant involvement in matters that benefit her husband's clients,[6] approached Quigley to ask why he could not just approve the permit. Quigley replied that he would forget that she had asked that question "because [she] had just crossed a whole bunch of lines."

145.    On May 20, 2016, shortly after these discussions, Quigley "was ushered out of [PDEP]." He was replaced as Secretary by Patrick McDonnell ("McDonnell").

146.    Quigley stated that, after his departure, he heard that "the Governor's office ordered [his] successor to issue the permit, and [McDonnell] capitulated" in short order.

---

[6] In the article about Yesenia Bane's alleged conflicts of interest ("Wolf aide married to gas industry lobbyist may be violating Pa.'s ethics law," NPR, December 10, 2016), NPR noted that a review of her daily schedule in 2016 revealed that she was "*frequently involved in matters related to her husband's clients and their business interests.*" Yesenia Bane's husband is a gas industry lobbyist, and his clients "include[ed] key players in the oil and gas industry." When NPR sought comment on the allegations from the governor's office, a spokesperson wrote by email that, "*[i]n fact, there is no appearance of any violation*" of ethics rules. As a separate article published by the Guardian indicated ("Pennsylvania governor under scrutiny for role in approving pipeline, *the Guardian*, April 8, 2019), Yesenia Bane's husband left lobbying to work for EQT Corporation, which contracted to use ME2 and gave $20,000 to Governor Wolf's 2018 reelection campaign.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 45

147.    In December 2016, some months before the final permit would be suddenly issued, Sunoco had mostly ceased working on getting the application materials to pass muster and had pivoted to begin mobilizing the actual construction work.

148.    After Quigley had been ousted and PDEP was run by McDonnell, treatment of the ME2 application became extremely questionable. For instance, at an internal PDEP meeting, a high level PDEP official instructed staff involved with the ME2 permitting to use phone calls whenever possible, and to keep emails to a minimum.

149.    Additionally, workers participating in the construction of ME2 reported hearing discussions of the Wolf administration's "big role" in the ME2 permit approvals in several instances and under various circumstances.

150.    Bane, who had been rebuffed by Quigley for improperly pressing PDEP to issue the permit, actively monitored new Secretary McDonnell's and PDEP's progress on the ME2 permits. She frequently planned and attended meeting between PDEP, Sunoco and its consultants, and the governor's office. Bane also instructed PDEP to not move forward with its regulatory actions until informing the governor's office. When asked by NPR, a spokesperson from the governor's office stated that "the decision on Sunoco's permit applications lies squarely with the [PDEP]."[7]

151.    Sunoco instructed the Wolf administration, which pressured PDEP, that it required that the final permits be issued by February 2017. Sunoco said that Energy Transfer, which was due to acquire Sunoco by merger, pushing the permitting timeline. Quigley stated, "It was an inside job, and it was the Governor's office ordering my successor" to issue the

---

[7] *See* https://stateimpact.npr.org/pennsylvania/2017/02/07/deps-mcdonnell-meets-with-mariner-east-pipeline-opponents/ (last visited July 30, 2020).

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 46

permits on Sunoco's schedule. Others, including another former PDEP official, corroborated Quigley's assessment.

152.    On February 13, 2017, PDEP issued final permits to Sunoco for ME2. The permits were issued with a raft of "special conditions" that Sunoco had to satisfy during its construction of ME2. A former PDEP official noted that he "had never known a situation where permits were issued despite the presence of deficiencies," or where "special conditions" operated in lieu of satisfying the minimum statutory requirements.

153.    The permits were issued days before Sunoco released its annual financial results, which occurred as scheduled on February 24, 2017. Sunoco was therefore able to include and highlight the fact that ME2 permits had received final approvals in its phone calls with investors and analysts.

154.    Shortly thereafter, on April 28, 2017, Energy Transfer consummated its acquisition by merger of Sunoco.

155.    An NPR article published on February 13, 2017, titled, "DEP approves Mariner East 2 permits," commented on the permit application process and the surprising speed at which the permits had been approved as follows:[8]

> The [PDEP] has approved earth-moving and water-crossing permits for Sunoco's controversial Mariner East 2 pipeline project, paving the way for construction on the 350-mile line that would begin in Ohio and West Virginia, and travel through 17 counties across Pennsylvania to Sunoco's Marcus Hook plant in Delaware County. The pipeline would carry natural gas liquids from Marcellus and Utica Shale fields to Sunoco's export terminal, where the plan is to ship the gas to Scotland to make plastics.
>
> **The company began its permit applications in May 2014, and was sent back to the drawing table several times by [P]DEP for glaring deficiencies.** Acting

---

[8] *See* https://stateimpact.npr.org/pennsylvania/2017/02/13/dep-approves-mariner-east-2-permits/ (last visited July 29, 2020).

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 47

[P]DEP Secretary Patrick McDonnell said in a release that permits were issued "after extensive review."

      \*      \*      \*

***Critics of the pipeline project are skeptical that the hundreds of deficiencies detailed previously by the agency could have been corrected in such a short period of time.*** Gerhart says the application doesn't even include mention of her drinking water well.

      \*      \*      \*

"[P]DEP issued the permits for the ME II pipeline, despite continuing complaints from the public, citizens' groups and environmental organizations, about risks to public health and safety, inaccurate delineation of wetlands, incomplete and deficient permit applications and the agency's denial of repeated requests for a new public comment period," said Pam Bishop.

156.    A subsequent NPR article published on March 10, 2017, titled, "DEP approves Mariner East 2 permits despite deficiencies, documents show," pointed out that PDEP had approved the construction permits even though the Company had not yet met all necessary regulatory requirements, stating the following:

***[PDEP] issued final permits for the Mariner East 2 pipeline even though the pipeline's builder, Sunoco Logistics, had not met all regulatory requirements at the time of issuance***, DEP documents show.

The state's top environmental regulator acknowledged that the company's applications for permits on water crossings and soil disturbance contained many "deficiencies," but gave the multi-billion dollar project a green light anyway, according to the documents obtained by [NPR].

      \*      \*      \*

"The Bureau explained that minimum standards have been met and many remaining identified deficiencies are not required to be addressed for permit issuance," said the document, dated Feb. 10, three days before the permits were issued. "Therefore, at the direction of the Bureau, special conditions have been drafted to address the outstanding items."

157.    Upon information and belief, PDEP could not, under Chapter 102 and Chapter 105, issue the required Chapter 102 and 105 permits unless and until all the regulatory requirements had been met. The fact that it did so underscores just how irregular and improper the events described herein were.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 48

158.    A subsequent NPR article published on January 26, 2018, titled, "Mariner East 2: Texts raise questions about Wolf Administration role in permitting process," highlighted the irregular circumstances of PDEP's sudden grant of the ME2 permits. Specifically:

> *A senior staffer for Pennsylvania Gov. Tom Wolf asked the state's chief environmental regulator not to send letters to Sunoco detailing problems with its permit applications* for a controversial pipeline project until the governor was updated, according to text messages obtained through a lawsuit.

> The texts also show the official asking the [PDEP] whether some deficiencies cited in Sunoco's Mariner East 2 plans could "remain flexible for field adjustments."

> \*        \*        \*

> Friedman takes issue with a text he says shows *a Sunoco lobbyist… asking Wolf aide Yesenia Bane instead of DEP for a call on the status of the permits.* Bane texted then-acting DEP Secretary Patrick McDonnell:

> "Where are we? McGinn is asking for a call."

> \*        \*        \*

> For pipeline opponents, another issue regarding the texts is that *Bane is married to a gas industry lobbyist.* [NPR] reported in December 2016 about Bane's potential conflict of interest, and *last month, a Chester County resident filed a complaint against her with the Pennsylvania State Ethics Commission*.

> State Sen. Andy Dinniman, a Chester County Democrat and outspoken opponent of Mariner East 2, said *it appears that Yesenia Bane had a conflict of interest and should not have been the person to communicate with DEP over the Mariner East 2 permits*. Abbott, Wolf's spokesman, said there was no conflict of interest.

159.    As would be revealed on April 4, 2019, when the Guardian published an article titled, "Pennsylvania governor under scrutiny for role in approving pipeline," under McDonnell, the PDEP engaged in questionable communications with Sunoco, including with the then-CEO of Sunoco, Hennigan, shortly before the ME2 permits were approved.[9]   The article, which

---

[9] *See* https://www.theguardian.com/us-news/2019/apr/08/pennsylvania-governor-pipeline-tom-wolf-per (last visited July 30, 2020).

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 49

contained information based on internal governmental records obtained by the Guardian, stated the following, in relevant part:

> ***Emails, text messages and regulatory records show that the secretary of PDEP, Patrick McDonnell, directed staff to cut short their environmental review even as numerous shortcomings remained in the project's permit application. The department also appeared to be under pressure from Wolf's office at the time.***
>
> DEP staff internally circulated two "deficiency letters" on 20 January 2017 that they were preparing to send to an ETP subsidiary, Sunoco Logistics, citing inadequacies in the company's plans concerning earth disturbance activities and drilling beneath water bodies.
>
> Five days later, a senior official in Wolf's office, Yesenia Bane, texted McDonnell to request the agency refrain from sending a deficiency letter, pending a meeting involving Wolf, the governor's chief of staff, and McDonnell.
>
> "Understood," McDonnell wrote in response. Less than an hour later, McDonnell emailed several staff members involved in the pipeline review that "Govs [sic] office needs a list of the outstanding issues ASAP".
>
> Roughly two weeks after that, ***the DEP approved the pipeline without requiring many of the environmental safeguards it had initially sought***. A DEP senior official who was involved in the Mariner East 2 project, John Stefanko, noted in a later legal deposition that McDonnell had directed staff "that we needed to make a decision by February 10th", although the review had been scheduled to persist for at least several additional months.
>
> The text messages and a handwritten note from a DEP staff member show that the then ***CEO of Sunoco, Mike Hennigan, regularly talked to McDonnell in the lead-up to the permit authorization, and that [PDEP secretary] McDonnell reported to the governor's staff on those conversations.***

160.    On February 13, 2017, despite the fact that many important and substantive deficiencies enumerated in the deficiency letters issued between summer 2015 up until February 1, 2017 had not been corrected and despite the fact that citizens were not allowed a public comment period in which to raise their concerns about the permitting process and pipeline, PDEP issued the required permits for ME2 construction to commence.

161.    Noting citizens' significant and ultimately unaddressed concerns about the permitting process, the Philadelphia Inquirer noted that "pipeline opponents are likely to appeal

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 50

the [ME2] permits, and any deficiencies will increase the likelihood those opponents will prevail in court."

162.    In light of the media coverage documenting the extensive, credible evidence in support of further investigation of impropriety in the issuance of ME2 permits, Pennsylvania state legislators met with Secretary McDonnell to press for further and more detailed answers about the permit approval process.

163.    Subsequently, the FBI had opened a formal corruption probe into the PDEP's permit issuance for ME2. On November 12, 2019, the Associated Press reported that the investigation had been ongoing for at least six months prior and that "[t]he focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return."

### Defendants' Pattern of Environmental Violations

164.    Predictably, the deficient permits foreshadowed deficient construction, exposing the Company to further liability and the unitholders to further losses.

165.    Construction began almost before the ink was dry on the final permits. By May 3, 2017, DEP had received reports of a frac-out and released pollutants.

166.    Simultaneously, Energy Transfer was litigating an appeal of the PDEP's issuance of the ME2 permits brought by environmental advocates. The advocates requested an injunction to prevent Energy Transfer from continuing construction so as to protect the environment.

167.    On June 10, 2017, while the above litigation was ongoing, Sunoco caused the release of 140 gallons of drilling pollutants in two related frac-out incidents. Sunoco claimed

that the incidents were related to historic coal mining activities, which should have been identified and addressed in a complete permit application.

168.    On July 25, 2017, the Environmental Hearing Board (the "EHB") granted the injunction against Sunoco's continuing construction, ordering work to halt immediately. According to an anonymous source identified as an employee of one of the contractors Sunoco employed, site managers repeatedly ignored stop-work orders and pressed forward with construction despite lacking proper permits. Managers told the source that the Company knew the permits would come and that it was better to make a head start and hope that they would not be caught.

169.    On August 10, 2017, the EHB lifted the stop-work order and entered a Stipulated Order, under which Sunoco agreed to commission a reevaluation of the safety of HDD at a total of 63 sites, as well as at any sites where a frac-out would occur over the course of construction. Sunoco was also required to revise the incident response plan it had submitted as part of the permitting process (the "HDD IR Plan"), which was not performing effectively; under the HDD IR Plan, Sunoco was required to immediately inform PDEP after each frac-out incident.

170.    After the 63 reevaluations, Sunoco ultimately was required to perform 27 redesigns which required new DEP approvals to make its plans compliant with PDEP regulations.

171.    In all, DEP issued 36 notices of violation in 2017, and 55 notices of violation in 2018.

### Lisa Drive Site and the Swedesford Site

172.    Among the reevaluated sites were two sites that ultimately came to pose major problems for Sunoco. HDD Site #S3-0381, Permit ID #PA-CH-0219 (the "Swedesford Site")

was located off Swedesford Road in West Whiteland Township, Chester County, PA, a prosperous Philadelphia mainline suburb. HDD Site #S30400, Permit ID #PA-CH-0256 (the "Lisa Drive Site") was located only half a mile away, in the same township.

173.    As part of the reevaluation, Energy Transfer submitted a Void Mitigation Plan for Karst Terrain and Underground Mining on August 8, 2017, which classified the Swedesford Site as having a "low" risk of encountering subsurface voids, and the Lisa Drive Site as having a "very low" risk. However, two contractors—Groundwater & Environmental Services ("GES") and Tetra Tech—had each identified serious sinkhole risks, GES stating in its report that the rock formations underneath the two sites and in the area generally "are prone to sinkhole development and solution opening, and should be thoroughly investigated before construction."

174.    The underlying formation is generally known as "karst," topography formed by soluble rocks like the local limestone and dolostone that create underground caverns and rivers that can cause the overlaying surface to collapse into depressions and sinkholes. In addition, because the underground rivers flow freely through the subterranean caverns, any pollutants which reach these rivers can be rapidly dispersed into the local drinking water supply.

175.    On November 11, 2017, drilling in Whiteland Township karst caused a 500-gallon frac-out and five sinkholes to appear at the Lisa Drive Site. Lisa Drive residents described the frac-out as "geysers of drilling fluids" spewing out of the ground and across their properties. PDEP investigation confirmed that Energy Transfer had caused the frac-out and, moreover, had failed to immediately notify PDEP as required under both the Special Permits and the HDD IR Plan.

176.    On November 16, 2017, PDEP issued a Notice of Violation to Energy Transfer. PDEP cited the "history of incidents" at the site, the numerous frac-outs, and the noncompliance

with notification requirements under the Special Conditions and the HDD IR Plan. PDEP stated that it was "very concerned with Energy Transfer's continued failure to provide the required notifications," and ordered Energy Transfer to file belated incident reports for August 2017 frac-outs and any other frac-outs that had not yet been reported.

177.    Throughout November, problems persisted. Additional sinkholes appeared at the Lisa Drive Site, casing structural damage to homes and causing the public water utility, Aqua America, to perform emergency work to prevent the collapse of water lines. Aqua America had specifically warned Energy Transfer against using HDD in the area, noting that joint aquifer testing indicated that HDD could cause the permanent loss of local wells that supplied drinking water to the area.

178.    Although Energy Transfer consultants and public agencies both warned about risks of using HDD in the area's karst geology, Energy Transfer spokesperson Jeff Shields stated that "construction through this area is safe. There is some karst north of this area, but it does not impact this area."

179.    In March 2018, despite these assertions, continuing work in the area led to additional sinkholes. Without permission or permit, Energy Transfer dumped at least eight cement truckloads of cement grout into the sinkholes, and PDEP and the Public Utilities Commission (the "PUC") immediately sought and were granted a stop work order against Energy Transfer. Local residents reported that "[t]he neighborhood is being dug up by backhoes in an emergency effort to uncover the full extent of the disaster wrought by Sunoco. The underground had been so altered by Sunoco's [s]inkholes that [PDEP] and PUC are concerned about imminent and catastrophic hazard… arising from the damage to [ME1,] the existing

natural gas pipeline." They also reported that Sunoco had installed seismic monitors because of "concerns that the pipeline will shift and explode."

180.    An additional NPR article published on September 25, 2018, titled, "Mariner East 2: Sunoco's incidents, fines and shutdowns fuel residents' safety concerns" described myriad fines and shutdowns imposed by PDEP and other Pennsylvania authorities over the course of the construction of ME2, including a $12.6 million penalty levied against Sunoco for "egregious" violations. The article stated, in relevant part, the following:[10]

> Critics of the project say Sunoco has paid little heed to the fines and shutdowns handed out by Pennsylvania regulators. They note that the company has continued to spill drilling fluid into waterways, prompting the [PDEP] to issue dozens of violations, as recently as Sept. 18 [2018], despite the agency's $12.6 million penalty and permit suspension earlier this year for what it called "egregious" violations.
>
> *         *         *
>
> Data from the Pipeline and Hazardous Materials Safety Administration show Sunoco Pipeline reported 302 incidents from its pipelines carrying hazardous liquids such as crude oil or petroleum products nationwide from 2006 to 2018, year-to-date. That was the second-most among 2,152 operators in the agency's database after Enterprise Crude Pipeline, a carrier of crude oil, which reported 306 incidents. Sunoco also had 175 federal inspections and 37 enforcement actions during the period.

181.    Even after ME2 went online in December 2018, sinkholes continued to appear. For instance, on January 20, 2019, another sinkhole appeared at the Lisa Drive Site. At PUC's suggestion, the pipeline was shut off while further investigation was conducted. Local news reporting on the most recent sinkhole indicated that Energy Transfer was "blaming recent heavy rains" for causing the subsidence.

182.    Because of the ongoing damages to the Lisa Drive Site, Energy Transfer ultimately purchased two of the most affected houses for $400,000 each.

---

[10] *See* https://stateimpact.npr.org/pennsylvania/2018/09/25/mariner-east-2s-incidents-fines-and-shutdowns-fuel-residents-safety-concerns/ (last visited July 29, 2020).

183.    In addition to the incidents specific to the Lisa Drive Site and the Swedesford Site, Energy Transfer was cited for repeated environmental violations throughout the length of ME2 and the duration of its construction.

**Shoen Road Drill Area**

184.    Between July 6, 2017 and July 10, 2017, 14 different homeowners near the "Shoen Road Drill Area," also in West Whiteland Township, reported issues with their well water supply as a result of Energy Transfer's HDD technique.

185.    On July 24, 2017, PDEP and Sunoco entered into a Consent Order and Agreement under which the PDEP found Sunoco culpable for the damage to well water and in violation of the requirement to notify PDEP of adverse impacts to private water supplies. PDEP further ordered Sunoco to cease HDD activities and implement a contingency plan to address further adverse impacts to private water supplies.

**Loyalhanna Lake**

186.    That same summer, in Loyalhanna Township, Westmoreland County, Sunoco used HDD to install pipeline under Loyalhanna Lake. On May 13, 2017, Sunoco caused a frac-out under the lake, which had been assessed by the Pennsylvania Fish and Boat Commission in 2014 and been found to have fair to very good populations of gamefish.

187.    On June 1, 2017, the Westmoreland County Conservation District ("WCCD") inspected the surrounding area and determined that Sunoco was noncompliant with its Chapter 102 permit and the Clean Streams Law, and had failed to implement Best Management Practice ("BMPs") as required by that permit and law.

188.    On June 6, 2017, Sunoco caused two additional frac-outs. Sunoco also caused a frac-out on July 16, 2017, and another on July 17, 2017.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 56

189.    On July 27, 2017, in response to the repeated frac-outs, WCCD conducted a follow-up inspection in which it again determined that Sunoco had violated its Chapter 102 permits and the Clean Streams Act, had failed to maintain BMPs, and further had caused pollution to waters of the Commonwealth.

190.    On September 7, 2017, a third inspection conducted by WCCD determined that Sunoco had failed to remedy its noncompliance, had violated its Chapter 102 permits and the Clean Streams Act, had failed to maintain BMPs, had caused pollution to waters of the Commonwealth, and had failed to remediate the pollution it had caused in Loyalhanna Lake.

191.    On December 15, 2017, PDEP fined Energy Transfer $79,000 in connection with repeated violations at Loyalhanna Lake. It also ordered Energy Transfer to clean up the pollution, regularly report on its progress to PDEP, conduct studies to determine the extent of the pollution, and fund a program to repopulate the gamefish of Loyalhanna Lake.

**Raystown Lake**

192.    Despite this, Defendants caused Energy Transfer to continue conduct similar HDD activities—and cause similar environmental damages and create liability for the Company—at Raystown Lake in Huntingdon County ("Raystown Lake HDD Site").

193.    On December 11, 2017, Sunoco reported a 2,000-gallon frac-out, which discharged into Raystown Branch Juanita River. On December 20, 2017, Sunoco reported an additional surface-level release of pollutants.

194.    Between the December 11, 2017 and December 20, 2017 incidents, Sunoco caused almost daily unreported incidents of pollutant releases, discharging nearly one million gallons of pollutants into the environment near Raystown Lake. Each incident was required to be reported to PDEP under Sunoco's permits and HDD IR Plan. Sunoco did not report any of

the releases in this paragraph until March 2018, three months later, and did not file a formal evaluation and report to PDEP until December 6, 2018, almost a calendar year after the releases had occurred.

195.    On February 18, 2019, Sunoco reported that between April 9, 2017 and October 30, 2017, it had caused 39 unreported frac-outs which, cumulatively, resulted in the release of two million gallons of pollutants released in the vicinity of Raystown Lake-- in addition to the one million gallons released in December 2017 and tardily reported. Sunoco had only reported one of these incidents, although under its Chapter 102 permits and HDD IR Plan it had been required to immediately report at least 30 of the incidents.

196.    On July 16, 2019, Sunoco submitted a report to PDEP which stated that the cumulative three million gallons of pollutants released between April 2017 and December 2017 had contaminated approximately eight acres of the lakebed of Raystown Lake.

197.    On January 3, 2020, PDEP issued a Consent Agreement and Order which required Sunoco to pay a $1.95 million fine, conduct a clean-up of 110 acres of the bottom of Raystown Lake, and submit a Fish Habitat Improvement Plan to the DEP within the month.

**Lebanon County**

198.    On December 21, 2017, PDEP fined Sunoco $44,000 for multiple violations of its ME2 permits and the Clean Stream Law related to failures to implement and maintain erosion and sedimentation control BMPs at three ME2 sites throughout Lebanon County. It also ordered Sunoco to implement and maintain erosion and sedimentation control BMPs at all sites.

**Hay Creek, Berks County and Other Unpermitted HDD Sites**

199.    On November 11, 2017, the PDEP received a notice from a third party and subsequently confirmed through investigation by the Berks County Conservation District

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 58

("BCCD") that Sunoco had caused a frac-out at a site in Berks County (the "Berks 1 Site"), which had caused pollutants to be discharged into Hay Creek, a Class A wild trout water and Exceptional Value Water. Sunoco had not reported the frac-out, as it was required to do under its permit. Clean-up and containment lasted a week.

200.     PDEP also noted that the relevant permit did not allow HDD at the site; it provided for open bore trenching.

201.     PDEP further noted that under the permit, Sunoco was barred from performing in-stream work between October 1 and April 1 unless it received prior written approval from the Pennsylvania Fish and Boat Commission. In July 2017, Sunoco had applied to the Fish & Boat Commission for a waiver to perform in-stream work year-round, and the application had been denied.

202.     Because of the multiple and flagrant violations of the Berks 1 Site permit, BCCD also inspected a similar nearby site (the "Berks 2 Site"). BCCD determined that, like at the Berks 1 Site, Sunoco was conducting unpermitted HDD activities and had been conducting in-stream work during the restriction period.

203.     On November 21, 2017, PDEP issued a Notice of Violation to Sunoco, and also ordered Sunoco to provide PDEP with a list of ME2 sites where Sunoco had permits for open trenching work but had conducted HDD instead.

204.     On November 28, 2017, Sunoco replied and identified seven locations where Sunoco had unilaterally "field changed" the pipeline crossing method from open bore trenching to HDD without any notification, permit modification, or any kind of authorization from PDEP.

**Perry Bridge**

205.    On December 5, 2017, PDEP responded to another third-party complaint that Sunoco had built a bridge at a water-crossing site in Perry County (the "Perry Bridge Site"). Sunoco had not obtained the required Chapter 105 permits to build a bridge in the location. In addition to the seven sites where Sunoco violated its permits by conducting unauthorized HDD activities, Sunoco had unilaterally "field changed" the crossing method at the Perry Bridge Site without ever notifying PDEP.

206.    PDEP requested a meeting with Sunoco and an explanation for why the Perry Bridge Site had not been included in the list of water crossings that had been constructed without notification to the PDEP or modification of applicable permits. At the December 6, 2017 meeting, Sunoco averred that it was not aware of any other instances in which Sunoco was in violation of its permits, and agreed to apply for a post hoc permit to construct the Perry Bridge and provide Perry County and PDEP with a detailed analysis so that the regulators could evaluate the safety of the bridge.

**Additional "Field Changes" to HDD**

207.    On December 18, 2017, Sunoco reported to the PDEP that Sunoco had received two complaints from Cumberland County residents that their water had become contaminated. The Cumberland County Conservation District ("CCCD") determined that Sunoco had used HDD in violation of their permits, which provided for open trench boring. Notably, like the Perry Bridge Site, the site at issue had not been included in Sunoco's November 28, 2017 communication to PDEP which purported to disclose all such "field changes", nor had Sunoco taken the opportunity to disclose the change at its December 6, 2017 meeting with PDEP, when PDEP asked whether Sunoco was in violation of any other permits.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 60

### A Total Stop-Work Order

208.   On January 3, 2018, PDEP ordered a total halt on construction of ME2 and ME2X.

209.   In the January 3, 2018 order (the "January 2018 Order"). PDEP stated:

> Sunoco's unlawful conduct… demonstrates a lack of ability or intention on the part of Sunoco to comply with the Clean Streams Law, the Dam Safety and Encroachments Act, and the permits issued thereunder. Suspension of the permits… is necessary to correct the egregious and willful violations described herein. Other enforcement procedures, penalties and remedies available to [PDEP] under the Clean Streams Law and the Dam Safety and Encroachments Act would not be adequate to effect prompt or effective correction of the conditions or violations demonstrated by Sunoco's lack of ability or intention to comply.

210.   Sunoco was therefore required to "immediately suspend all work" on ME2 and ME2X unless that work was expressly authorized by PDEP in writing. PDEP also, again, ordered Sunoco to report any other changes it had made to the permits it had been issued. Work was stopped for over a month.

211.   On February 8, 2018, PDEP assessed a *$12.6 million fine*, one of the largest civil penalties ever issued by PDEP. Thereafter, Sunoco was permitted to resume work on ME2 and ME2X.

212.   On March 7, 2018, not even a month after Sunoco had been allowed to resume construction on ME2 and ME2X, the PUC granted an emergency request made by its Bureau of Investigation and Enforcement, and ordered Energy Transfer to temporarily shut down ME1, due to concerns about the "integrity of the pipeline" that arose when new sinkholes in Chester County revealed some of the subterranean pipeline. Sunoco completed corrective action in late April 2018, and ME1 operations were allowed to resume on May 3, 2018.

213.   On April 25, 2018, Pennsylvania State Senator Andrew Dinniman ("Dinniman") filed a formal complaint against Sunoco before the PUC with respect to Sunoco's HDD

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 61

operations in West Whiteland Township, Chester County. He sought, *inter alia*, an injunction to prohibit Sunoco from constructing ME2 or ME2X within fifty feet of any home, industrial building, or public gathering place in West Whiteland Township and from continuing to operate ME1. His complaint and the relief sought were based on Sunoco's history of accidents, pollution, noncompliance, and willful and egregious conduct towards regulators, many instances of which are enumerated herein. The emergency petition was granted on May 21, 2018.

214.    In the decision, Judge Barnes stated:

Sunoco has made ***deliberate managerial decisions*** to proceed in what appears to be a rushed manner in an ***apparent prioritization of profits over the best engineering practices*** available in our time that might best ensure public safety.

**Fines Levied for Additional Violations**

215.    On April 27, 2018, PDEP found that Sunoco had violated its permits and Pennsylvania laws with respect to 69 frac-outs that occurred in just over two months. PDEP fined Energy Transfer an additional $355,000.

216.    On August 2, 2018, PDEP fined Energy Transfer an additional $147,000 for multiple instances of violations which were reported by affected citizens, fifteen of whom were in Chester County and one each in Berks and Lebanon Counties. All violations were caused by HDD activities, resulted in the contamination of private well water supplies, and were not reported by Sunoco to PDEP as required under the Special Permits and the HDD IR Plan.

217.    On August 20, 2019, PDEP fined Energy Transfer an additional $240,000 for more than 100 violations of Special Conditions and Pennsylvania laws in ten counties.

218.    On August 21, 2019, the very next day, PDEP fined Energy Transfer an additional $78,000 for further violations of permits which required Sunoco to implement and maintain erosion and sedimentation control BMPs in Cumberland County and which Sunoco failed to do.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 62

219.    In March 2020, the Company applied for and was granted a waiver from Pennsylvania's requirement that all non-essential work cease due to Covid-19.

220.    In the waiver request, Energy Partners enumerated the work remaining on ME2:

- 46 horizontal directional drill ("HDD") locations across the Commonwealth of Pennsylvania, which included:

    o HDD that was at only the first, pilot stage at (i) Milford Road/Little Conestoga Road in Chester County; and (ii) Bow Tree/Matlack Stratsburg Road in Chester County. At both locations, groundwater was surfacing through the HDD borehole;

    o HDD that was at 54% of the final ream stage at Arch Bishop/South Chester Road in Chester County. Groundwater was also surfacing at this location;

    o HDD at Creek T-307 in Lebanon County; and Case 2:20-cv-00200-GAM Document 43 Filed 06/15/20 Page 120 of 197 - 115 –

    o HDD at Whitehouse Lane in Dauphin County.

- Three in-progress HDDs on property owned by the U.S. Army Corps of Engineers, specifically Loyalhanna Lake in Loyalhanna Township, Westmoreland County (discussed above in Section IV.F.2); Livermore Road in Derry Township, Westmoreland County; and Raystown Lake in Penn Township, Huntingdon County (discussed above in Section IV.F.2);

- Construction activity at a road bore underway at Pottstown Pike, located in West Whiteland Township, Chester County; and the open cut of a portion of Appalachian Drive, located in Middlesex Township, Cumberland County; and

- Four work locations on the ME2/2X pipeline project where open excavation trenches/pits still existed, which included: Piney Creek (Blair County); Delmont Terminal (Westmoreland County); Beckersville Terminal (Berks County); and Chestnut Hill (Berks County).

**Defendants' Bribery Scheme at Lisa Drive**

221.    In addition to Defendants' environmental violations and improper conduct in connection with the permitting of ME2, Defendants also caused Energy Transfer to orchestrate a bribery scheme in brazen violation of Pennsylvania law.

222.    In order to control ME2 sites, including the Lisa Drive Site, Defendants caused Energy Transfer to illegally hire Pennsylvania Constables to act as private security, assuming the guise of the authority of the Commonwealth and its courts to intimidate citizens and repress objections to its operations.

223.    In fact, Energy Transfer had an "unwritten policy" to employ Constables as private security for the Pipeline Projects. Energy Transfer further directed the Constables to wear uniforms and display their badges and firearms so as to conceal unlawful construction practices.

224.    Energy Transfer further created a series of shell companies through which it paid the Constables so as to conceal what it was doing.

225.    The Constables, under Pennsylvania law, are elected officials who are paid by the Pennsylvania state courts as provided by statute. Constables are authorized, *inter alia*, to serve arrest warrants and civil process, to transport criminal defendants, to serve as courtroom security, and to preserve the peace at polling locations. They are prohibited from representing themselves as officers of the court when not engaged in official duties. They are also prohibited from holding private detective licenses. They are governed by the Pennsylvania Ethics Act, under which they are prohibited from using their office for their own private pecuniary benefit.

226.    On December 19, 2018, DA Hogan initiated a criminal investigation into ME2 construction, which led to charges of criminal bribery and conspiracy against Energy Transfer's security manager and four employees at the two independent security contractors employed by Energy Transfer, TigerSwan LLC ("TigerSwan") and Raven Knights LLC ("Raven Knights").

227.    Subsequently, the Delaware County Attorney General and Pennsylvania Attorney General commenced a parallel investigation into similar misconduct in Delaware

County.

228.    On August 17, 2017, Energy Transfer's security manager for the Mariner East System, Frank Recknagel ("Recknagel") sent a text message which read, "working on a plan to have a *licensed/un[i]formed PA State Constable* provide coverage at this specific area."

229.    On November 30, 2017, a TigerSwan employee proposed using off-duty police officers; Recknagel replied in an email that it was Energy Transfer's "unwritten policy" to use "On Duty" officers to provide armed security. Rather than hire a private security firm, Energy Transfer specifically employed uniformed and armed Constables because it anticipated that their official badges and firearms would be more authoritative than a private security guard uniform.

230.    On January 22, 2019, Energy Transfer claimed that it had "engaged security at Lisa Drive *at the request of the impacted homeowners* to restrict access to their property as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property."

231.    However, while Lisa Drive homeowners *had* expressed concerns, those concerns were about the presence of armed security in close proximity to their homes and families. In response to these concerns, on April 12, 2018, an Energy Transfer executive directed Recknagel to have the Constables make themselves available to meet with local parents.

232.    Local police also filed several reports documenting encounters with the Constables. March 5, 2018 and March 24, 2018 reports, in which the West Whiteland Township police officers were responding to complaints of trespassing, note that the officers spoke with Constable Kareem Johnson, who stated that he had been hired by Sunoco. Likewise, a May 7, 2018 report by an officer responding to a disturbance notes that the officers spoke to Dauphin

County Constable Tyrai Anderson, who stated that he had been "hired as a deterrent and to monitor the Lisa Drive location."

233.    As part of DA Hogan's investigation into the ME2 construction and illegal use of Constables, on January 2, 2019, Chester County Detective Ben Martin ("Detective Martin") conducted a visit to the Lisa Drive Site.[11] While there, he interviewed Thomas Allen, who owned property on Lisa Drive which had an easement that Energy Transfer used to construct and operate ME2. Allen said that he had seen armed individuals on his property, and that a Sunoco subcontractor had identified one as a Constable.

234.    On January 4, 2019, as part of the same investigation, Detective Martin interviewed State Senator Dinniman. Dinniman said that he had received reports from his constituents that at an ME2 site, Energy Transfer employed security personnel who displayed official badges, were armed, and identified themselves as Constables. Dinniman further said that the constituents reported being intimidated by the security personnel and that the security personnel restricted residents' movements on the residents' own properties.

235.    On January 21, 2019, Detective Martin again visited the Lisa Drive site, where he was approached by Constables to intimidate him. He parked in a legal space on a public street at approximately 10:30 am, when an armed security guard approached. The guard, who identified himself as Constable Mike Robel ("Robel") was a Constable in Northumberland County and wore a "patrol style duty belt with a firearm" and a visible constable badge. Robel told Martin that he could not park in the legal space on the public street, and that he would have to move the vehicle. Martin informed Robel that he was a Chester County detective, and that he would move the vehicle when he had finished what he was doing.

---

[11] Information about Detective Martin's investigation is derived from DA Hogan's criminal complaint against Recknagel and the four TigerSwan and Raven Knights employees.

236.    Later on January 21, 2019, Martin again spoke with Robel. Robel stated that he worked as a subcontractor for Sunoco through James Murphy, who was associated with Raven Knights, the security contractor Sunoco employed. Robel stated that he was being paid by Sunoco, not by the courts, because "Sunoco wanted certified Constables in uniform as private security for the project."

237.    On March 13, 2019, Martin spoke with Constable Tyrone Harley, Jr ("Harley"). Harley stated that he had been recruited by James Murphy of Raven Knights to work as security for the Mariner East System. Harley stated that he reported to Mike Boffo ("Boffo"), of TigerSwan, and that he used WhatsApp, a secure end-to-end encrypted texting app, to communicate about the work. Harley also stated that he was paid $25 per hour in paper checks.

238.    On April 8, 2019, Martin spoke with Constable Paul Norris ("Norris"). Norris stated that he had heard about the work from Constable Kareem Johnson, who had passed along Norris's information. Several weeks afterwards, "a security supervisor" contacted Norris to join the security team. Norris stated that he had faxed his credentials and qualifications to James Murphy, of Raven Knights.

239.    At an unspecified date, Martin spoke with Constable Kareem Johnson ("Johnson"). Johnson stated that he called a number provided by Constable Harley, and spoke to an individual who Johnson believes was Nikolas McKinnon ("McKinnon" of TigerSwan. Soon after, Johnson went to the Fairfield Inn in Lionville, PA, where Johnson met with Boffo and Bobbie Ripley, both of TigerSwan, and provided his credentials and certifications. Johnson stated that during this meeting, he was wearing his uniform and that he was told to do so when he was working as security on the Mariner East System.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 67

240.    According to Constable Norris, Boffo set up a suite of rooms at the Fairfield Inn in Lionville, PA from which to run the security operations for the Mariner East System.

241.    According to Constable Harley, Boffo provided him with a body camera to use while he worked as security for the Lisa Drive Site.

242.    McKinnon, a TigerSwan employee, conveyed both specific and general information reported by the Constables to Recknagel.

243.    As stated above, the Constables identified themselves to citizens, West Whiteland Township police, and Chester County Detective Martin as Constables employed by Sunoco.

244.    On August 8, 2019, Chester County law enforcement arrested Constables Robel and Johnson and charged them with bribery, official oppression, and violations of the Pennsylvania Ethics Act.

245.    Energy Transfer spokesperson Lisa Coleman stated in an email:

Constables Johnson and Robel were not Sunoco or Energy Transfer employees. They were employed by Raven Knights, who provided security services and personnel. We have a code of conduct for all of [our] contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that.

246.    Charges brought against Energy Transfer allege that Energy Transfer and Sunoco illegally hired 19 constables in connection with construction of ME2. DA Hogan named not only Recknagel, but also James Murphy and Richard Lester, respectively operator of and owner of Raven Knights, and McKinnon and Boffo, respectively senior security adviser and site security manager of TigerSwan.

247.    Raven Knights is controlled by former Pennsylvania state troopers James Murphy and Richard Lester, and were hired by and controlled by TigerSwan.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 68

248.     TigerSwan has long been associated with Energy Transfer, including with its controversial projects. TigerSwan employees McKinnon and Boffo both previously worked on the Dakota Access Pipeline Project, located in North Dakota, and TigerSwan was a defendant in litigation related to allegations of unlicensed security work related to that project. In Louisiana, with respect to Energy Transfer's Bayou Bridge Pipeline, TigerSwan was accused of improperly registering a new company to circumvent the denial of a license to perform security work. TigerSwan also faced negative press coverage related to its conduct at the Dakota Access Pipeline, which detailed TigerSwan's militaristic "counterterrorism" tactics used against protestors lawfully exercising their Constitutional rights.

249.     Upon information and belief, Energy Transfer, at the direction of Defendants, directly controlled the operations of Raven Knights and TigerSwan and through them, illegally hired Constables to use the authority of their official positions to intimidate citizens.

250.     As alleged in DA Hogan's complaint, Energy Transfer paid the constables through a convoluted series of accounts "in a fashion calculated to avoid legally-mandated reporting requirements." The contractors were paid a total of $804,590 between September 2017 and February 2019, in more than 23 separate transactions. The Constables were paid from a Ravens Knight bank account funded by deposits made by TigerSwan and by two Energy Transfer construction subcontractors without any involvement or operational control over the Constables. However, TigerSwan and Raven Knights communicated extensively with Energy Transfer via Recknagel about, *inter alia*, payments made to the Constables, a quarterly spending breakdown for the Lisa Drive Site, the hiring process, credentialing, training, scheduling, and duties. The emails differentiated between the private security and the Constables when

discussing personnel and budgets. Moreover, the Constables failed to report the income on their Pennsylvania Ethics Statements, as they were legally required to do.

### Another Pattern of Environmental Violations at Revolution Project

251.   Revolution was a system of "feeder" lines that was intended to gather NGLs from the Marcellus Shale and transport them to the transmission lines, including ME2.

252.   Like with the ME2 Pipeline, Defendants claimed that, for Revolution, their highest priority was safety for employees, the surrounding community, and the general public; that the Company met and exceeded all environmental standards and regulations, and that the Company was doing its utmost to ensure the safe and timely completion of Revolution. However, like with ME2, Defendants acted with severe recklessness and a total disregard for Pennsylvania law when constructing Revolution.

253.   After a series of misconduct and mishaps throughout Revolution construction, on September 10, 2018, problems at Revolution came to a head when the pipeline actually exploded, demonstrating the very real danger to human health and the environment that the pipeline posed.

254.   Energy Transfer relied on its subsidiary ETC Northeast Pipeline LLC ("ETC NE") throughout the construction of Revolution. The project envisioned a pipeline to transport gas drilled by third parties to a cryogenic gas procession plant (the "Revolution Plant"). These third parties would be customers, paying Energy Transfer for use of the pipeline. Energy Transfer would also profit by its operations at the Revolution Plant, where it would process and separate the raw liquid natural gas into methane and other NGLs. These would be compressed and then transported through ME2 or another Energy Transfer pipeline, Rover.

255.   Construction on Revolution began on March 14, 2017, with an anticipated completion date of mid-2017, only a few months later.

256.   However, this deadline was impossible to meet from the beginning. In early 2017, EdgeMarc Energy Holdings, LLC ("EdgeMarc") abandoned its commitment to transport NGLs through Revolution when Energy Transfer failed to meet the "drop dead" date in the Energy Transfer-EdgeMarc commitment contract, under which EdgeMarc could back out without penalty if Energy Transfer failed to have Revolution operational by that date.

257.   In order to entice customers back to Revolution, Defendants orchestrated a campaign of misrepresentations, promising customers firm completion dates and, again, providing "drop dead" dates in contracts, under which the customers could exit the contract without penalty if Energy Transfer failed to deliver on its promised completion date. This was fortuitous for the customers because failing to deliver on Revolution's completion date is exactly what Energy Transfer did.

258.   EdgeMarc entered a subsequent commitment contract with Energy Transfer, under which EdgeMarc committed to using Revolution and Energy Transfer committed to having a safe, legal, structurally sound pipeline in-service by January 1, 2019. If Energy Transfer failed to do so, EdgeMarc could walk away without penalty.

259.   PennEnergy Resources, LLC ("PennEnergy"), another customer, entered into a similar contract under which PennEnergy committed to using Revolution and Energy Transfer committed to having a safe, legal, structurally sound pipeline in-service by October 1, 2018. If Energy Transfer failed to do so, PennEnergy could walk away without penalty.

260.   Because of these "drop dead" dates, timing was of critical importance to Energy Transfer, and that motivated Energy Transfer to cut corners and engage in unsafe, illegal

construction practices.

261.    Defendant McCrea was ultimately responsible for Revolution, as well as the contracts with EdgeMarc and PennEnergy. Defendant McCrea was the actual decision maker for ETC NE, and had "final sign off" for Revolution.

262.    The route for Revolution traversed 110 miles, including geological areas prone to landslides, soil erosion, and sedimentation. This was known to Defendants based on the many geological studies of the area and route prepared by Energy Transfer and its consultants, as well as from public records, including studies conducted by the U.S. Geologic Survey, which specifically designates the area in Western Pennsylvania as having a high incidence of landslides.

263.    Over the course of 2017, the completion date for Revolution was continually pushed back. Although in March 2017, the completion date was projected to be "mid-2017," by May 4, 2017, Defendant Long stated on an earnings call that Revolution "is still on schedule to be in service in the fourth quarter on 2017." On another earnings call on August 9, 2017, Defendant Long repeated the fourth quarter 2017 completion date. By the November 8, 2017 earnings call, Defendant Long admitted that Revolution would not be completed in the fourth quarter of 2017, or in fact during 2017 at all, stating that "[c]onstruction is scheduled to be completed in the first quarter of 2018." On February 28, 2018, Defendant Long again walked back the completion date, stating that "construction is mechanically complete," and that in-service dates were dependent on Rover and ME2 (which he also falsely suggested were imminently going to go online).

264.    Despite all these assertions that Revolution was on the verge of completion, in fact, Energy Transfer had been conducting daily inspections of Revolution which found that the

pipeline had repeated surface failures along its route, and found areas where the ground nearby appeared to be experiencing subsidence due to the underlying geologic conditions, which had been known or should have been known to Defendants throughout planning and construction.

265.   In order to progress as far and as fast as they did, Defendants caused the Company to break numerous laws and regulations related to safety and environmental protections, which, once Defendants' misconduct was discovered, would cause fines, civil penalties, and litigation, and would necessitate additional work to bring Revolution into compliance.

266.   In January 2016, pre-construction, Energy Transfer hired an engineering consultant firm, Terracon Consultants, Inc. ("Terracon"), to evaluate the safety of the proposed pipeline route. The consulting firm's report stated that the proposed path was highly dangerous and crossed terrain known to experience landslides. However, because obtaining easements for another route would have been time-consuming and would likely delay completion, and because Defendants had put the Company under such extreme pressure to meet the promised completion dates, construction of Revolution along the original, highly dangerous route went forward. Terracon produced a Geohazard Evaluation Report (the "Geohazard Report"), which was for use by field personnel to control risks associated with constructing the pipeline along this particularly dangerous route.

267.   In order to construct Revolution, Energy Transfer applied for and obtained numerous permits, including Erosion and Sedimentation Control General Permit Authorizations (the "ESCG Permits"), which provided that noncompliance would constitute not only a violation of the permit itself, but also of the Clean Streams Law and the 2012 Oil and Gas Act.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 73

268.    In addition to the ESCG Permits, Energy Transfer also applied for and obtained permits for "limited encroachments" on waters of the Commonwealth ("Encroachment Permits"), which were required under the Dam Safety Act.

269.    The ECSG Permits and the Encroachment Permits required that Energy Transfer use "Best Management Practices" ("BMPs") to minimize and control soil sedimentation and erosion, manage stormwater runoff when moving earth for construction purposes, and ensure that the area around Revolution was properly stabilized. The ECSG Permits also required Energy Transfer to create Erosion and Sedimentation Control Plans ("E&S Plans") and Post-Construction Stormwater Management Plans ("PCSM Plans").

270.    These safeguards were particularly necessary because the route passed through shale bedrock formations, which are known to have a high potential for geological hazards. Additionally, the route passed over steep slopes, holes and shafts from historical mining operations, and areas with high risks of landslides and sinkholes.

271.    Terracon conducted four scan line reviews. Scan line reviews are field reconnaissance of segments of the pipeline path, and, of the four reviews conducted, one was within five hundred feet of the site where Revolution ultimately exploded in September 2018. At that sites, Terracon reported that the area showed multiple signs of being particularly susceptible to landslides.

272.    Landslides are more likely to occur in areas with rotational slips and/or hammocky topography. Rotational slips are when land mass moves downwards along a slope, often when the weight of heavy rainwater exerts pressure on the land mass. Hammocky topography is highly irregular and wavy ground located near the bottom of a rotational slip, often caused by previous landslides.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 74

273.    Terracon advised that because of the signs rotational slip and hammocky topography, removal of vegetation (which naturally stabilizes the ground) and restriction of natural drainage—both of which would be necessary to construct Revolution—may increase in even greater susceptibility to landslides.

274.    Nevertheless, Defendants insisted on building Revolution on the original, highly dangerous path.

275.    In addition to ignoring their own experts' reports, Defendants repeatedly caused Energy Transfer to violate permits while constructing Revolution.

276.    BMPs included use of compost filter socks, waterbars, stabilized road entrance, erosion control blankets, and seeding. ECSG Permits required inspection of the BMPs weekly and after each stormwater event. E&S Plans required that, in areas susceptible to slope failures, i.e. landslides, construction activities "should be investigated and evaluated by a licensed Geotechnical Engineer in order to address any stability issues."

277.    In January 2017, preconstruction, PDEP and other regulators issued technical deficiency letters with respect to many of Energy Transfer's planned E&S Plans and BMPs.

278.    In May 2017, during construction activity, PDEP inspections identified violations related to improper BMP implementation.

279.    At one location, from November 2017 until March 2018, at least ten separate PDEP inspections identified over a dozen violations of the Clean Stream Laws and ultimately led to a June 2018 Consent Order and Agreement (the "June 2018 Order"), which found that Energy Transfer had violated the Dam Safety & Encroachments Act, the Clean Streams Law, and regulations related to dam safety, water management, erosion, and sedimentation control.

280.    PDEP also cited Energy Transfer for failing to prevent spoiled material from sliding downslope into Racoon Creek, a waterway close to the site of the September 2018 Revolution Explosion. The slide resulted in a "significant loss of the streambank," affecting (i.e. destabilizing) some 290 linear feet. Energy Transfer paid a $145,250 penalty related to its violations at Raccoon Creek and agreed to implement restoration plans to remediate the damage, and to monitor the site for five years.

281.    At a different section in Independence Township near the intersection of Newman Road and Route 30, PDEP conducted three separate inspections from May 3 until May 29, 2018, and issued at least fifteen citations for violations of the Clean Streams Law, related to failures to maintain BMPs, failures to stabilize the area, and failures to comply with permit conditions.

282.    In February 2018, a "major" landslide, which damaged trees and gouged land down to a nearby stream, occurred in the pipeline right-of-way near Penny Hollow Road in Beaver County.

283.    In April 2018, another landslide occurred near Highway 151 in Independence Township, only thirty feet from the site of the Revolution Explosion. There, Energy Transfer attempted to stabilize the area by desaturating soil, moving the soil uphill, and installing unpermitted underground drainage. Not only was the work conducted without proper permits, but PDEP later determined that no engineer or geotechnical expert was consulted by field staff when performing this structural geotechnical work.

284.    Altogether, Revolution was subject to numerous soil stability issues, including landslides, slope failures, and ground cracks, in at least 39 different locations.

285.     Nevertheless, on or about June 1, 2018, Energy Transfer reported to PDEP that Revolution was "mechanically complete and ready to be placed into commercial service."

286.     The soil stability issues that had plagued Revolution's construction continued as Energy Transfer prepared to place the pipeline into service in summer 2018.

287.     In fact, in the days before the Revolution Explosion, Energy Transfer installed curtain drains and erosion matting, mixed calcimite into the soil, and re-seeded the slope, indicating that it was clearly aware of the risks associated with instability at the location, and yet continued to attempt to bring Revolution into commercial service to transport quantities of highly explosive NGLs along the pipeline's unstable route through residential areas.

288.     On September 9, 2018, Energy Transfer began the multi-day commissioning process to bring Revolution online or "in-service." This required purging all air from inside the pipeline and then filling the pipelines with gas to the necessary pressure levels.

289.     Energy Transfer never completed the commissioning process, and Revolution never commenced commercial service.

290.     At approximately 4:56 a.m. on the morning on September 10, 2018, residents of Ivy Lane in Center Township, a municipality near Pittsburgh, reported that they were woken by a geyser of fire exploding from the pipeline, so loud that they thought a plane was crashing into their homes. Several homes were destroyed, and one family nearly killed, by the Revolution Explosion.

291.     Callers to emergency services variously reported plane crashes, meteorite, and power plant explosions. Neither the residents nor local fire department nor other local government officials were aware that gas had begun flowing through Revolution the day before.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 77

292.    On September 11, 2018, Energy Transfer sent a letter to affected homeowners, blaming the Revolution Explosion on a landslide due to "unprecedented" rainfall, even though rainfall was within the expected range for the area.

293.    ETC NE, which was in charge of contracts with customers, sent a letter to EdgeMarc and one to PennEnergy, which claimed that Revolution had been placed into service on September 9, 2018, despite the fact that the multi-day commissioning process had not been completed and the pipeline had never been able to transport NGLs commercially.

294.    The letters from ETC NE to EdgeMarc and PennEnergy further claimed that a *force majeure* event, outside of Energy Transfer's control, had occurred, making Energy Transfer unable to accept gas from its customers.

295.    Defendants knew or should have known that Revolution had never been in-service.

296.    Both PennEnergy and EdgeMarc ultimately contested Energy Transfer's claims under the contracts, noting that they were not liable for the contracts because Energy Transfer had failed to put Revolution in-service by October 1, 2018 and January 1, 2019, respectively. They also contested Energy Transfer's characterization of the landslide and resulting Revolution Explosion as a *force majeure* event.

297.    Defendants knew or should have known that what occurred was not a *force majeure* event, but rather, an entirely foreseeable landslide that occurred at a site particularly susceptible to landslides, through which Energy Transfer had nevertheless chosen to construct the pipeline over safer alternative routings, at which Energy Transfer had repeatedly failed to comply with permits meant to protect public safety and the environment, and at which, when the heavy rain that normally affected the region occurred, the pipeline foreseeably failed.

298.    Post hoc review of permitting documents for the Revolution Explosion site showed that Energy Transfer knew, since at least 2015, that the area "included a 'slip' landslide area" with "dangerous and unstable hillslope terrain."

299.    Not only did Defendants' mismanagement of Revolution create unacceptable risks to public health and safety and the environment, it also caused foreseeable economic loss to the Company due to failure to meet the contractual "drop dead" dates with customers.

300.    The Company was further subjected to regulatory consequences. On October 29, 2018, PDEP issued an order (the "October 2018 Order") to "immediately stabilize disturbed areas, repair erosion control features, and stop all other earth moving activities associated with the Revolution." PDEP also ordered Energy Transfer to submit a detailed plan to repair the damage caused by the Revolution Explosion. A public press release commenting on the October 2018 Order stated that ""inspections discovered violations including unreported landslides, impacts to aquatic resources, construction activities occurring in unpermitted areas, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."

301.    In addition to PDEP's regulatory response, public prosecutors initiated several investigations into the Revolution Explosion. The U.S. Attorney for the Western District of Pennsylvania issued a federal grand jury subpoena seeking documents relevant to the Revolution Explosion. The Pennsylvania Attorney General is also conducting its own investigation.

302.    On November 26, 2018, PDEP rejected Energy Transfer's first erosion control plan pursuant to the October 2018 Order. On December 3, 2018, PDEP rejected Energy Transfer's first Stabilization Plan, Landslide Plan, and Updated ESC Plan (the "Repair Plan").

Energy transfer submitted a subsequent five Repair Plan to PDEP, all of which were rejected as technically deficient, before receiving approval on the seventh plan submitted.

303.    Additionally, between September 10, 2018 and the first week of January 2019, PDEP performed 46 separate inspections of Revolution, each finding continuing violations.

304.    On January 9, 2019, PDEP issued a notice to Energy Transfer (the "January 2019 Notice"). The January 2019 Notice stated that Energy Transfer had "failed to comply with the [October] 2018 Order." It further stated that Energy Transfer had "[f]ailed to install flagging, markers, or signs at the site," had failed to "cease sediment laden discharges into Commonwealth waters," and had failed to "temporarily stabilize disturbed areas." The January Notice further stated that not only was Energy Transfer noncompliant, "[m]ultiple inspections by [PDEP] staff" had determined that Energy Transfer "*was not progressing towards compliance.*"

305.    On February 8, 2019, PDEP issued another letter to Energy Transfer. The letter stated the Energy Transfer was continuing to fail to remedy the site damaged in the Revolution Explosion, and to comply with the October 2018 Order generally.

306.    On February 8, 2019, PDEP issued a hold on all Energy Transfer Clean Water Permit approvals and modifications. The hold was to continue until PDEP was satisfied that Energy Transfer had corrected all misconduct. The hold affected not just Revolution, but *all* permits and projects Energy Transfer with which Energy Transfer was involved in Pennsylvania.

307.    On December 13, 2019, more than fifteen months after the Revolution Explosion, PDEP conditionally approved Energy Transfer's Repair Plan.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 80

308.   During those fifteen months, numerous PDEP inspections identified at least 19 distinct segments that were not properly stabilized, at least 353 distinct instances of accelerated erosion and sedimentations, and at least 540 distinct instances of discharge of sediment-laden water in the waters of the Commonwealth, each a flagrant violation of relevant permits and laws.

309.   Moreover, as to the permits, PDEP identified at least 868 BMPs that were improperly implemented or maintained; at least 1,589 BMPs that were not installed or improperly installed; and at least 244 instances where Energy Transfer failed to submit corrective action reports in response to BMP failures.

310.   On January 3, 2020, exactly two years after the January 2018 Order (pertaining to "willful and egregious" misconduct involving ME2), PDEP issued a further order to Energy Transfer (the "January 2020 Order"). The January 2020 Order admonished Energy Transfer for "willful and egregious" violations during its planning and construction process for Revolution.

311.   The January 2020 Order enumerated repeated findings of misconduct by Energy Transfer, in violations of safety and environmental obligations. It stated:

> "[F]rom the commencement of construction on March 14, 2017 to September 10, 2018, [Energy Transfer] failed to inform the people that performed construction work on the Revolution Pipeline of the ESCGP Geohazard Requirements, the Construction Sequence, or any other part of the Narrative of the ESCGP."

312.   PDEP Secretary McDonnell commented:

> "[ETC NE]'s lack of oversight during construction of Revolution Pipeline and their failure to comply with DEP's October 2018 compliance order *demanded serious accountability*. Their inaction led directly to this unprecedented civil penalty."

313.   The PDEP's "unprecedented civil penalty" was a ***$30.6 million fine***, in addition to injunctions that Energy Transfer remediate the effects of its prior misconduct, and bring itself into compliance before proceeding any further with Revolution. In addition to the $30.6 million

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 81

fine, PDEP also assessed **$20,000 per day of noncompliance**, which, upon information and belief, is still accruing against the Company. As of May 1, 2020, Energy Transfer owed DEP nearly $2.5 million from the accrued per diem fines, but had yet to pay PDEP any of that amount.

314.     Despite this, by April 27, 2020, the *Pittsburgh Post-Gazette* had published an article titled "Energy Transfer racks up more violations on Revolution Pipeline," reporting that Energy Transfer was "already negotiating a new settlement to address a slew of violation found since" the January 2020 Order. The new settlement was supposed to address 596 new violations, which included causing soil displacement, erosion, and sediment laden water to enter waters of the Commonwealth, violations in like kind of those that had led to the January 2020 Order and its $30.6 million fine. The newspaper calculated that inspections of Revolution comprised less than one percent of the 8,200 inspections PDEP conducted between January 1, 2020 and the date of publication, but accounted for 19% of violations. Revolution garnered nearly ten violations per inspection.

315.     The *Pittsburgh Post-Gazette* also reported that Energy Transfer had not yet been able to demonstrate to PDEP's satisfaction that Energy Transfer had attained control of erosion at the site of the Revolution Explosion, and, consequently, Energy Transfer was not able to begin actually repairing the ruptured pipeline.

316.     As of the filing of this Complaint, daily fines against Energy Transfer continue to accrue, and Revolution has remained inoperable.

### False and Misleading Statements

### February 24, 2017 Form 10-K

317.     During after-market hours on February 24, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 82

10-K"). The 2016 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Brannon, Turner, and Williams, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McReynolds and Long attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

318. The 2016 10-K emphasized the Company's extensive corporate governance, stating that "[t]he Board of Directors has adopted both a Code of Business Conduct and Ethics applicable to our directors, officers and employees, and Corporate Governance Guidelines for directors and the Board."

319. The 2016 10-K further noted "[s]pecific provisions [of the Company's corporate governance] are applicable to the principal executive officer, principal financial officer, principal accounting officer and controller, or those persons performing similar functions, of our General Partner." The 2016 10-K directed the investing public to the Company's Code of Conduct by stating, "[c]urrent copies of [the Company's] Code of Business Conduct and Ethics . . . are available on [the Company's] website."

320. The 2016 10-K also stated that the Company believed that it had valid title to all of its properties, and that the Company had obtained or was in the process of obtaining all necessary permits and authorizations for its properties, including its pipelines. The 2016 10-K stated the following:

> ***We believe that we have satisfactory title to or valid rights to use all of our material properties***. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances,

easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. *In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business*.

Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business" are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee. ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

321.    The 2016 10-K also specifically referenced the Mariner East System as follows:

NGL Pipelines

Sunoco Logistics owns approximately 900 miles of NGLs pipelines, primarily related to the Mariner systems in the northeast and southwest United States.

- The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. *The second phase of the project, referred to as Mariner East 2, will expand the total takeaway capacity to 345,000 Bbls/d for interstate and intrastate propane, ethane and butane service, and is expected to commence operations in the third quarter of 2017.*
  *        *        *
- *Marcus Hook Industrial Complex.* In 2013, Sunoco Logistics acquired Sunoco, Inc.'s Marcus Hook Industrial Complex.  The acquisition included terminalling and storage assets, with a capacity of approximately 3 million barrels of NGL storage capacity in underground caverns, and

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 84

related commercial agreements.  The facility can receive NGLs via marine vessel, pipeline, truck and rail, and can deliver via marine vessel, pipeline and truck. In addition to providing NGLs storage and terminalling services to both affiliates and third-party customers, the Marcus Hook Industrial Complex currently serves as an off-take outlet for the Mariner East 1 pipeline, and will provide similar off-take capabilities for the [ME2] pipeline when it commences operations.

322.   With respect to the Company's internal controls, the 2016 10-K stated the following, in relevant part:

The management of Energy Transfer Equity, L.P. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the President and Group Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

323.   With respect to changes in the Company's internal controls, the 2016 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

324.   The foregoing statements made in the 2016 10-K were materially false and misleading because Defendants failed to disclose the Pipeline Misconduct, and because Defendants knew, or should have known, that completing ME2 and bringing it into service at the promised time and throughput was impossible due to delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to

bring the pipeline into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by violating permits, and other misconduct.

**May 4, 2017 Earnings Call**

325.    On May 4, 2017, the Company held an earnings call with investors, attended by Defendants Hennigan, Long, McCrea, and Warren. On the call, Defendant Long stated, "Our Revolution Project is still on schedule to be in service in the fourth quarter of 2017."

326.    This statement was materially false and misleading because Defendants knew, or should have known, that completing Revolution by the fourth quarter of 2017 was impossible. Completing ME2 and bringing it into service was a necessary precondition to completing and bringing into service Revolution, and, as discussed above, ME2 could not be brought into service on the promised schedule because of delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipeline into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by violating permits, by causing the release of millions of gallons of pollutants into waters of the Commonwealth, which subsequently had to be remediated, by failing to use required BMPs for soil erosion which caused significant structural risk to the pipelines, and other misconduct.

**May 31, 2017 MLPA Investor Conference**

327.    On May 31, 2017, Energy Transfer executives attended the 2017 MLPA Investor Conference, during which Defendants stated that ME2 would be in-service *"by the end of Q3 2017"* with "*initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."* Defendants also stated that the Company forecast "strong distributable cash flow expected from *growth projects coming online in 2017*," and indicated that ME2, ME2X, and Revolution were among these "growth projects." Additionally, Defendants stated that Revolution would be "in-service Q4 2017."

328.    Defendants would go on to make the same above-described representations regarding ME2's operational date and capacity at numerous conference calls following the May 31, 2017 conference, including the August 16, 2018 Citi One-on-One MPL Conference; the September 6, 2017 Barclays CEO Energy-Power Conference; the November 15, 2017 RBC Capital Markets Midstream Conference; the November 29, 2017 Jeffries 2017 Energy Conference; the December 6, 2017 Wells Fargo Pipeline, MLP and Utility Symposium; the January 9, 2017 UBS Midstream & MLP Conference; the February 28, 2018 Morgan Stanley Midstream Energy Conference; the April 9, 2018 Mizuho Energy Summit; the May 21, 2018 2018 MLP & Energy Infrastructure Conference; and the June 19, 2018 J.P. Morgan 2018 Energy Conference.

329.    These statements were materially false and misleading because Defendants knew, or should have known, that completing Revolution by the fourth quarter of 2017 was impossible. Completing ME2 and bringing it into service was a necessary precondition to completing and bringing into service Revolution, and, as discussed above, ME2 could not be brought into service on the promised schedule and at the promised capacity because of delays

caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipeline into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by violating permits, by causing the release of million gallons of pollutants into waters of the Commonwealth, which subsequently had to be remediated, by failing to use required BMPs for soil erosion which caused significant structural risk to the pipelines, and other misconduct.

**June 27, 2017 J.P. Morgan Equity Conference**

330.    On June 27, 2017, Energy Transfer executives attended the 2017 J.P. Morgan Equity Conference, during which Defendants stated that the Company would have ""strong distributable cash flow expected from growth projects coming online in 2017." They described ME2 and Revolution as two of these "growth projects."

331.    Defendants also stated that ME2 would be in-service "by the end of Q3 2017," with initial capacity of 275,000 bls/d and "with upside of up to 450,000 bls/d," and that Revolution would be completed and "in-service Q4 2017."

332.    These statements were materially false and misleading because Defendants knew, or should have known, that completing Revolution by the fourth quarter of 2017 was impossible. Completing ME2 and bringing it into service was a necessary precondition to completing and bringing into service Revolution, and, as discussed above, ME2 could not be brought into service on the promised schedule and at the promised capacity because of delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipeline into regulatory compliance, repeated stop

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 88

work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by violating permits, by causing the release of million gallons of pollutants into waters of the Commonwealth, which subsequently had to be remediated, by failing to use required BMPs for soil erosion which caused significant structural risk to the pipelines, and other misconduct.

### August 9, 2017 Earnings Call

333.   On August 9, 2017, the Company held an earnings call with investors announcing its second quarter 2017 financial results. The call was attended by Defendants Long, McCrea, Ramsey, and Warren. On the call, Defendant Long stated that, "[o]n our Revolution project, *construction is scheduled to be completed in the fourth quarter of 2017*." Also, Defendant McCrea stated that Revolution "will be up and ready for service *in the fourth quarter*," and Defendant Ramsey stated that ME2 would be online "*sometime in the fourth quarter*" of 2017.

334.   These statements were materially false and misleading because Defendants knew or should have known that the Company could not deliver on the timelines Defendants promised to investors because of delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipelines into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other misconduct.

### November 8, 2017 Earnings Call

335.   On November 8, 2017, the Company held an earnings call with investors announcing its third quarter 2017 financial results. On the call, Defendant Long stated that the

Company was "*very focused on safely and responsibly bringing our projects into service*, including [ME2]."

336.   On the Company's November 8, 2017 earnings call, Defendant Long also spoke about the long-delayed completion date for Revolution, pushing the date out and stating at that time that "On our Revolution project[, c]onstruction is scheduled to be completed in the first quarter of 2018."

337.   These statements were materially false and misleading because Defendants knew or should have known that the Company was constructing its Pipeline Projects, specifically ME2 and Revolution, unsafely and irresponsibly. Moreover, the Company could not deliver on the timelines Defendants promised to investors because of delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipelines into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other misconduct.

**January 3, 2018 Public Statement**

338.   On January 3, 2018, spokesperson Jeff Shields responded to media inquiries about PDEP's stop work order on ME2 and PDEP's statement that the stop work order was because of "egregious and willful violations" of ME2 permits and relevant laws. Shields stated, "We… reiterate our commitment to the *highest levels of construction expertise and our dedication to preserving and protecting the environment* in which we conduct our work."

339.   These statements were materially false and misleading because Defendants knew or should have known that the Company was constructing its Pipeline Projects, specifically ME2 and Revolution, unsafely and irresponsibly, and that the Defendants caused the Company

to completely disregard public safety, construction guidelines including relevant permit requirements, and environmental safety throughout the construction process.

**February 8, 2018 Public Statement**

340.   On February 8, 2018, spokesperson Jeff Shields responded to media inquiries about the $12.6 million fine the Company agreed to pay to lift the above stop work order. Shields stated:

> [The Company is] committed to fully complying with the [PDEP] order, which includes following all permit requirements… Safety is paramount for any energy infrastructure project that we do—the safety of the communities in which we work and operate, the safety of our employees, and the safety of the environment.

341.   These statements were materially false and misleading because Defendants knew or should have known that the Company was constructing its Pipeline Projects, specifically ME2 and Revolution, unsafely and irresponsibly. Furthermore, Defendants knew or should have known that numerous violations were part of a pattern of noncompliance, which put the safety of people and environments in the vicinity of the pipelines at serious risk.

**February 22, 2018 Earnings Call**

342.   On February 22, 2018, the Company held an earnings call with investors to discuss its 2017 financial results, which would be released on Form 10-K the next day. On the call, Defendant Long stated that "[w]e continue to make progress on the construction of [ME2 and ME2X], with **94% of mainline construction complete and 83% of HDDs completed or underway**. At this time, we continue to target placing ME2 into service by the end of the second quarter of 2018."

343.   On the call, Defendant Long also stated that the Company "remain[s] committed to working closely with… [PDEP] and other regulatory agencies are [is] focused on safely and responsibly bringing Phase 2 of… ME2… into service."

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 91

344.    Regarding Revolution, Defendant Long claimed that "On our Revolution project, construction is mechanically complete, and we will go into full service once Rover and Mariner East 2 are in service" and Defendant McCrea added that "Revolution, as you know, that is built to feed Rover, and it's built to feed Mariner. . . And we're very hopeful that we'll have Rover complete. We're very close on that soon and that sometime in the second quarter, we'll have Mariner on and ready to take barrels from Revolution."

345.    Also during the call, Defendant Ramsey stated the following:

I think we have a good working relationship with PA DEP. We have a weekly meeting with them, where we look at the gating items. We are still under court order deadlines that we have to adhere to and they have to adhere to. But I think our progress is good, and so I don't see a change in the time line from what we've given you before.

346.    These statements were materially false and misleading because Defendants knew or should have known that there was no way to get ME2 and Revolution into service on the timeline Defendants promised to investors. In fact, according to a contractor cited to in the Securities Class Action who worked on ME2 from fall 2017 through March 2018, as of March 2018, which was after the February 22, 2018 call occurred, ME2 was never even close to 90% complete, and, in fact, could not have been more than 80% complete.

**February 23, 2018 Form 10-K**

347.    On February 23, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Brannon, Turner, and Williams, and contained SOX certifications signed by Defendants McReynolds and Long attesting to the accuracy of the 2017 10-K.

348.    The 2017 10-K made the same representations pertaining to Energy Transfer's corporate governance as outlined in the 2016 10-K and referenced in the Company's Code of Conduct, stating the following:

> The Board of Directors has adopted a Code of Business Conduct and Ethics applicable to our officers, directors and employees. Specific provisions are applicable to the principal executive officer, principal financial officer, principal accounting officer and controller, or those persons performing similar functions, of our general partner.

349.    The 2017 10-K made substantively the same representations as those made in the 2016 10-K regarding the validity of the Company's title and rights to its properties, stating the following:

> **We believe that we have satisfactory title to or valid rights to use all of our material properties**.  Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole.  **In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business**.
>
> Substantially all of our subsidiaries' pipelines, which are described in "Item 1. Business," are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. Our subsidiaries have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our subsidiaries' pipelines were built were purchased in fee. ETP also owns and operates multiple natural gas and NGL storage facilities and owns or leases other processing, treating and conditioning facilities in connection with its midstream operations.

350.    The 2017 10-K also specifically referenced the Mariner East System as follows:

The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including ETP's Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. ***The second phase of the project, referred to as [ME2], will expand the total takeaway capacity to 345 MBbls/d*** for interstate and intrastate propane, ethane and butane service, ***and is expected to commence operations in the second quarter of 2018.***

351.   With respect to the Company's internal controls, the 2017 10-K stated the following, in relevant part:

The management of Energy Transfer Equity, L.P. and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the President and Group Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2017.

352.   With respect to changes in the Company's internal controls, the 2017 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

353.   The foregoing statements made in the 2017 10-K were materially false and misleading because Defendants failed to disclose the Pipeline Misconduct, and because Defendants knew, or should have known, that completing ME2 and bringing it into service at the promised time and throughput was impossible due to delays caused by Defendants' repeated

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 94

noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipeline into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by causing the release of three million gallons of pollutants at Raystown Lake, which subsequently had to be remediated, by failing to use BMPs for soil erosion which caused significant structural risk to the pipelines, and other misconduct.

### March 22, 2018 Statement to Media

354.   On March 22, 2018, Company spokesperson Jeff Shields responded to allegations that HDD operations on ME2 caused risk to Lisa Drive homeowners, stating that there were no karst formations at the Lisa Drive Site and that karst did not affect the Lisa Drive Site. Specifically, he stated: "professional geologists are always a part of the planning and operating of our pipelines, and ME2 and ME2X are no exception…. [C]onstruction through this area is safe. There is some karst north of this area, but it does not impact this area."

355.   This statement was materially false and misleading because Defendants knew that at the Lisa Drive Site, at least the first third of the pipeline route was through known limestone formations, which is a type of karst.

### 2018 Full Page Ad

356.   In early 2018, the Company paid for the following full-page ad to be printed in a Harrisburg, PA newspaper:

### <u>Mariner East Going Above and Beyond</u>

Energy Transfer and Sunoco Pipeline are Committed to the Long-Term Integrity and Safe Operation of the Mariner East 2 Pipeline. At Energy Transfer and

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 95

Sunoco Pipeline, we pledge to the communities we cross and the customers we serve that we will operate our pipeline with highest level of safety at all times.

Safety is what we do – providing the same and reliable transportation of energy resources.

Mariner East 2 exceeds federal safety regulations in many areas:

- It starts in the pipe mill, where our inspectors oversee the manufacture of the pipe to our strict standards, then inspect the pipe when it arrives in the construction site.

- Before and after the pipeline is buried, and again once it is in operation, we put our pipelines through rigorous testing above and beyond what is required by federal safety regulations. Then we monitor them 24/7, 365 days a year.

- We employ heavier pipe wall thickness than required by the U.S. Department of Transportation. The higher quality of pipe reduces the risk of damage from sources such as excavating equipment or ground movement.

- We bury the pipeline deeper underground than required in most cases – at least 4 feet and up to 200 feet. We inspect 100% of pipeline welds by X-ray; rather than the 10% required.

- We patrol our Mariner East pipelines more frequently than required by ground and air.

In addition:

- We team with local emergency responders along the route to provide information and training on emergency pipeline response. We have trained more than 2,000 emergency responders and public officials.

- State and federal regulators spent more than 100 inspection days during 2017 on the Mariner East project, more inspection days than on any other pipeline in Pennsylvania.

We're paying extra attention to safety, because that's what you deserve – safe, clean, reliable energy and a stronger economy for Pennsylvania.

357. These statements were false and misleading because, in fact, the Company did

not "bury the pipeline deeper underground than required in most cases;" in some cases, the

Company actually buried the pipelines shallower than permits required. For instance, on May

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 96

21, 2018, a public water utility installing a residential water main had been informed by Sunoco that ME2 was buried 9 feet below the surface at the location. In fact, the utility's contractor hit ME2 pipeline at 6.2 feet below ground. ME2 was not yet in service at that time, thankfully, because leaked NGLs carried by ME2 are highly explosive and can be ignited by as little as ringing a doorbell, making a phone call, or starting an engine. Additionally, the fact that "state and federal regulators spent… more inspection days" at Mariner East System sites than at any other pipelines was largely due to repeated inspections necessitated by the repeated, serious, unremedied violations of applicable permits and laws at many sites, not, as implied in the ad, because of civic concerns about the public safety.

**May 3, 2018 Press Release**

358.     On May 3, 2018, the Company issued a press release titled, "Mariner East 1 Released for Service by Pennsylvania Public Utility Commission." The press release discussed the purported benefits of the Mariner East System and announced a positive report from the Pennsylvania Public Utility Commission regarding the safety and integrity of the pipeline, stating the following:

> DALLAS--(BUSINESS WIRE)--May 3, 2018-- Energy Transfer Partners, L.P. (NYSE: ETP) announced today that its subsidiary, Sunoco Pipeline L.P. (SPLP), received a unanimous vote from the Pennsylvania Public Utility Commission (PUC) to resume operations of its Mariner East 1 pipeline. SPLP has worked diligently with the PUC's I&E Division and their outside experts on the matter for several weeks and is pleased that all investigations concur regarding the safety and integrity of the pipeline. The procedures to resume public utility service on the pipeline will begin immediately.
>
> Mariner East 1 is a major transporter of propane in Pennsylvania, which is ultimately delivered to local communities, providing affordable fuel to heat homes and run businesses. When Mariner East 1 was shut-in as a precautionary measure, there were no issues with the pipeline, which has been safely operating for decades. Its continued safe operation has now been verified by all parties.

> Mariner East 1 is part of a larger public utility system including the [ME2] and [ME2X] pipelines, which are currently under construction. [ME2] mainline construction is 98% complete and 93% of the HDDs are either complete, in-progress or have been released for restart. [ME2] is a critical energy infrastructure project, not only for Pennsylvania's economy, but for the thousands of people it puts to work every day. The total potential economic impact from all Mariner East construction in Pennsylvania is estimated to be more than $9 billion, supporting approximately 9,500 total jobs each year over six years of construction, with estimated wages of nearly $3 billion. These projects provide an economic boost in the 17 counties where they are located and across the entire Commonwealth.

359. These statements were materially false and misleading because they misrepresented the completion status of ME2 and ME2X, which were, at the time the statements were made, far from finished. Moreover, the characterization of ME2 as a "critical energy infrastructure project" was materially false or misleading because ME2 was designed primarily to transport NGLs to be exported and made into plastics, not provide energy to Pennsylvanians or anybody else.

**May 10, 2018 Conference Call**

360. On May 10, 2018, the Company held a call to discuss its financial results for the first quarter of 2018. Defendants Long, McCrea, Ramsey, and Warren attended the call. On the call, Defendant Ramsey stated that ME2 would enter service by "mid to late" third quarter 2018.

361. This statement was materially false and misleading because Defendants knew that it would be impossible to have ME2 in service by mid-to-late 2018, and were, at the time the statement was made, actually abandoning their existing strategy to complete ME2 and were instead seeking PDEP and municipal permission to use preexisting, century-old pipe for a segment of the route, which would seriously reduce the pipeline's throughput.

**June 19, 2018 J.P. Morgan Energy Conference**

362. On June 19, 2018, the Company presented at the 2018 J.P. Morgan Energy Conference. During the conference, Defendants characterized ME2 as a "growth project," and

stated that it would go "in-service in Q3 2018." They continued to state that it would have "initial capacity of 275,000 barrels per day with upside of up to 450,000 barrels per day."

363.     These statements were materially false and misleading because Defendants knew that it would be impossible to have ME2 be in service by the third quarter of 2018, and were, at the time the statement was made, actually abandoning plans to complete ME2 as planned and seeking PDEP and municipal permission to use preexisting century old pipe for a segment of the route, which would seriously reduce the pipeline's throughput.

**August 9, 2018 Earnings Call**

364.     On August 9, 2018, the Company held an earnings call with investors. Defendants Long and McCrea attended the call. On the call, Defendant Long stated,

> PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteland Township. To avoid any delays in the ME2 project schedule, we will utilize a section of the existing pipeline in the affected area for initial in-service. This plan does not require any new permits and we have made all applicable regulatory notifications… [W]e continue to expect to place ME2 in service by the end of this [third] quarter. This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments.

365.     When asked for clarification on how "utilize[ing] a section of the existing pipeline in the affected area for initial in-service" would work, Defendant McCrea refused to comment on the effects on initial in-service capacity, but stated that "the utilization of the 12-inch more than provides the necessary capacity to move the volumes we've contracted."

366.     Also during the call, Defendant Ramsey stated the following:

> Let me expand on that a little bit. On ME2, I guess it's the, obviously, the first issue with use of the 12-inch line through there. We have, kind of repeating what was said in the earlier remarks, 99% of the mainline construction is complete, the 1% that remains on mainline construction is associated with the HDD's that we are completing right now. So we have 16 HDD's to complete, all those have been approved by PA DEP and they're either drilling ahead or they're in the stage where we're going back to PA DEP with – when we have an inadvertent return. But they've all been approved so we don't have to have any changes approved by PA DEP going forward like that. All the road bores are finished. And as Tom said

in the early remarks, 80% of the line has been hydro tested. So we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year.

367.    These statements were materially false and misleading because Defendants represented that the ME2 project was proceeding apace, even though the old pipeline interpolated into ME2 would significantly reduce throughput, and therefore profitability, for the project—a fact that would have been highly material to investors. Furthermore, Defendants knew or should have known that, even while they opted to abandon ME2 as envisioned, they would still be unable to bring ME2 online by the end of the third quarter of 2018.

**July 3, 2018 Statement**

368.    On July 3, 2018, Energy Transfer spokesperson Vicki Granado commented on the state of ME2, purporting that "[w]e have identified an existing pipeline that will allow us to meet our customer obligations to get natural gas liquids to the Marcus Hook Industrial Complex while work on the Mariner East system continues," and that "[a] minimum amount of work will be required to change this line from a refined products line to a[n] NGL pipeline – e.g., connection pipeline and five new mainline valves, which can be done quickly and safely."

369.    These statements were materially false and misleading because Defendants knew or should have known that the old pipeline interpolated into ME2 would significantly reduce throughput, and therefore profitability, for the project—a fact that would have been highly material to investors. Furthermore, Defendants knew or should have known that, even while they opted to abandon ME2 as envisioned, they would still be unable to bring ME2 online by the end of the third quarter of 2018.

**July 27, 2018 Press Statement**

370.    On July 27, 2018, NPR reported that PDEP had settled with environmental

activist groups over concerns about PDEP's handling of the ME2 permits. NPR quoted Company spokesperson Lisa Dillinger on the safety of ME2 construction, about which she stated, "From the outset, Sunoco has maintained that the permits were… fully protective of the environment."

371.    NPR again quoted Lisa Dillinger on the propriety of the permitting, about which she stated, "From the outset, Sunoco has maintained that the permits were properly and lawfully issued by [PDEP]."

372.    These statements were materially false and misleading because the Company's permits were highly irregular in that they relied heavily on special conditions, and were therefore not fully protective of the environment. Furthermore, this irregularity was heightened by the extremely questionable and improper pressure that Sunoco brought to bear against the governor's office and the PDEP to have the permits granted despite numerous facial deficiencies.

**September 10, 2018 Statements**

373.    On September 10, 2018, the Company held a press conference to address the media and the public with respect to the September 9, 2018 Revolution Explosion. *The Pittsburgh Post-Gazette* reported Company spokesperson Vicki Granado's statements:

> Energy Transfer spokeswoman Vicki Granado said the company would join the PUC in the investigation beginning Tuesday. "***Our obligation to homeowners is 100 percent — that people continue to be safe and secure***," Ms. Granado said at a news conference at the Center municipal building Monday night. Ms. Granado said she couldn't recall a similar incident involving Energy Transfer, which has 83,000 miles of pipeline throughout the United States.
>
> She said there were ***no environmental health risks to residents in the aftermath of the explosion***. The Revolution pipeline had been in the commissioning phase — a kind of dress rehearsal — since Sept. 3, according to Ms. Granado. It wasn't yet operating commercially, but gas was running through the pipe during the trial period, just as it would during normal operations, she said.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 101

Ms. Granado didn't know how much pressure was in the line before it burst; it is designed to operate at a maximum pressure of 1,440 pounds per square inch.

Recent rain has ETC and its regulators focused on erosion control, Ms. Granado said, when asked about past landslides. "***It's something definitely that is being actively managed.***"

374.   On September 10, 2018, the Company also sent a letter to homeowners on Ivy Lane, which had been affected by the Revolution Explosion. The letter stated, "Our first priority continues to be the safety of those who live in this community." It further stated that its initial assessment indicated that the Revolution Explosion had been caused by a landslide, and stated, "[T]his type of land movement had been occurring throughout the state due to the unprecedented amount of rainfall."

375.   These statements were materially false and misleading because they mischaracterized the cause of the Revolution Explosion. The landslide and land movement were not due to environmental factors; they were due to the construction that the Company rushed through in order to meet the Defendants' promises to investors, which failed to satisfy the applicable permits and, specifically, the BMPs for controlling erosion and sedimentation. Furthermore, the precipitation was not "unprecedented"; the Company had simply failed to design and build a pipeline that could withstand precipitation within the normal range of variation.

**September 15, 2018 NPR Article**

376.   On September 15, 2018, NPR published an article about incidents, fines, and shutdowns on the ME2 project. It quoted spokesperson Lisa Dillinger:

Lisa Dillinger, a spokeswoman for Sunoco's parent, Energy Transfer Partners, said . . . that since Sunoco Pipeline's integration with ETP on May 1, 2017, accidents have been "***drastically reduced***," and that the company spent $429 million on assets in 2017.

"It is our priority to maintain and operate our assets to the highest safety **standards**, not just because it makes good business sense, but because it is the right thing to do," she said.

377.    These statements were materially false and misleading because throughout the ME2 project, Defendants caused the Company to construct and operate its pipelines in a manner that was demonstrably inconsistent with "the highest safety standards," and, in fact, frequently fell below the *minimal* state-mandated standards for safe construction and operation, as evidenced by the numerous fines, delays, and lawsuits that resulted.

**October 21, 2018 *Pittsburg Post-Gazette* Article**

378.    On October 21, 2018, the *Pittsburgh Post-Gazette* published an article in which it discussed the $12.6 million fine assessed by PDEP and PDEP officials' remarks that ME2 had more than 70 permit violations and that "[t]he reality is that they were not meeting those permit obligations." It quoted spokesperson Lisa Dillinger:

> When asked about noncompliance last week, Ms. Dillinger noted only one instance, when Sunoco initiated a horizontal underground drilling operation on a site that was permitted for trenching.
>
> "That was rectified about eight months ago," she said. "*We are committed not only to following the strict guidelines set forth in our permits but to employing the highest levels of construction expertise and to preserving and protecting the environment in which we conduct our work.*"

379.    These statements were materially false and misleading because, in fact, at least eight locations were identified where excavation used unpermitted HDD techniques but the Company's permits only allowed trenching. Moreover, not only did Sunoco continually, repeatedly fail to follow the strict guidelines set forth in its permits, this was part of a pattern of behavior that reflected reckless disregard for the environment.

**November 1, 2018 Observer-Reporter Article**

380.    On November 1, 2018, the Observer-Reporter published an article about the stop

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 103

work order for Revolution. It quoted spokesperson Alexis Daniel:

> Energy Transfer spokeswoman Alexis Daniel said in an email the company remains in "continued communication" with [PDEP].
>
> ***"We have been and will continue to comply with their orders,"*** she wrote, adding that ***the safety of the surrounding area is "our first priority."***

381.    These statements were materially false and misleading because Defendants had not been complying with PDEP orders, and, because the safety of the people and environment were not their "first priority," Defendants had no intention of compliance going forward.

**November 21, 2018 Statement**

382.    On November 21, 2018, spokesperson Lisa Dillinger responded by email to a petition filed two days before by seven Pennsylvania residents, in which the residents had requested the PUC issue a stop work order for ME2 construction and noted their concerns that Energy Transfer was unprepared to respond to leaks and that the placement of a highly volatile NGL pipeline that mostly supplied exports to international petrochemical industries, not domestic energy, through these highly-populated residential areas was inappropriate and constituted "an unnecessary and unacceptable risk to public safety." Dillinger stated via email, "We do not believe the claim is valid… ***The integrity of our [ME1] and [ME2] pipelines has been verified in the last few months by the PUC and PHMSA through numerous tests and data collection along the routes."***

383.    This statement was materially false and misleading because, in fact, testing and data collection did *not* demonstrate the integrity of the Mariner East System, but rather showed that because of subsidence caused by Defendants' noncompliance with permits and surface wear on the pipelines, the Mariner East System was highly unsafe.

**December 19, 2018 Statement**

384.    On December 19, 2018, Energy transfer released a statement in response to DA

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 104

Hogan's announcement of a criminal investigation into ME2 construction. As to the safety of the project, the Company stated, "The safety of all those who live and work along our pipeline is our first priority and this project was planned and implemented based on that fact."

385.   As to the Company's legal compliance in ME2 permitting and construction, the Company stated the following:

> We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines. We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies contained in the District Attorney's press release. We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites. ***We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania*** and we are committed to aggressively defending ourselves against these ***baseless allegations.*** We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

386.   These statements were false and misleading because the accusations brought by DA Hogan were not "baseless" at all—Defendants had caused the Company to engage in criminal conduct, including constructing significant portions of ME2 and Revolution without appropriate permits, violating environmental regulations, and bribing uniformed Constables to intimidate citizens. Defendants clearly knew or should have known that their acts were criminal because not only did they use the Constables to conceal their crimes, Defendants obscured payments to the Constables because Defendants knew that it was illegal to pay law enforcement for the use of their official authority. The Defendants knew or should have known that, by so doing and by their inadequate planning of ME2 (reflected in the fact that Sunoco never submitted facially adequate permit application materials), Defendants constructed a pipeline project that was highly unsafe for the surrounding communities.

**December 29, 2018 Press Release**

387.    On December 29, 2018, the Company issued a press release titled, "Energy Transfer Announces Mariner East 2 Pipeline is in Service," which boasted of the purported benefits ME2 would provide, stating the following, in relevant part:

> DALLAS--(BUSINESS WIRE)--Dec. 29, 2018-- Energy Transfer LP (NYSE: ET) announced that effective today its Mariner East 2 natural gas liquids (NGLs) pipeline is in service, available for both interstate and intrastate service. The 350-mile NGL pipeline transports domestically produced ethane, propane and butane east from processing plants in Ohio across West Virginia and Pennsylvania to Energy Transfer's Marcus Hook Industrial Complex in Delaware County, PA, where the NGLs are stored for distribution to local, domestic and waterborne markets.

> Mariner East 2 is part of Energy Transfer's Mariner East system of pipelines designed to provide much-needed NGL takeaway capacity for the Marcellus and Utica Shale production areas in Eastern Ohio, West Virginia and Western Pennsylvania. **_The Mariner East 2X pipeline, which parallels Mariner East 2, is expected to be in service in late 2019._** The Mariner East system will provide both operational flexibility and enhanced security of NGL supply from producing areas to key markets in the region and beyond.

> According to a 2015 economic impact study by EConsult Solutions, the total impact from the construction of the Mariner East pipelines is estimated to be more than $9.1 billion in Pennsylvania alone. When complete, the projects will have provided more than 9,500 construction jobs per year for six years, with associated earnings totaling more than $2.7 billion.

388.    These statements were materially false and misleading because ME2 was in a real sense incomplete—it relied upon the "Frankenpipe" arrangement, meaning ME2's purported 350 miles of brand-new, 20" diameter NGL pipeline would never be fully realized. Furthermore, Defendants knew or should have known that they would ultimately be unable to bring ME2X into service by late 2019, and in fact, ME2X is _still not in service_ at the time of the filing of this Complaint.

**January 4, 2019 Statements**

389.    On January 4, 2019, DA Hogan announced the appointment of former federal

prosecutor Seth Weber to the ME2 investigation, noting that it "certainly sends a message that we are taking it very seriously, and that somebody who has experience in this field is taking it very seriously." In a statement to NPR, Energy Transfer characterized the investigation as "meritless."

390.    NPR quoted spokesperson Lisa Dillinger, who stated that investigators "would not be able to avoid the inescapable conclusion that Energy Transfer has not engaged in any form of criminal activity, and the issues referenced have already each been thoroughly investigated, reviewed, and ultimately resolved by the appropriate government agencies."

391.    These statements were materially false and misleading because Defendants had repeatedly engaged in several forms of criminal behavior with respect to the environment, public safety, and law enforcement.

### January 22, 2019 Statements

392.    On Jan 22, 2019, NBC Philadelphia reported the following Energy Transfer statement:

> *We have engaged security on Lisa Drive at the request of the impacted homeowners to restrict access to their property* as they were concerned not only with protecting their privacy, but the possibility of people trespassing on their property," company spokeswoman Lisa Dillinger said in a statement. "I will decline to discuss any further details of *our security efforts*, beyond that we do use security on our projects as needed to ensure the safety of our employees, our assets and those who live in the area."

393.    These statements were materially false and misleading because not only had the Lisa Drive homeowners never requested that Defendants illegally bribe Constables, the homeowners in fact reported that they were "terrified" by the Constables' unlawfully restricting their movements on their own property. The Lisa Drive homeowners also sought assistance from elected representatives and others to get to the bottom of why the Constables were suddenly present. Defendants knew or should have known that the Lisa Drive homeowners were

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 107

not proponents of the Constables' presence because Defendants caused the Constables to make themselves available to the Lisa Drive homeowners to address concerns.

### February 22, 2019 Form 10-K

394.   On February 22, 2019, the Company filed the 2018 10-K with the SEC. The 2018 10-K was signed by Defendants Warren, Long, McReynolds, McCrea, Ramsey, Anderson, Brannon, Davis, and Grimm, as well as non-party A. Troy Sturrock, and contained SOX certifications signed by Defendants Warren and Long attesting to the accuracy of the 2018 10-K.

395.   The 2018 10-K made the same representations pertaining to Energy Transfer's corporate governance as outlined in the 2016 and 2017 10-K, and referenced the Company's Code of Conduct as follows:

> The Board of Directors has adopted a Code of Business Conduct and Ethics applicable to our officers, directors and employees. Specific provisions are applicable to the principal executive officer, principal financial officer, principal accounting officer and controller, or those persons performing similar functions, of our general partner.

396.   The 2018 10-K made substantively the same representations as those made in the 2016 and 2017 10-K regarding the validity of the Company's title and rights to its properties, stating the following:

> ***We believe that we have satisfactory title to or valid rights to use all of our material properties***. Although some of our properties are subject to liabilities and leases, liens for taxes not yet due and payable, encumbrances securing payment obligations under non-competition agreements and immaterial encumbrances, easements and restrictions, we do not believe that any such burdens will materially interfere with our continued use of such properties in our business, taken as a whole. ***In addition, we believe that we have, or are in the process of obtaining, all required material approvals, authorizations, orders, licenses, permits, franchises and consents of, and have obtained or made all required material registrations, qualifications and filings with, the various state and local government and regulatory authorities which relate to ownership of our properties or the operations of our business***.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 108

Substantially all of our pipelines, which are described in "Item 1. Business," are constructed on rights-of-way granted by the apparent record owners of the property. Lands over which pipeline rights-of-way have been obtained may be subject to prior liens that have not been subordinated to the right-of-way grants. We have obtained, where necessary, easement agreements from public authorities and railroad companies to cross over or under, or to lay facilities in or along, watercourses, county roads, municipal streets, railroad properties and state highways, as applicable. In some cases, properties on which our pipelines were built were purchased in fee. We also own and operate multiple natural gas and NGL storage facilities and own or lease other processing, treating and conditioning facilities in connection with our midstream operations.

397.    The 2018 10-K also specifically referenced the Mariner East Pipeline as follows:

The Mariner East pipeline transports NGLs from the Marcellus and Utica Shales areas in Western Pennsylvania, West Virginia and Eastern Ohio to destinations in Pennsylvania, including our Marcus Hook Industrial Complex on the Delaware River, where they are processed, stored and distributed to local, domestic and waterborne markets. The first phase of the project, referred to as Mariner East 1, consisted of interstate and intrastate propane and ethane service and commenced operations in the fourth quarter of 2014 and the first quarter of 2016, respectively. The second phase of the project, referred to as Mariner East 2, began service in December 2018.

398.    With respect to the Company's internal controls, the 2018 10-K stated the following, in relevant part:

The management of Energy Transfer LP and subsidiaries is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer of our General Partner, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in the 2013 *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").

Based on our evaluation under the COSO framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2018.

399.    With respect to changes in the Company's internal controls, the 2018 10-K further stated, "[t]here has been no change in our internal controls over financial reporting (as

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 109

defined in Rules 13a–15(f) or Rule 15d–15(f)) that occurred in the three months ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting."

400.    The foregoing statements made in the 2018 10-K were materially false and misleading because Defendants failed to disclose the Pipeline Misconduct, and because Defendants knew, or should have known, that completing ME2 and bringing it into service at the promised time and throughput was impossible, because of delays caused by Defendants' repeated noncompliance with permits, which caused the Company to be saddled with additional work to bring the pipeline into regulatory compliance, repeated stop work orders from regulators, multiple bouts of litigation, and other delays. Additionally, Defendants caused delays with respect to Revolution by causing Energy Transfer to undertake significant portions of the construction without proper and necessary permitting, by causing the release of three million gallons of pollutants at Raystown Lake, which subsequently had to be remediated, by failing to use BMPs for soil erosion which caused significant structural risk to the pipelines, and other misconduct.

**March 20, 2019 Statement**

401.    On March 20, 2019, Chester SPIRIT quoted the following statement from Company spokesperson Lisa Dillinger:

> "Safety is our priority. There's no legitimate basis for conducting a criminal investigation into our company and the Mariner East pipelines," Energy Transfer spokeswoman Lisa Dillinger told The SPIRIT. "We have worked closely with commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information that is readily available on the PUC and DEP websites and we are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania and are committed to aggressively defending ourselves," Dillinger said. "We look forward to opening dialogue with the attorney general's and district attorney's offices in the hopes that we can bring this matter to an appropriate resolution," Dillinger said.

402.     These statements were materially false and misleading because Defendants had repeatedly engaged in several forms of criminal behavior with respect to the environment, public safety, and law enforcement.

**July 6, 2019 Statement**

403.     On July 6, 2019, *Philadelphia* Magazine quoted Company spokesperson Lisa Dillinger, who stated that Energy Transfer remains "***confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania*** and are committed to aggressively defending ourselves."

404.     This statement was materially false and misleading because Defendants had repeatedly engaged in several forms of criminal behavior with respect to the environment, the public safety, and law enforcement.

**August 8, 2019 Statement**

405.     On August 8, 2019, Phillymag.com reported on a statement issued by the Company regarding the use of Constables, stating the following:

> In its own statement, Energy Transfer stressed that ***constables Johnson and Robel "were not Sunoco or Energy Transfer employees***." "They were employed by Raven Knights, who provided security services and personnel," the Energy Transfer statement continued. "***We have a code of conduct for all of contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that***."

406.     These statements were materially false and misleading because Defendants knew or should have known that they did employ Constables, including Johnson and Robel. Defendants also knew or should have known that they had an "unwritten policy" of employing "on-duty" law enforcement as private security, violating criminal laws and their own Code, and that they failed to uphold the Code and did not expect their contractors to abide by it.

**The Truth Gradually Emerges**

407.    On August 9, 2018, the Company held a conference call with investors. On the call, Defendant Long stated that Energy Transfer would only be able to meet its much-delayed promise to have ME2 online by the end of third-quarter 2018 by using a pre-existing 1930s-era 12" pipeline for a segment of the route. That is, ME2 could only be brought into service on the promised schedule by *not* being c*ompleted* at all. Defendant Long stated:

> We continue to make progress on the construction of ME2 with 99% of mainline construction complete and 80% of hydro testing complete. In addition, 100% of HDDs are completed, or in process, in line with our approved HDD plan with no more drilling re-evaluation reports required from DEP. The Pennsylvania PUC's commissioners have overturned the prior decision that prevented continued construction in West Whiteman Township. ***To avoid any delays in the ME2 project schedule, we will utilize a section of an existing pipeline in the affected area for initial in-service***. This plan does not require any new permits and we have made all applicable regulatory notification.
>
> As a result, we continue to expect to place ME2 in service by the end of this quarter. ***This will allow us to bring sufficient capacity online to meet all of our initial contractual commitments***. Construction of ME-2X also continues and we expect the pipe to be online in mid-2019.

408.    On the same call, Defendant Ramsey stated: that only "1%" of the pipeline was incomplete and that 1% related solely to 16 incomplete HDD sites. He also stated that "***we feel confident that we'll be finished with ME2 and in service by the end of the third quarter of this year***."

409.    Despite the fact that Defendants had finally disclosed that ME2 could not be completed as planned, a brand-new 350 mile line of 20" diameter pipe, Defendants continued to falsely insist that the modified ME2 would be "completed" by the end of third quarter 2018; that there was minimal work remaining; and that the new arrangement would significantly reduce the overall ME2 throughput because the rate at which NGLs could flow through ME2 was

limited to the lowest flow rate of any section, i.e., by the lower flow rate of the old 12" diameter pipes.

410. Analysts promptly nicknamed Defendants' hodgepodge pipe plan the "Frankenpipe".

411. On August 10, 2018, analysts from Wolfe Research, LLC ("Wolfe") and Wells Fargo Securities, LLC ("Wells Fargo") released reports commenting on Defendants' representations during the August 9, 2018 conference call.

412. Wolfe characterized the August 9, 2018 call as "confusing" and noted that "transparency and disclosure on this project" was "very low." It stated:

> *Mariner East is messier than expected but consistent with our conservative modeling*. Discussion of ME 2 on the call was confusing. We talked to the company afterward. The "interim solution" with re-purposing of pipes is large enough to satisfy contracts plus some walk-up volumes. We estimate this could provide $150M - $250M of EBITDA starting in Q4. However, *ME 2 may not reach full capacity (previously disclosed as 275 mbd) until 4Q19 (one year delay). Due to construction / regulatory issues, the company is using a hodgepodge of different sized pipes that will then be re-worked / upsized over time. A final connection involving a small amount of ME 2 / ME 2x capacity won't be completed until 4Q20.*

413. Wells Fargo corroborated that the August 9, 2018 call had "seemed to confuse the market," and noted that Wells Fargo had followed up to confirm its understanding of the plan. It stated:

> Energy Transfer plans to utilize different diameter NGL pipelines in various segments of Mariner East 2's pipeline route in an effort to bring capacity into service as quickly as possible. Eventually, ME 2 will consist of one 20-inch pipeline and ME 2X will consist of one 16-inch pipeline (ME1 is an 8 inch line). *However, in the interim, smaller diameter pipes (e.g. an existing 12-inch refined products line and a greater amount of smaller 16-inch lines rather than 20-inch) will be used* to allow capacity to be brought online faster. Based on our understanding, partial ME 2 service will begin in *Q3'18 (we estimate roughly 100 MBbls/d of capacity)*, almost full ME 2 / ME 2X service will begin in late Q3'19 (we estimate roughly 475 MBbls/d of capacity), and full ME 2 / ME 2X service will begin in Q3'20 (full 525 MBbls/d of capacity). *In our previous model, we*

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 113

**had assumed full ME 2 service by the end of Q4'18** and full ME 2X service by the end of Q3'19.

414.    The initial capacity of 100 MBLs/d, or 100,000 barrels per day—a figure that Wells Fargo shared with Energy Transfer, and that Energy Transfer did not correct—represented a nearly 65% reduction from the initial capacity Energy Transfer referenced at the 2018 J.P. Morgan Energy Conference just two months earlier.

415.    News of the "Frankenpipe" configuration, the completion delay, and the adverse effect on throughput caused the price of Energy Transfer units to sink over the course of the next several trading days from $18.45 per unit at market close on August 8, 2018, to $17.41 per unit at market close on August 13, 2018, a 5.6% decline.

416.    On October 27, 2018, the Associated Press published "Pipeline ruptures bring new scrutiny to Pennsylvania geology," an expose originally run in the *Pittsburgh Post-Gazette*, which detailed the risks that Pennsylvania's geography and long history of sub-surface mining posed along the pipeline's route. The article further detailed how Defendants had caused Energy Transfer to issue misleading, incomplete, and plainly false statements about those well-known risks, and on how Defendants' misstatements and the Company's rush to build had resulted in preventable tragedies and negative impacts for Pennsylvanians near the route. It stated:

> With a soaking spring and summer, western Pennsylvania has had its share of [landslides] in recent months, including the Sept. 10 slip that ruptured a newly activated natural gas pipeline in Beaver County. The pipeline was built by Energy Transfer Partners.
>
> The resulting explosion burned down a home and brought a new level of alarm to residents near the yet-unfinished Mariner East 2 pipeline - a path that stretches 303 miles across picturesque hills underlain by hundreds of miles of old mines.
>
> **Before construction began, Sunoco, which merged with Texas-based Energy Transfer Partners last year, told Pennsylvania regulators that the chances of its drills running into voids was either "low" or "very low**." The schematic for the horizontal drilling planned to go under [a local family's (the Seamans')] home shows the entire area sits on top of the old Pittsburgh Coal Co.'s Cincinnati Mine.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 114

Opened in 1835, the mine was notorious for one of the worst explosions in the history of the industry, which killed 96 miners and one rescuer in 1913.

Sunoco's drilling work near the couple's Washington County home began May 27, 2017. *The first signs of trouble showed up within the first week.*

Drilling mud came out of the ground in three unexpected places: two near a travel trailer sales parking lot and one just outside the Seamans' home, flowing into a culvert that emptied into the high-quality stream known as Froman Run.

*Sunoco stopped drilling, placed filter socks and straw bales around the spills then carried on.*

On June 10, about 40 gallons of drilling mud oozed out of the ground outside Mingo Presbyterian Church, a 187-year-old building with a bright red roof next to the Seamans' place. A pumper truck was called in to vacuum the spill.

The next day, some 100 gallons of muddy water showed up in an old pump house behind the Seamans' home.

Sunoco dispatched vacuum trucks and stationed someone from the company to sit outside the couple's kitchen window 24 hours a day for weeks, monitoring the old water well to ensure a quick response to subsequent mud spills.

**Deep underground coal mining**

In its initial report to the [PDEP], Sunoco said the spills were likely related to conditions below the surface caused by "historic deep underground coal mining in the area."

When Tetra Tech, the same contractor that had prepared the original spill response plan, was asked to reevaluate the design of drills in the area, *it determined the risk of further spills was inherent to drilling in that spot. It was bound to happen*. "In response to a better understanding of the subsurface geology and degree of fracturing," Sunoco said, it decided to abandon attempts to install the pipeline through horizontal directional drilling - a method of tunneling under obstacles – and to instead use a combination of trenches and shallower, shorter bores. That's when Sunoco cut down the trees on the steep slope in the Seamans' backyard and dug a trench that has remained empty since this summer, save for a large hole filled with muddy water.

The homeowners, meanwhile, wondered: If a pipeline is ever laid there, will it be vulnerable to landslides?

**Rethinking pipeline failures**

So far, spills and mishaps at Sunoco's horizontal drilling sites for the Mariner East 2 pipeline have been examined by regulators from an environmental

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 115

perspective – Did the spill pollute a creek? Did it foul drinking water or cause erosion?

**Those things draw fines and require the company to rethink its processes.**

But the earth's reaction to the pipeline can also be considered from the lens of safety: If the underground rock and soil shifted easily when prodded, will they do so again when a pipeline is installed, pressurized and filled with a highly volatile liquid?

These concerns have been articulated most forcefully by residents in a Philadelphia suburb in Chester County, where attempts to bore underground opened up sinkholes in people's backyards.

What if the ground moves again, they asked Sunoco when its officials were put on the stand at an administrative hearing earlier this year.

State Sen. Andy Dinniman, a Democrat from Chester County who has been the leading political voice against Sunoco, suggested that laying pipelines in karst geology - which exists where limestone has eroded underground and left voids behind - could be unsafe.

John Zurcher, a pipeline safety expert hired by Sunoco to testify at the May 10 hearing, disagreed.

Of all the thousands of miles of transmission lines in Pennsylvania, he said, "I know of no incidents that any one of those pipeline companies have had with subsidence or anything else due to these formations."

Zurcher said he consulted a database of pipeline incidents maintained by the Pipeline & Hazardous Materials Safety Administration before making his claim. **"There's never been a failure of a pipeline in one of these areas caused by geology or a sinkhole or even mining subsidence that we have here in Pennsylvania."**

**Checking the records**

**The PHMSA records, which date back several decades, show more than a dozen such incidents across the country, including in Pennsylvania**…

In the same testimony in which he said that subsidence has never broken a pipeline in this region, Zurcher, who worked as a safety manager at Columbia Gas Transmission from 1997 until 2003, noted seven protective measures that Sunoco had included in its permit to mitigate the risk of earth movement on Mariner East 2.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 116

For example, for areas where there is a risk of subsidence from karst or mining activity, Sunoco's experts suggested keeping the pipe somewhat loose in the bore - not cementing it tightly against the hole.

\*       \*       \*

***Mine-related subsidence has foiled Sunoco's Mariner East 2 drilling plans in several other sites in western Pennsylvania.***

417.   On October 29, 2018, PDEP ordered a subcontractor to immediately stop work on Revolution because of unreported landsides and soil erosion from the pipeline route into waterways. PDEP noted that this was in violation of Chapter 102, and ordered Energy Transfer to provide a detailed plan to control erosion and landslides by November 9, 2018.

418.   This news caused Energy Transfer's unit price to fall from $15.46 per unit at market close on October 26, 2018, to $14.84 per unit on October 29, 2018, the next trading day, a 4% decline.

419.   On December 19, 2018, DA Hogan announced Chester County's investigation into Energy Transfer and its conduct. Hogan stated that "these pipelines rip through the heart of Chester County" and that reports of "not-so-subtle bullying of Chester County citizens by big corporate interests" had reached his office. DA Hogan further stated that the DA office had expected that state regulators and Governor Wolf would "step in and assure the safety of Pennsylvanians. They have not."

420.   In the announcement, DA Hogan also referenced the September 2018 Revolution Explosion. DA Hogan stated that he had visited affected homeowners in West Whiteland, and that he "could see the terrible damage that had been done to their property, and… could see the fear on their faces about what was going on… ***We've gone from hypothetical risk to actual harm***… We want to make sure that anything that happens here in Chester County, people understand they could be liable." He stated that he realized the

jurisdiction of the DA is limited, but that the DA office could make sure that operations complied with all criminal laws. He further stated that he hoped the very fact of the investigation would dissuade further criminal behavior by the company. DA Hogan's announcement of this investigation was widely reported, including by local news *KYW News Radio* and international news *Reuters*.

421.   News of the criminal investigation caused Energy Transfer's unit price to fall from $12.97 per unit at market close on December 19, 2018, to $12.24 per unit at market close on December 21, 2018, a 5.6% decline.

422.   On December 21, 2018, in response to news of DA Hogan's investigation, Defendants caused the Company to issue a press release that falsely denied any wrongdoing on the part of the Company, stating the following:

> We were surprised to learn that the Chester County District Attorney believes there is a legal basis for conducting a criminal investigation into our company and the Mariner East pipelines. ***We vehemently deny any such wrongdoing and we take issue with the many factual inaccuracies*** contained in the District Attorney's press release. We have worked closely with Commonwealth officials and inspectors to respond to citizen concerns as evidenced by the information on our project that is readily available on the PUC and DEP websites. ***We are confident that we have not acted to violate any criminal laws in the Commonwealth of Pennsylvania*** and we are committed to aggressively defending ourselves against these ***baseless*** allegations. We look forward to opening a dialogue with the District Attorney's Office in the hope that we can bring this matter to an appropriate resolution.

423.   On August 8, 2019, DA Hogan arrested and charged two Constables in connection with the investigation into Energy Transfer's misconduct. The arrests were reported in the media that same day. *3 CBS Philly* reported the following:

> Two Pennsylvania constables have been arrested after prosecutors say they improperly used their elected positions for personal profit while working security on the Mariner East Pipeline. The Chester County District Attorney's Office announced the arrests of 47-year-old Kareem Johnson, a constable in Coatesville, and 58-year-old Michael Robel, a constable in Northumberland County, on Thursday.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 118

Prosecutors say Johnson and Robel were hired by a Harrisburg-based company called Raven Knights as private security guards along the construction area of the Mariner East Pipeline in Chester.

The Chester County District Attorney's Office opened a criminal investigation in connection to the Mariner East Pipeline project in December 2018. Investigators say Chester County residents reported that armed security guards identified themselves as state constables on their property…

**"We cannot have elected law enforcement officials hiring themselves out and using their public positions for person[al] profit,"** Chester County District Attorney Chief of Staff Charles Gaza said. "It undermines the integrity and independence of law enforcement and our government."

Johnson and Robel have been charged with official oppression, Ethics Act violations and other related offenses…

"There is a troubling aspect to this investigation that bears note," Chester County District Attorney Tom Hogan said. "[PDEP] is charged with protecting Pennsylvania residents… However **[PDEP] has retained criminal defense lawyers to represent them in this investigation and have insisted that all communications go through those lawyers.**

"Imagine if the West Chester Police Department was investigating a burglary with the DAO [District Attorney's Office] but retained criminal defense lawyers to represent the police department and would only communicate with the DAO through the defense lawyers. In almost 30 years working in the criminal justice system, **I have never seen a state or federal agency retain criminal defense lawyers to communicate with the prosecutors that the agencies were supposed to be helping."**

424.    On the same issue, NPR and another local nonprofit news source reported the following:

DA Thomas Hogan said Michael Robel, 58, of Shamokin in Northumberland County and Kareem Johnson, 47, of Coatesville in Chester County also **violated laws on bribery** when they worked for Raven Knights, a Harrisburg company that was hired by Sunoco to provide security for pipeline construction.

As state constables, the defendants are elected officials who are authorized for tasks including transporting criminal defendants, serving arrest warrants, and in limited circumstances making arrests, Hogan said in a news release.

But he said they are not allowed to hire themselves out as security guards while working as constables, and must declare any income of $1,300 or more…

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 119

According to the complaint, Johnson's ***activities included instructing a freelance journalist not to step into the street at Lisa Drive, where sinkholes opened up during pipeline construction starting in late 2017. The complaint against Robel said he told a plain-clothes detective not to park on a part of Lisa Drive near where Sunoco was working. Robel was wearing a firearm and displayed a state constable badge***, the complaint said…

***The charges include "official oppression," meaning that the defendants were using their status as constables to keep people away from public property where they had a right to be present***, [Hogan's chief of staff, Charles] Gaza said…

425.    News of the arrests caused Energy Transfer's unit price to fall from $14.03 per unit at market close on August 8, 2019, to $13.38 per unit on August 12, 2019, a 4.6% decline.

426.    Following the arrests, Defendants caused the Company to release a statement which falsely claimed that Energy Transfer had no association with the Constables who had been arrested. Spokesperson Lisa Coleman stated:

Constables Johnson and Robel ***were not Sunoco or Energy Transfer employees***. They were employed by Raven Knights, who provided security services and personnel. ***We have a code of conduct for all of [our] contractors and third party vendors that clearly states what are acceptable behaviors and business practices, and we expect our contractors and their employees to adhere to that.***

427.    This was materially false and misleading because in fact, Defendants had caused Energy Transfer to enact an "unwritten policy" of hiring "on duty" law enforcement personnel to provide private security for pipeline projects, including ME2, in direct and knowing violation of the Code of Conduct the Defendants purported to follow, a knowingness demonstrated by the extensive efforts taken to conceal payments to and association with the Constables.

428.    On November 12, 2019, the *Associated Press* published a report on its website titled, "FBI eyes how Pennsylvania approved pipeline."  The report revealed to the public that the FBI had begun a corruption investigation into Governor Wolf's administration in connection with the ME2 permits, stating the following:

HARRISBURG, Pa. (AP) — The FBI has begun a corruption investigation into how Gov. Tom Wolf's administration came to issue permits for construction on a

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 120

multibillion-dollar pipeline project to carry highly volatile natural gas liquids across Pennsylvania, The Associated Press has learned.

FBI agents have interviewed current or former state employees in recent weeks about the Mariner East project and the construction permits, according to three people who have direct knowledge of the agents' line of questioning.

All three spoke on condition of anonymity because they said they could not speak publicly about the investigation.

The focus of the agents' questions involves the permitting of the pipeline, whether Wolf and his administration forced environmental protection staff to approve construction permits and whether Wolf or his administration received anything in return, those people say.

The Mariner East pipelines are owned by Texas-based Energy Transfer LP, a multibillion-dollar firm that owns sprawling interests in oil and gas pipelines and storage and processing facilities. At a price tag of nearly $3 billion, it is one of the largest construction projects, if not the largest, in Pennsylvania history.

However, the construction has spurred millions of dollars in fines, several temporary shutdown orders, lawsuits, protests and investigations. When construction permits were approved in 2017, environmental advocacy groups accused Wolf's administration of pushing through incomplete permits that violated the law.

429.    The *Philadelphia Inquirer* also reported on the FBI investigation, stating the

following in a November 12, 2019 report:

The FBI is investigating how Gov. Tom Wolf's administration issued construction permits for the $5.1 billion Mariner East project, the latest official inquiry into the contentious cross-state pipeline project that carries highly volatile gas liquids to a Delaware River export terminal.

***The federal probe has been running for at least six months*** and started in response to similar inquiries launched in the last year by the district attorneys of Delaware and Chester Counties as well as state Attorney General Josh Shapiro, according to three sources who spoke on the condition of anonymity because they were not authorized to publicly discuss the case.

The FBI's investigation, first reported by *The Associated Press*, has focused on ***whether Wolf administration officials forced staff of the [PDEP] to ignore shortcomings and approve the pipeline's construction permits, according to the sources, who include current and former Wolf administration officials***. A fourth source described the investigation as being in its preliminary stages…

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 121

Chester County District Attorney Thomas P. Hogan, who launched the first criminal probe of the pipeline's construction last year, said Tuesday **he has three prosecutors forging ahead**. He welcomed news of the FBI's involvement. "It doesn't impact our investigation, which has been going full steam ahead," he said. "However, it's always good to see federal authorities bringing their resources to the table in an investigation of this complexity and magnitude."

430. On this news, the price of Energy Transfer's units dropped by approximately 6.77% over the course of the next two trading sessions, from $11.97 per unit at the close of trading on November 11, 2019, to $11.16 per unit at the close of trading on November 13, 2019.

431. On November 13, 2019, the Allegheny Front published an article commenting on the Associated Press report published the prior day and on the implications of the FBI's investigation, stating the following:

Mariner East 2 went into service in December 2018. It has a long track record of drilling mud spills, fines and regulatory shutdowns. As of August, the [PDEP] had entered into several consent orders and agreements with the company resulting from permit violations, and issued just under 100 separate notices of violations resulting in more than $13 million in penalties.

\*       \*       \*

Rich Raiders, an eminent domain attorney who has represented landowners fighting the pipeline, called the FBI's investigation a "major development." He said people have been concerned that "political actors" got involved in the permitting process.

"The fact that the FBI is involving itself in this matter tells me that a lot of the questions the citizens have been raising over time have some merit or potentially have some merit," Raiders said. "The permitting process seemed to be unusual in that the questions being asked by the agency in the late 2016 deficiency letters never seemed to get answered."

432. On November 14, 2019, an industry news source, SNL Energy's *Daily Gas Report,* stated:

**Energy Transfer LP shares saw their highest volume of trading since April 2016 as investors reacted to reports that the FBI is investigating Pennsylvania's permitting of subsidiary Sunoco Pipeline LP's Mariner East family of NGL pipelines.**

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 122

More than 55.6 million Energy Transfer units traded hands Nov. 13, with the stock price down nearly 4.3% to $11.16 per share.

FBI agents interviewed current or former state employees about the construction permits granted to Sunoco and whether Gov. Tom Wolf or members of his administration pressured environmental regulators to move the permits along, The Associated Press reported Nov. 12. The agents are also trying to find out whether Wolf or his administration gained anything in return for approving the permits, the report said.

***The Mariner East 2 pipeline project, which has had a string of problems with construction, is operating at a reduced capacity, moving NGLs to a shipping terminal in Marcus Hook, Pa., for export for producers.*** The line takes NGLs from Ohio, West Virginia and western Pennsylvania to Marcus Hook, on the Delaware River near Philadelphia.

Mariner East 1 was shut down for three months earlier in the year after a sinkhole was found in a community in Chester County.

433.    On December 3, 2019, DA Hogan's office followed up on the earlier charges against Constables employed as private security with charges against Energy Transfer's head of security for the Mariner East System, Recknagel, and four individuals associated with security contractors TigerSwan and Ravens Knight. These serious criminal charges included bribery, conspiracy, dealing in proceeds of an unlawful activity, violations of the Pennsylvania Constables Act, and violations of the Pennsylvania Ethics Act. DA Hogan's office issued a press release, which stated:

This is a pretty simple case. State Constables sold their badges and official authority. Energy Transfer bought those badges and authority, then used them as a weapon to intimidate citizens. And the defendants attempted to conceal their activity through a maze of companies and payments.

*         *         *

Energy Transfer decided they needed security for the pipeline. ***However, rather than simply hiring a private security firm, Energy Transfer decided to recruit and hire armed Pennsylvania Constables to act as a private security force for the pipeline.*** Pennsylvania Constables are elected officials, who are permitted to carry out enumerated official duties, and are governed by the Pennsylvania Ethics Act. ***Pennsylvania State Constables are not permitted to use their official position or badges for private security jobs.***

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 123

434.   Although Defendants no longer claimed that the Company had not hired the Constables, as they had when DA Hogan brought charges against the Constables, Defendants continued to misleadingly claim that the Company's employment of constables had been aboveboard. As the *Philadelphia Inquirer* stated in a December 3, 2019 article:

> Vicki A. Granado, **a spokesperson for Energy Transfer Partners, said . . . local law enforcement officials did not object to the company's plan to hire constables** when it was discussed with them. **Later Tuesday, West Whiteland Township police said they were unaware that the company had hired constables for security. Energy Transfer, they said, told them the company had hired a private security firm.**

435.   News of the charges against Recknagel and the security contractors caused Energy Transfer's unit price to fall from $11.63 per unit at market close on December 2, 2019, to $11.40 per unit at market close on December 3, 2019, a decline of 2%.

436.   On January 27, 2020, the Guardian published an article commenting on the current state of affairs regarding the ME2 permits and the FBI's investigation, and further highlighting the dubiousness of the permit approvals in light of the controversies and misconduct surrounding the pipeline.[12]  The article stated the following, in relevant part:

> Sam Rubin, from Food and Water Watch, said: "There have been questions about the quality of the permits since they were granted in 2014 … there is a pattern of malfeasance that is established and known which was overlooked when permits were granted by the DEP and Wolf administration."
>
> *       *       *
>
> Still, the project is also subject to criminal and civil investigations, which include:
>
> - A FBI corruption investigation into Wolf's administration handling of the permit process.
>
> - State and county investigations into alleged corruption, criminal misconduct and environmental crimes.

---

[12]    https://www.theguardian.com/us-news/2020/jan/27/pennsylvania-residents-mariner-east-pipelines-drinking-water-contamination (last visited July 29, 2020).

- At the end of 2019, security personnel working with Energy Transfer were charged with bribery and criminal conspiracy for allegedly recruiting, hiring, and hiding payments to state police officers. The company says the charges have no merit.

- A homeowner is suing Sunoco, claiming its drilling punctured the aquifer supplying his water well and led to E coli contamination that made him ill[.]

- Residents who live close to the pipeline – known as the Safety Seven – have an ongoing case with the regulator, the PUC, to shut down the project on the grounds it poses unacceptable safety risks, and the company has failed to develop a credible evacuation plan.

## DAMAGES TO ENERGY TRANSFER

437.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer will lose and expend many millions of dollars.

438.    These expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

439.    These expenditures also include, but are not limited to, any fees associated with the FBI's corruption investigation, the Chester County District Attorney's investigation, the Delaware County District Attorney's investigation, the Pennsylvania Attorney General's investigation, the U.S. Attorney for the Western District of Pennsylvania's investigations, and any other governmental, regulatory, or criminal investigations or proceedings initiated in connection with the Pipeline Misconduct, as well as additional costs caused by stop work injunctions and other regulatory delays.

440.    Additionally, these costs include the "historic" $12.6 million and $30.6 million fines from PDEP, as well as many millions of dollars in other fines and cost from PDEP, WCCD, and other governmental, regulatory, or criminal investigations or proceedings initiated

in connection with the Company's environmental misconduct, and amounts and settlements paid out to parties affected by Defendants' misconduct, such as the $800,000 spent to purchase just two of the Lisa Drive homes that suffered severe sinkholes.

441.    These expenditures further include costs related to the civil litigation brought by affected parties such as the Lisa Drive homeowners' suit, State Senator Dinniman and environmental advocates' suits, and suits brought by customers including EdgeMarc and PennEnergy.

442.    As a direct and proximate result of the General Partner and the Individual Defendants' conduct, Energy Transfer has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

443.    Plaintiffs bring this action derivatively and for the benefit of Energy Transfer to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as general partner and directors and/or officers of Energy Transfer, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof.

444.    Energy Transfer is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

445.    Plaintiffs are, and have been at all relevant times, unitholders of Energy Transfer. Plaintiffs will adequately and fairly represent the interests of Energy Transfer in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 126

## DEMAND FUTILITY ALLEGATIONS

446.    Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

447.    A pre-suit demand on the General Partner is futile and, therefore, excused. Demand is excused as to the General Partner because Defendant LE GP faces a significant likelihood of liability as a result of its knowing engagement in the Pipeline Misconduct and the scheme to cause the Company to make false and misleading statements and omissions of material fact to the investors and the general public that falsely represented the Company's performance and value. As the primary controller and beneficiary of the above-alleged schemes, the General Partner benefited at the expense of the Company. As the General Partner breached its fiduciary duties to the Company, it faces a substantial likelihood of liability, and it is not independent or disinterested, and thus demand on the General Partner is futile.

448.    Additionally, as the Company admitted in its 2019 10-K, the General Partner and its affiliates have conflicts of interests, which may cause them to favor their own interests to the detriment of the Company and its unitholders. The 2019 10-K stated the following:

> Conflicts of interest may arise among our general partner and its affiliates, on the one hand, and us, on the other hand. As a result of these conflicts, our general partner may favor its own interests and the interests of its affiliates over our interests.

449.    As a result of the foregoing, the General Partner breached its fiduciary duties, faces a substantial likelihood of liability in this Action, is not disinterested, and demand upon it is futile, and thus excused.

450.    Additional reasons that demand on the General Partner is futile follow.

451.    First, all of the directors on the Board of the General Partner have fiduciary duties to the General Partner, and in controlling the General Partner, they would cause it not to

consider a demand fairly because granting the demand would damage it.

452.    Second, the majority of the Board of the General Partner is not independent or disinterested, as each of them either knowingly or recklessly participated in the conduct alleged herein, in complete abdication of their fiduciary duties to the Company, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the General Partner. At the time of filing of this action, the Board of directors of the General Partner consisted of Defendants Warren, Long, McReynolds, McCrea, Ramsey, Anderson, Brannon, Davis, Grimm, and Washburne (the "Director-Defendants"), along with non-party James R. (Rick) Perry (together, the "Directors"). The Pipeline Projects were of enormous financial importance to the Company, and were intensely scrutinized by investors and by the media during the Relevant Period. As such, each of the Director-Defendants—who held themselves out as knowledgeable with respect to the Company's business and operations—certainly would have been fully aware of the Pipeline Misconduct and the other highly material, yet undisclosed issues with the Pipeline Projects described herein.

453.    Additional reasons that Defendant Warren is not independent or disinterested follow. Defendant Warren is a co-founder of the Company, and has served as the General Partner's Chairman and CEO since 2007. He is also the majority owner of the General Partner. Thus, as the Company admits, he is a non-independent director. Defendant Warren was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, all of which he signed or authorized the signing of. As the General Partner's highest officer and as a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 128

reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Warren is a defendant in the Securities Class Action. For these reasons, Defendant Warren breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

454.   Additional reasons that Defendant Long is not independent or disinterested follow. Defendant Long has served as the General Partner's CFO since February 2016, and has served as a director of the General Partner since April 2019. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant Long with his principal occupation, and he receives handsome compensation, including $6,609,967 in 2018 and $4,845,208 in 2019 for his services. As such, Defendant Long is beholden to the General Partner. As the General Partner's CFO and as a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Long signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant Long is a defendant in the Securities Class Action.  For these reasons, Defendant Long breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

455.   Additional reasons that Defendant McReynolds is not independent or disinterested follow. Defendant McReynolds served as the President of the General Partner from March 2005 until October 2018, on which date he became Special Advisor to the General

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 129

Partner. He has also served as a director of the General Partner since August 2005. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant McReynolds with his principal occupation, and he receives handsome compensation, including $1,422,273 in 2018 for his services. As such, Defendant McReynolds is beholden to the General Partner. As the General Partner's President and as a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McReynolds signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant McReynolds is a defendant in the Securities Class Action. For these reasons, Defendant McReynolds breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

456.    Additional reasons that Defendant McCrea is not independent or disinterested follow. Defendant McCrea has served as the President and CCO of the General Partner since October 2018, and has served as a director of the General Partner since December 2009. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant McCrea with his principal occupation, and he receives handsome compensation, including $10,780,120 in 2018 and $11,601,341 in 2019 for his services. As such, Defendant McCrea is beholden to the General Partner. As the General Partner's President and CCO, and as a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his

duties to protect corporate assets. Furthermore, Defendant McCrea signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant McCrea is a defendant in the Securities Class Action. For these reasons, Defendant McCrea breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

457.    Additional reasons that Defendant Ramsey is not independent or disinterested follow. Defendant Ramsey has served as the COO of the General Partner since October 2018, and has served as a director of the General Partner since July 2012. Thus, as the Company admits, he is a non-independent director. The General Partner provides Defendant Ramsey with his principal occupation, and he receives handsome compensation, including $4,400,195 in 2018 and $4,715,743 in 2019 for his services. As such, Defendant Ramsey is beholden to the General Partner. As the General Partner's COO and as a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Ramsey signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. Moreover, Defendant Ramsey is a defendant in the Securities Class Action. For these reasons, Defendant Ramsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

458.    Additional reasons that Defendant Anderson is not independent or disinterested follow. Defendant Anderson has served as a director of the General Partner since June 2018.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 131

Defendant Anderson has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Anderson signed, and thus personally made the false and misleading statements in the 2018 10-K.  For these reasons, Defendant Anderson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

459.    Additional reasons that Defendant Brannon is not independent or disinterested follow. Defendant Brannon has served as a director of the General Partner since March 2016. Defendant Brannon has received and continues to receive compensation for his roles with the Company as described above. As a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Brannon signed, and thus personally made the false and misleading statements in the 2016 10-K, the 2017 10-K, and the 2018 10-K. For these reasons, Defendant Brannon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

460.    Additional reasons that Defendant Davis is not independent or disinterested follow.  Defendant Davis is a co-founder of the Company, and has served as a director of the General Partner since July 2018.  Defendant Davis has received and continues to receive

compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.  Furthermore, Defendant Davis signed, and thus personally made the false and misleading statements in the 2018 10-K.  For these reasons, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

461.   Additional reasons that Defendant Grimm is not independent or disinterested follow. Defendant Grimm has served as a director of the General Partner since October 2018. Defendant Grimm has received and continues to receive compensation for his roles with the Company as described above.  As a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Grimm signed, and thus personally made the false and misleading statements in the 2018 10-K. For these reasons, Defendant Grimm breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

462.   Additional reasons that Defendant Washburne is not independent or disinterested follow.  Defendant Washburne has served as a director of the General Partner since April 2019. As a trusted Director, he conducted little, if any, oversight of the Pipeline Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 133

such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets.   For these reasons, Defendant Washburne breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus would not cause the General Partner to consider a demand fairly.

463.   Additional reasons that the Director-Defendants are not independent or disinterested follow.

464.   The Directors-Defendants control the General Partner and have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently.

465.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting, of the Company's engagement in the Pipeline Misconduct, of the scheme to issue materially false and misleading statements to the public, and of the scheme to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In violation of the Code of Conduct, the Director-Defendants failed to comply with the law.   Thus, the Director-Defendants face a substantial likelihood of liability and are not independent or disinterested.

466.   In violation of the Code of Ethics, Defendants Warren and Long conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the scheme to allow the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross

mismanagement, and waste of corporate assets.  In violation of the Code of Ethics, Defendants Warren and Long failed to comply with the law. Thus, Defendants Warren and Long face a substantial likelihood of liability and are not independent or disinterested.

467.    Energy Transfer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the General Partner has not filed any lawsuits against itself or others who were responsible for that wrongful conduct to attempt to recover for Energy Transfer any part of the damages Energy Transfer suffered and will continue to suffer thereby. Thus, any demand upon the General Partner would be futile.

468.    The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's Partnership Agreement (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to cause the General Partner to pursue this action on behalf of the unitholders of the Company.

469.    The acts complained of herein constitute violations of fiduciary duties owed by the General Partner and its officers and directors, and these acts are incapable of ratification.

470.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the unitholders of Energy Transfer.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that

eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to cause the General Partner to sue themselves or certain of the officers of the General Partner, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to cause the General Partner to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the General Partner is futile and, therefore, excused.

471.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause General Partner to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

472.     Thus, for all of the reasons set forth above, the General Partner cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the General Partner is excused as futile.

## FIRST CLAIM

### Against Defendants for Breach of Fiduciary Duties

473.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

474.     Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Energy Transfer's business and affairs.

475.     Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

476.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Energy Transfer.

477.    In breach of their fiduciary duties owed to Energy Transfer, Defendants willfully or recklessly caused the Company to make use of permits that were obtained through the use of coercion, bribery, or other improper methods, and make false and misleading statements and omissions of material fact that that failed to disclose, *inter alia*, that: (i) the construction permits issued by PDEP in connection with the ME2 and ME2X were obtained by the Company through the use of coercion, bribery, or other improper methods; (ii) construction of the Company's pipelines was not conducted in conformity with the Company's permits and violated both the permits and applicable laws and regulations; (iii) the Company had in place an "unwritten policy" to hire on-duty law enforcement officials to provide private security for its Pipeline Projects, which constituted bribery and violated numerous laws; (iv) the foregoing misconduct substantially increased the risk that the Company would be subjected to material investigations and/or litigation commenced by government authorities and others; and (v) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

478.    Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

479.    Also in breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

480.    Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Energy Transfer's units and benefitting third parties.

481.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

482.    As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Energy Transfer has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

483.    Plaintiffs on behalf of Energy Transfer have no adequate remedy at law.

## SECOND CLAIM

### Against Defendants for Unjust Enrichment

484.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

485.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Defendants were unjustly enriched at the expense of, and to the detriment of, Energy Transfer.

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 138

486.    The Defendants either benefitted financially from the improper conduct, including from the receipt of bonuses, unit options, or similar compensation from the General Partner that was tied to the performance or artificially inflated valuation of Energy Transfer, or received compensation that was unjust in light of the Defendants' bad faith conduct.

487.    Plaintiffs, as unitholder and representatives of Energy Transfer, seek restitution from the Defendants and seek an order from this Court disgorging all profits, including from benefits and other compensation, including any performance-based or valuation-based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

488.    Plaintiffs on behalf of Energy Transfer have no adequate remedy at law.

## THIRD CLAIM

### Against Defendants for Abuse of Control

489.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

490.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Energy Transfer, for which they are legally responsible.

491.    As a direct and proximate result of Defendants' abuse of control, Energy Transfer has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Energy Transfer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

492.    Plaintiffs on behalf of Energy Transfer have no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants for Gross Mismanagement

493.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

494.    By its actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Energy Transfer in a manner consistent with the operations of a limited partnership.

495.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Energy Transfer has sustained and will continue to sustain significant damages.

496.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

497.    Plaintiffs on behalf of Energy Transfer have no adequate remedy at law.

## FIFTH CLAIM

### Against Defendants for Waste of Corporate Assets

498.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

499.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public unitholders, Defendants have caused Energy Transfer to waste valuable corporate assets, to incur many millions of dollars of regulatory fines (including, inter alia, the largest single fine *ever* levied by the DEP), to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 140

financing from investors and business from future customers who no longer trust the Company and its products.

500.    As a result of the waste of corporate assets, the Defendants are each liable to the Company.

501.    Plaintiffs on behalf of Energy Transfer have no adequate remedy at law.

## SIXTH CLAIM

**Against Defendants Warren, Long, McReynolds, McCrea, and Ramsey for Contribution Under Sections 10(b) and 21D of the Exchange Act**

502.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

503.    Energy Transfer, along with Defendants Warren, Long, McReynolds, McCrea, and Ramsey are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Warren, Long, McReynolds, McCrea, and Ramsey's willful and/or reckless violations of their obligations as officers and directors of Energy Transfer.

504.    Through their positions of control and authority as officers and directors of Energy Transfer, Defendants Warren, Long, McReynolds, McCrea, and Ramsey were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

505.    As such, Defendants Warren, Long, McReynolds, McCrea, and Ramsey are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and

Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

506.    Accordingly, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Warren, Long, McReynolds, McCrea, and Ramsey.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Energy Transfer, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Defendants have breached their fiduciary duties to Energy Transfer;

(c)    Determining and awarding to Energy Transfer the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Energy Transfer and the Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Energy Transfer and its unitholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for unitholder vote the following resolutions for amendments to the Company's Partnership Agreement and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen Defendant LE GP's Board's supervision of operations and develop and implement procedures for greater unitholder input into the policies and guidelines of the Board;

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 142

2.       a provision to permit the unitholders of Energy Transfer to nominate at least six candidates for election to the Board; and

3.       a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)       Awarding Energy Transfer restitution from Defendants, and each of them;

(f)       Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)       Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: September 8, 2020                    Respectfully submitted,

                                            **STECKLER GRESHAM COCHRAN PLLC**


                                            */s/ R. Dean Gresham*
                                            R. Dean Gresham
                                            State Bar No.: 24027215
                                            12720 Hillcrest Road, Suite 1045
                                            Dallas, Texas 75230
                                            Telephone: (972) 387-4040
                                            Facsimile: (972) 387-4041
                                            Email: dean@stecklerlaw.com

                                            *Liaison Counsel for Plaintiffs Bettiol and King and*
                                            *[Proposed] Liaison Counsel for Plaintiffs*

                                            **THE BROWN LAW FIRM, P.C.**
                                            Timothy Brown
                                            240 Townsend Square

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 143

Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Lead Counsel for Plaintiffs*

**PAWAR LAW GROUP, P.C.**
Vik Pawar
20 Vesey Street, Suite 1410
New York, NY 10007
Telephone: (212) 571-0805
Facsimile: (212) 571-0938
Email: vik@pawarlaw.com

*Counsel for Plaintiff King*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on Defendants' counsel

of record via the Court's Electronic Case Filing system on this the 9th day of September, 2020.

*/s/ R. Dean Gresham*
R. Dean Gresham

**VERIFIED CONSOLIDATED AMENDED UNITHOLDER DERIVATIVE COMPLAINT** – Page 144